**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JEFFERSON WAYNE SCHRADER, et al., | ) |
| | ) Case No. 10-CV-1736-RMC |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| ERIC HOLDER, et al., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS AND IN SUPPORT OF
PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

**COME NOW** the Plaintiffs, Jefferson Schrader and the Second Amendment Foundation,

Inc., by and through undersigned counsel, and submit their Memorandum of Points and

Authorities in Opposition to Defendants' Motion to Dismiss and in Support of Plaintiffs' Cross-

Motion for Summary Judgment.

Dated: March 11, 2011          Respectfully submitted,

Alan Gura (D.C. Bar No. 453449)
Thomas M. Huff (D.C. Bar No. 978294)
Gura & Possessky, PLLC
101 N. Columbus Street, Suite 405
Alexandria, VA 22314
703.835.9085/Fax 703.997.7665

By:  /s/Alan Gura_____
Alan Gura

Attorneys for Plaintiffs

# TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

A.    The Relevant Federal Legislative Framework. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

B.    Plaintiffs Jefferson Schrader and Second Amendment Foundation.. . . . . . . . . . . . . . . . . 6

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.    THIS COURT HAS SUBJECT MATTER JURISDICTION OVER ALL CLAIMS. . . . . 8

      A.    Plaintiff Schrader has standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      B.    Plaintiff Second Amendment Foundation has standing. . . . . . . . . . . . . . . . . . . . 13

II.   FEDERAL LAW DOES NOT PROHIBIT ORDINARY COMMON LAW
      MISDEMEANANTS FROM POSSESSING FIREARMS. . . . . . . . . . . . . . . . . . . . . . 16

      A.    The Text Of The Federal Felon-In-Possession Statute Demonstrates That
            Uncodified Common Law Misdemeanor Offenses—Which Are Not
            "Punishable" By Any Specified Statutory Criteria—Do Not Constitute
            Disqualifying Offenses.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      B.    The Government's Reading Of The Felon-In-Possession Statute
            Fundamentally Alters Its Structure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      C.    Legislative History Confirms That The Government's Reading of the Felon-
            In-Possession Statute Was Not Contemplated By The Enacting Congress. . . . . . 21

      D.    The Fourth Circuit's Approach. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

      E.    The Rule Of Lenity Further Confirms That Common Law Misdemeanor
            Convictions Do Not Trigger The Felon-In-Possession Statute. . . . . . . . . . . . . . 25

      F.    Even Assuming The Government's Reading, Schrader's Federal Prohibition
            Was Lifted When Maryland Statutorily Restored His State Civil Rights. . . . . . . 26

III.   THE IMPOSITION OF A FIREARMS BAN ON ORDINARY COMMON LAW
       MISDEMEANANTS VIOLATES THE SECOND AMENDMENT. . . . . . . . . . . . . . . 29

       A.   *Heller* Changed The Doctrinal Framework For Analyzing Government
            Action Implicating The Right To Keep And Bear Arms. . . . . . . . . . . . . . . . . . . 29

            1.   The Supreme Court's decisions in *Heller* and *McDonald*. . . . . . . . . . . . 29

            2.   The applicable doctrinal framework. . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

       B.   Schrader's Core Second Amendment Rights Are Implicated By The
            Government's Application Of The Felon-In-Possession Ban. . . . . . . . . . . . . . . 33

       C.   The Application Of 18 U.S.C. § 922(g)(1) To Schrader Cannot Survive
            Independent Review Under Any Appropriate Level Of Scrutiny. . . . . . . . . . . . 33

            1.   A complete firearms ban applied to an ordinary common law
                 misdemeanant like Schrader cannot survive strict scrutiny—the
                 appropriate level of Second Amendment scrutiny. . . . . . . . . . . . . . . . . . . 33

                 a.   The core of the right to keep and bear arms is fundamental
                      and entitled to strict scrutiny review. . . . . . . . . . . . . . . . . . . . . . . 33

                 b.   Violent felons were historically outside the protective scope of
                      the right to keep and bear arms; *Heller*'s dictum concerning the
                      presumed constitutionality of felon dispossession laws is
                      entirely consistent with strict scrutiny. . . . . . . . . . . . . . . . . . . . . . 35

                 c.   A complete firearms ban applied to an ordinary common law
                      misdemeanant like  Schrader cannot survive strict
                      scrutiny review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

            2.   A complete firearms ban applied to an ordinary common law
                 misdemeanant like  Schrader also fails review under intermediate
                 scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

# TABLE OF AUTHORITIES

## Cases

*Abbott* v. *United States*,
131 S. Ct. 18 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Aetna Life Insurance Co.* v. *Haworth*,
300 U.S. 227 (1937). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Animal Legal Def. Fund* v. *Glickman*,
154 F.3d 426 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Ashcroft* v. *ACLU*,
542 U.S. 656 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Bach* v. *Pataki*,
408 F.3d 75 (2nd Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Baily* v. *United States*,
516 U.S. 137 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Bd. of Trs.* v. *Fox*,
492 U.S. 469 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Bloate* v. *United States*,
130 S. Ct. 1345 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Britt* v. *State*,
363 N.C. 546 (N.C. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Caron* v. *United States*,
524 U.S. 308 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Carr* v. *United States*,
130 S. Ct. 2229 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Castillo* v. *United States*,
530 U.S. 120 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Clark* v. *Jeter*,
486 U.S. 456 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Cutaiar* v. *Marshall*,
    590 F.2d 523 (3d. Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Deal* v. *United States*,
    508 U.S. 129 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Dickerson* v. *New Banner Institute, Inc.*,
    460 U.S. 103 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*District of Columbia* v. *Heller*,
    554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9, 25, 29-31, 34, 35, 38, 42

*Fair Employment Council* v. *BMC Mktg. Corp.*,
    28 F.3d 1268 (D.C. Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Franchise Tax Bd. of California* v. *Constr. Laborers Vacation Trust*,
    463 U.S. 1 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Fraternal Order of Police* v. *United States*,
    152 F.3d 998 (D.C. Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Gonzales* v. *O Centro Espirita Beneficente Uniao do Vegetal*,
    546 U.S. 418 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Green* v. *Bock Laundry Mach. Co.*,
    490 U.S. 504 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Grid Radio* v. *FCC*,
    278 F.3d 1314 (D.C. Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Grosjean* v. *American Press Co., Inc.*,
    297 U.S. 233 (1936). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Grutter* v. *Bollinger*,
    539 U.S. 306 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Haitian Refugee Ctr.* v. *Gracey*,
    809 F.2d 794 (D.C. Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Havens Realty Corp.* v. *Coleman*,
    455 U.S. 363 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Heller* v. *District of Columbia*,
     698 F. Supp. 2d 179 (D.D.C. 2010) ("*Heller II*"). . . . . . . . . . . . . . . . . . . . . . 30-32, 35, 42

*Hickman* v. *State*,
     193 Md. App. 238 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Hodgkins* v. *Holder*,
     677 F. Supp. 2d 202 (D.D.C. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15

*Johnson* v. *United States*,
     130 S. Ct. 1265 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 24, 38

*King* v. *St. Vincent's Hospital*,
     502 U.S. 215 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Lewis* v. *United States*,
     445 U.S. 55 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Logan* v. *United States*,
     552 U.S. 23 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 27, 40

*Marbury* v. *Madison*,
     5 U.S. (1 Cranch.) 137 (1803). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*McDonald* v. *City of Chicago*,
     130 S. Ct. 3020 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 34, 35

*New York* v. *Ferber*,
     458 U.S. 747 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Ord* v. *District of Columbia*,
     587 F.3d 1136 (D.C. Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Parents Involved in Cmty. Sch.* v. *Seattle Sch. Dist. No. 1*,
     551 U.S. 701 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Parker* v. *District of Columbia*,
     478 F.3d 370 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11

*Planned Parenthood* v. *Casey*,
     505 U.S. 833 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Reno* v. *Flores*,
    507 U.S. 292, 302 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Robinson* v. *State*,
    353 Md. 683 (Md. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Scarborough* v. *United States*,
    431 U.S. 563 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Scarborough* v. *United States*,
    431 U.S. 563 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Simms* v. *State*,
    288 Md. 712 (Md. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Small* v. *United States*,
    544 U.S. 385 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 22

*State of Wisconsin* v. *Schultz*,
    No. 10-CM-138, slip. op. (Wis. Ct. App. Oct. 12, 2010). . . . . . . . . . . . . . . . . . . . 32

*State* v. *Langlands*,
    276 Ga. 721 (Ga. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United Food & Commercial Workers Union Local 751* v. *Brown Group, Inc.*,
    517 U.S. 544 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States* v. *Barton*,
    2011 U.S. App. LEXIS 4111, No. 09-2211 (3d Cir. Mar. 4, 2011). . . . . . . . . . . . . . 4, 40

*United States* v. *Bass*,
    404 U.S. 336 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 26

*United States* v. *Batchelder*,
    442 U.S. 114 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States* v. *Bost*,
    87 F.3d 1333 (D.C. Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*United States* v. *Carolene Prod. Co.*,
    304 U.S. 144 (1938). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States* v. *Chester*,
    628 F.3d 673 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 31, 32, 42

*United States* v. *Coleman*,
    158 F.3d 199 (4th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States* v. *El*,
    5 F.3d 726 (4th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States* v. *Emerson*,
    270 F.3d 203 (5th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States* v. *Engstrum*,
    609 F. Supp. 2d 1227 (D. Utah 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States* v. *Hartwell*,
    73 U.S. 385 (1868). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States* v. *Hayes*,
    129 S. Ct. 1079 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 19, 20, 24

*United States* v. *Logan*,
    453 F.3d 804 (7th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States* v. *Marzzarella*,
    614 F.3d 85 (3d Cir. 2010).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32

*United States* v. *McKenzie*,
    99 F.3d 813 (7th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States* v. *Miller*,
    307 U.S. 174 (1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States* v. *Playboy Entm't Group*,
    529 U.S. 803 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States* v. *Reese*,
    627 F.3d 792 (10th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32

*United States* v. *Rene E.*,
    583 F.3d 8 (1st Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States* v. *Schultheis,*
    486 F.2d 1331 (4th Cir. 1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*United States* v. *Skoien,*
    587 F.3d 803 (7th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 35, 39

*United States* v. *Skoien,*
    614 F.3d 638 (7th Cir. 2010) (en banc). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States* v. *Tagg,*
    572 F.3d 1320 (11th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States* v. *Virginia,*
    518 U.S. 515 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States* v. *White,*
    593 F.3d 1199 (11th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States* v. *Williams,*
    616 F.3d 685 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 38

*Village of Arlington Heights* v. *Metro. Hous. Dev. Corp.,*
    429 U.S. 252 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Warth* v. *Seldin,*
    422 U.S. 490 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Washington* v. *Glucksberg,*
    521 U.S. 702 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Watt* v. *Energy Action Educ. Found.,*
    454 U.S. 151 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Woollard* v. *Sheridan,* ___ F. Supp. 2d __,
    2010 U.S. Dist. LEXIS 137031 at *2 n.1 (D. Md. Dec. 29, 2010). . . . . . . . . . . . . . . . 14

## Constitutional Provisions

U.S. Const. amend. II. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## Federal Statutes

18 U.S.C. § 921(a)(20). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 27, 28

18 U.S.C. § 921(a)(20)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 16

18 U.S.C. § 921(a)(33)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

18 U.S.C. § 922(g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6

18 U.S.C. § 922(g)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 5, 8, 14-16, 33, 40

18 U.S.C. § 922(g)(9). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5, 19

18 U.S.C. § 924(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 26

18 U.S.C. § 924(e)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

18 U.S.C. § 925(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

18 U.S.C. § 925A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

28 U.S.C. § 2201(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## State Statutes

Md. Ann. Code Art. El, § 5-202. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Md. Const. Art. 1 § 12. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Md. Courts And Judicial Proceedings Code Ann. § 8-103. . . . . . . . . . . . . . . . . . . . . 28

Md. Criminal Law Code Ann. § 10-201. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Md. Criminal Law Code Ann. § 3-202. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Md. Criminal Law Code Ann. § 3-203. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Md. Public Safety Code Ann. § 5-101. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Md. Public Safety Code Ann. § 5-101. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Md. Public Safety Code Ann. § 5-133. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Md. Public Safety Code Ann. § 5-133. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## Other Authorities

114 Cong. Rec. 14773 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Adam Winkler, *Heller's Catch 22*,
    56 UCLA L. REV. 1551 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

BLACK'S LAW DICTIONARY (9th ed., 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 16, 17

C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*,
    32 HARV. J.L. & PUB. POL'Y 695 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and*
    *Criminological Considerations*, 60 HASTINGS L.J. 1339 (2009). . . . . . . . . . . . . . . . . 37

Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the*
    *Second Amendment*, 82 MICH. L. REV. 204 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . 37

Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*,
    62 TENN. L. REV. 461 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

J.W. Cecil Turner, KENNY'S OUTLINES OF CRIMINAL LAW (16th ed. 1952). . . . . . . . . . . . . . . . 37

Norman J. Singer, SUTHERLAND ON STATUTORY CONSTRUCTION
    (7th ed. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-21, 25, 26

Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection*
    *of Judges Reign?*, 36 OKLA L. REV. 65 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis*
    *of the Right to "Bear Arms"*, 49 LAW & CONTEMP. PROBS. 151 (1986). . . . . . . . . . . . . 38

W. Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND (1769). . . . . . . . . . . . . . 36, 38, 39

WEBSTER'S NEW INTERNATIONAL DICTIONARY (3rd ed. 1961). . . . . . . . . . . . . . . . . . . . . . 16

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS AND IN SUPPORT OF
PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

**PRELIMINARY STATEMENT**

Rarely have the federal courts been confronted with as expansive a reading of the federal

firearms laws as the one the government asserts in this case. Since first enacting firearms

disqualification laws in 1938, Congress has consistently made such prohibitions narrow in scope.

Leaving the vast majority of individuals unaffected, federal gun bans are aimed only at those

persons whose gun rights have been disqualified by the occurrence of a statutorily-enumerated

triggering event—*e.g.*, a felony conviction, a finding of mental incompetence, a dishonorable

discharge from military service, or an addiction to a controlled substance. *See* 18 U.S.C. §

922(g). More recently, Congress has also extended the disqualification to a narrow subclass of

misdemeanants: those convicted of committing acts of violence within domestic relationships.18

U.S.C. § 922(g)(9).

The government in this case seeks to override that tailored legislative scheme by

stretching the reach of the felon-in-possession statute—which bans firearm possession by any

person convicted of a "crime punishable by imprisonment for a term exceeding one year," 18

U.S.C. § 922(g)(1)—to cover *all common law misdemeanors*: uncodified offenses that simply

have no statutory punishment criteria. Under the government's view, any offense that lacks such

punishment criteria will be *per se* classifiable as a felony.

The government's broad interpretation, however, finds little support in the structure,

history, and text of the federal gun control scheme. Congress chose the word "punishable"—a

term that necessarily refers to *specified* punishments—to describe predicate offenses that a

1

convicting jurisdiction's legislature has affirmatively deemed serious enough to warrant a prison sentence exceeding one year. The federal system relies on this localized legislative judgment to properly function. Moreover, the overarching structure of the federal scheme (which unambiguously specifies certain heightened categories of misdemeanants) demonstrates that when Congress wishes to reach non-felons, it does so clearly. This is further confirmed by the recorded legislative history, which reveals that no one in Congress contemplated—let alone intended—a categorical firearms ban on common law misdemeanants.

The failings of the government's position are illustrated by the facts of this case. In 1968, Plaintiff Jefferson Schrader was convicted of simple common law misdemeanor assault and battery for his involvement in a minor fistfight. His only punishment was a $100 fine, he received no jail time, and he has had no further meaningful encounters with law enforcement. But because common law assault and battery had no legislatively-capped punishment range, the government is treating him as it would a convicted felon for the purpose of federal law, banning him for life from the possession of any firearm for any purpose, and listing his name in the federal government's National Instant Criminal Background Check ("NICS") database—administered by Defendant Holder—as disqualified from owning firearms.

Plaintiffs respectfully submit that the government's expansive reading of § 922(g)(1) is mistaken. But assuming that the reach of the federal gun ban can in fact extend to common law misdemeanants, its attempted application against Schrader fails constitutional scrutiny under the Second Amendment. As the Supreme Court recognized in *District of Columbia* v. *Heller*, 554 U.S. 570 (2008) and *McDonald* v. *City of Chicago*, 130 S. Ct. 3020 (2010), the Second Amendment protects a fundamental, individual right to keep and bear arms for purposes that

include self-defense. While subject to certain limitations on its scope—felons, for example, were historically unprotected—there can be little doubt that its protections reach ordinary misdemeanants like Schrader. And under any level of heightened scrutiny appropriate for a constitutionally enumerated fundamental right, the government's enforcement against Schrader of a categorical lifetime ban on firearms possession cannot survive. Accordingly, Schrader is entitled to summary judgment for the removal of his firearms disability from the NICS database, and a declaratory judgment that his 1968 Maryland common law misdemeanor assault conviction is not disabling under federal law.

Finally, there is no merit to the government's argument that Schrader lacks standing to bring his Second Amendment claim. Because Defendants list Schrader as a disqualified person in the federal government's NICS database, Schrader is presently unable to purchase or possess firearms. Indeed, his prior attempt to do so was thwarted by a "denial decision" by Defendant FBI. This administrative denial provides a straightforward and uncontroversial source of standing: Schrader suffers an ongoing injury-in-fact that prevents him from exercising his constitutional right to keep and bear arms. The Declaratory Judgment Act entitles him to resolve this "actual controversy" with the government in court. Nor does SAF lack organizational and representational standing on these facts, assuming the issue of its standing can even be reached.

The material facts of this case are straightforward and undisputed. Accordingly, Defendants' Motion to Dismiss should be denied, and Plaintiffs' Cross-Motion for Summary Judgment should be granted.

## STATEMENT OF FACTS

### A.      The Legislative Framework

Congress has created a federal legislative scheme that bans narrow groups of disqualified

persons from possessing firearms. Beginning with the Federal Firearms Act of 1938, Congress

originally proscribed the receipt across state lines of firearms by persons convicted of certain

violent offenses. The scheme was expanded in 1961 to include all felons, and rewritten again in

1968 to cover the "possession" (rather than mere receipt across state lines) of a firearm.[1] *See*

*United States* v. *Barton*, 2011 U.S. App. LEXIS 4111, No. 09-2211, at *11-12 (3d Cir. Mar. 4,

2011) (discussing history of federal firearms laws); *United States* v. *Skoien*, 614 F.3d 638, 640-

41 (7th Cir. 2010) (en banc) (same).

In 1986, however, Congress decided to ease a number of federal firearms restrictions

when it passed the Firearm Owners' Protection Act. Among other issues, Congress had become

concerned with the Supreme Court's opinion in *Dickerson* v. *New Banner Institute, Inc.*, 460

U.S. 103 (1983), which had held that even an expunged state felony conviction would disqualify

a person from gun ownership. Congress superceded *Dickerson* by shrinking the scope of the

felon-in-possession law: a new statutory provision expressly exempts all pardoned or expunged

convictions, as well as those convictions for which a person's civil rights have been restored. 18

U.S.C. § 921(a)(20). This exemption applies unless the relevant "pardon, expungement, or

---

[1] In passing the Federal Gun Control Act of 1968, Congress also issued factual findings about firearms-related hazards associated with "veterans who are discharged under dishonorable conditions, mental incompetents, aliens who are illegally in the country, and former citizens who have renounced their citizenship," and banned firearms possession from each of these groups of persons as well. *See Scarborough* v. *United States*, 431 U.S. 563, 571 n.10 (1977) (quoting congressional findings of fact).

restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms." *Id.*; *see also Logan* v. *United States*, 552 U.S. 23, 27-28 (2007) (discussing history of the Firearm Owners' Protection Act); *United States* v. *Logan*, 453 F.3d 804, 806-807 (7th Cir. 2006) (same).

The Firearm Owner's Protection Act also significantly reorganized the federal firearms laws. The felon-in-possession ban was re-codified at 18 U.S.C. § 922(g)(1), where it currently applies to any person convicted of "a crime punishable by imprisonment for a term exceeding one year"—a standard modern demarcation for felony crimes.[2] Statement of Undisputed Material Facts ("SMF") at ¶ 1. The ban specifically exempts from its reach any state misdemeanor crime that is "punishable by a term of imprisonment of two years or less." 18 U.S.C. § 921(a)(20)(B). Thus, with respect to any State conviction, the applicability of the felon-in-possession ban will turn on how severely that State has chosen to punish the offense at issue. Violation of the ban is punishable by a prison sentence of up to ten years. *See* 18 U.S.C. § 924(a)(2); SMF at ¶ 2.

In 1996, Congress expanded slightly the felon-in-possession statute to a narrow class of misdemeanants: those convicted of any "misdemeanor crime of domestic violence." 18 U.S.C. § 922(g)(9). As the Supreme Court has explained, domestic violence abusers raised unique concerns that Congress wished to address:

---

[2] *See, e.g.*, BLACK'S LAW DICTIONARY, 694 (9th ed., 2009) (hereinafter "BLACK'S") (defining felony as "[a] serious crime usu. punishable by imprisonment for more than one year or by death. Examples include murder, rape, arson, and burglary."). Accordingly, the Supreme Court and other courts generally refer to § 922(g)(1) as the "felon-in-possession" statute, though the statute itself does not use that terminology. *See, e.g., Abbott* v. *United States*, 131 S. Ct. 18, 23 (2010) (GINSBURG, J.); *Carr* v. *United States*, 130 S. Ct. 2229, 2234, n.1 (2010) (SOTOMAYOR, J.); *Bloate* v. *United States*, 130 S. Ct. 1345, 1350 (2010) (THOMAS, J.); *see also* Defs.' Br. [Dkt. #5] at 3, n.1.

> Existing felon in possession laws, Congress recognized, were not keeping firearms out of the hands of domestic abusers, because "many people who engage in serious spousal or child abuse ultimately are not charged with or convicted of felonies." 142 Cong. Rec. 22985 (1996) (statement of Sen. Lautenberg). By extending the federal firearm prohibition to persons convicted of "misdemeanor crime[s] of domestic violence," proponents of § 922(g)(9) sought to "close this dangerous loophole." *Id.*, at 22986.

*United States* v. *Hayes*, 129 S. Ct. 1079, 1087 (2009). Beyond this special case, however, Congress has shown no predilection for extending the gun ban to ordinary misdemeanants.

### B.   Plaintiffs Jefferson Schrader and Second Amendment Foundation

Plaintiff Jefferson Schrader is a 63-year-old United States citizen who wishes to keep firearms for purposes that include self-defense. SMF at ¶¶ 3, 8. He does not face any of the typical disqualifying barriers under the federal gun control laws.  Schrader is not under indictment, has never been convicted of a felony or misdemeanor crime of domestic violence, is not a fugitive from justice, is not an unlawful controlled substance user or addict, has never been adjudicated as a mental defective or committed to a mental institution, has not been discharged from the Armed Forces under dishonorable conditions, has never renounced his citizenship, and has never been the subject of a restraining order relating to an intimate partner. *Id.* at ¶ 4; *cf.* 18 U.S.C. § 922(g) (defining categories of persons prohibited from possessing firearms). He is also fully qualified to possess firearms under the laws of Georgia—his State of citizenship. *Id.*

The government, however, is prohibiting  Schrader from buying or possessing firearms based on a 1968 common law misdemeanor conviction for simple assault and battery. *Id.* at ¶ 16. While Schrader received only a $100 fine as punishment, *id.* at ¶ 7, assault and battery in Maryland was at that time a *common law* misdemeanor[3]—as such, it was uncodified and simply

---

[3] Today, the offense of common law assault and battery no longer exists in Maryland, having been abrogated by statute in 1996. *See Robinson* v. *State*, 353 Md. 683, 686-687 (Md.

had no statutory sentencing criteria. Theoretically, its punishment was limited only by the Eighth Amendment's ban on cruel and unusual punishment. *See Simms* v. *State*, 288 Md. 712, 714 (Md. 1980). The United States is now treating this simple misdemeanor conviction as "a crime punishable by imprisonment for a term exceeding one year," thus placing Schrader in the same category as a convicted felon for purposes of the federal felon-in-possession statute. SMF at ¶ 16.

Schrader's conviction occurred in 1968 in Annapolis, Maryland, where he was stationed with the United States Navy. *Id*. at ¶ 5 . He was 20 years old. *Id*. at ¶ 8. While walking peaceably one night in July of that year, he was violently attacked by a street gang that claimed he had entered their territory. *Id*. at ¶ 5. A week or two later, on July 23rd, Schrader was again walking peaceably in Annapolis when he encountered one of the gang members who had previously assaulted him. *Id*. at ¶ 6. A dispute broke out between the two men, and Schrader punched his assailant. *Id*. A nearby police officer arrested Schrader, and charged him with common law assault and battery and disorderly conduct—both simple misdemeanor offenses. *Id*. A week later on July 31st, he was found guilty of misdemeanor assault and battery and received a $100 fine, which he paid two days later on August 2nd. *Id*. at ¶ 7. He was not sentenced to any jail time. *Id*. Schrader later completed a tour of Vietnam, and was honorably discharged from the Navy. *Id*. at ¶ 9. He has not had any further police encounters, save one traffic infraction. *Id*.

---

1999). Maryland currently has two forms of statutory assault. First Degree Assault is a felony punishable by up to 25 years imprisonment, and covers any assault that causes (or attempts to cause) serious physical injuries or that is carried out with a firearm. MD. CRIMINAL LAW CODE ANN. § 3-202. Second Degree Assault, a misdemeanor punishable by up to 10 years imprisonment, covers all other forms of assault. *Id*. at § 3-203. Disorderly conduct is a misdemeanor punishable by up to 60 days in jail. *Id*. at § 10-201.

More than 40 years later,  Schrader learned that the federal government's NICS computer system listed him as legally ineligible to purchase firearms when his companion attempted to buy him a shotgun as a gift in November of 2008. *Id*. at ¶¶ 11-12. The transaction was cancelled when Schrader's name appeared in the NICS database. *Id*. at ¶ 12. Around the same time, Schrader had also ordered a handgun to keep for self-defense. *Id*. at ¶ 11.

 Schrader inquired with the Federal Bureau of Investigations (the administrator of the NICS system) as to why his shotgun transaction was cancelled. On June 3, 2009, the FBI advised Schrader via written correspondence that it had made a "denial decision" of his shotgun transaction pursuant to 18 U.S.C. § 922(g)(1), on the basis of his 1968 Maryland misdemeanor conviction. *Id*. at ¶¶ 13-14. The letter included a copy of Schrader's FBI identification record, which listed a "State ID Number" corresponding to the State of Georgia. *Id*. at ¶ 15. Agent Lance Greer further advised him to dispose of or surrender any firearms he might possess or face criminal prosecution. *Id*. at ¶ 13.  Schrader subsequently did not complete his handgun order. *Id*.

Plaintiff Second Amendment Foundation ("SAF") is also a party in this case. SAF's members and supporters, including Plaintiff Schrader, are directly impacted by application of 18 U.S.C. § 921(g)(1) to common law misdemeanor offenses. SMF at ¶ 17. Additionally, SAF routinely expends resources responding to inquiries about the applicability of 18 U.S.C. § 921(g)(1) under a variety of circumstances, including those similar to Plaintiff Schrader's. *Id*.

## ARGUMENT

## I.	THIS COURT HAS SUBJECT MATTER JURISDICTION OVER ALL CLAIMS

Plaintiffs' amendment of the complaint resolves the issue of whether the United States is a necessary party to the litigation. The other standing arguments lack merit.

### A.    Plaintiff Scharder Has Standing.

The Declaratory Judgment Act was passed by Congress in 1934, granting federal courts

the power to declare the rights of individuals as an independent form of judicial relief. In relevant

part, it states:

> In a case of actual controversy within its jurisdiction, . . . [subject to certain enumerated
> exceptions not at issue here] . . . , any court of the United States, upon the filing of an
> appropriate pleading, may declare the rights and other legal relations of any interested
> party seeking such declaration, whether or not further relief is or could be sought. Any
> such declaration shall have the force and effect of a final judgment or decree and shall be
> reviewable as such.

28 U.S.C. § 2201(a). Defendants acknowledge Schrader's thwarted past attempts to purchase

firearms (*e.g.*, Def. Br. at 6), but claim that the Declaratory Judgment Act requires him also to

plead "allegations concerning where Plaintiff Schrader might attempt future purchases or

possession of firearms and what type of firearms . . . ," *id*. at 17, and to make a pre-enforcement

showing "that he has been singled out for prosecution." *Id*. at 19. These arguments are incorrect.

Independent of the requirements for "pre-enforcement" standing, it is a well-established

tenet of Article III standing that a plaintiff or petitioner suffers justiciable injury when the

government administratively denies him or her permission to engage in some desired conduct.

An administrative denial is not a mere threat of hypothetical criminal enforcement; rather, it is an

ongoing injury-in-fact restraining an individual. When the government says "no," a justiciable

controversy exists. *See Parker* v. *District of Columbia*, 478 F.3d 370, 376 (D.C. Cir. 2007)

(collecting cases), *aff'd sub nom Heller*, 554 U.S. 570.[4] Schrader's standing is obvious.

---

[4]Although Judge Henderson dissented from the panel's ruling on the merits, she agreed
that the denial of Heller's permit application afforded him standing. *Parker*, 478 F.3d at 402 n.2
(Henderson, J., dissenting).

As pleaded in his Complaint and described above, Schrader's first attempted to obtain a firearm when his companion tried to buy him a shotgun as a gift. Am. Compl. at ¶ 14. But because Defendants improperly list Schrader in the NICS database as legally ineligible to purchase firearms, Defendant FBI issued a "denial decision" against Schrader, blocking the transaction from completion. *Id*. at ¶¶ 15-16; *see also* SMF ¶ 14; Schrader Decl., Ex. A. As the FBI wrote in its letter to Schrader:

> . . . The fingerprints you submitted are identical with those in a record that was used to *deny your firearm purchase* or pawn redemption. A copy of your FBI identification record is enclosed for your review. Unless additional materials in the form of certified court documentation are submitted, we are unable to reverse *our original denial decision*. Your *denial* indicates that you have been matched with the following federally prohibitive criteria under Title 18, United States Code, Sections 921(a)(20) and 922(g)(1): A person who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year or any state offense classified by the state as a misdemeanor and is punishable by a term of imprisonment of more than two years.
>
> If you wish to Challenge the accuracy of the record upon which the *denial* is based, you may apply directly to the original submitting agency for correction of the record. . . .

SMF ¶ 14; Schrader Decl., Ex. A (emphasis added). This administrative denial provides Schrader with an uncontroversial source of standing. Moreover, a government agent subsequently contacted Schrader and advised him to surrender or dispose of any firearms he might possess or face prosecution. Am. Compl. at ¶ 16. This caused Schrader to avoid completion of a separate handgun order. *Id*.

Defendants claim that these incidents amount only to a series of *past* injuries, and not a live ongoing one. Def. Br. at 17. Defendants also attempt to distinguish *Parker* on the grounds that it asserted not just a general right to handgun ownership, but also to a handgun registration certificate. *Id*. at 17-18. But both arguments fail. As a starting point, they mistakenly presume that the *past* occurrence of an injurious event precludes the existence of a *current* case or

10

controversy. But the injury associated with an administrative denial can hardly be said to vanish with the drying of the ink on the stamped disapproval letter. To the contrary, the very enforcement scheme that has twice thwarted Schrader's ability to keep and bear arms continues to do so today: Schrader *still* appears in the NICS system as disqualified from possessing a firearm, and this fact *continues* to prevent him from exercising his constitutional right to keep and bear arms. And just as the government's administrative denial of Heller's registration certificate in *Parker* implicated an injury beyond "only a threatened prosecution . . . [or] . . . only a general right to handgun ownership," 478 F.3d at 376, so too does this case: Schrader has been administratively denied the ability to obtain firearms.

An administrative denial of this sort is a commonplace source of Article III standing.[5] Indeed, if standing could be denied to Schrader on the theory that Defendants' "denial decision" is an injury of the past, then so too would it be denied in the many administrative law cases routinely heard in this court. Taken to its logical conclusion, this theory would prevent even the Supreme Court from reaching the merits of a case like *Marbury* v. *Madison*, 5 U.S. (1 Cranch.) 137 (1803) on the grounds that Madison's refusal to deliver Marbury's judicial commission was a completed event of the past (despite Marbury's aggrievement in bringing the action).

---

[5] In fact, under the futile acts doctrine, even a denial itself is not required if circumstances make clear that the administrative application process is hopeless. *See Grid Radio* v. *FCC*, 278 F.3d 1314, 1319 (D.C. Cir. 2002) (broadcaster need not engage in futile application process for a license to engage in microbroadcasting where such activity was banned by the FCC); *accord Bach* v. *Pataki*, 408 F.3d 75, 82-83 (2nd Cir. 2005) (where plaintiff was told by state police that he was statutorily ineligible for a firearms carry license, he did not need to go through the futile gesture of filing an application). Of course, Defendants in this case have, in fact, affirmatively denied Schrader's attempts to obtain firearms.

To be sure, the Declaratory Judgment Act's text does refer to an "actual controversy." However, this is best understood as referring to the constitutional requirement—*i.e.*, the same requirements Article III imposes in all cases. *See*, *e.g.*, *Cutaiar* v. *Marshall*, 590 F.2d 523, 527 (3d. Cir. 1979) ("[The Supreme Court has] held that the Declaratory Judgment Act requirement of 'cases' and 'controversies' is identical to the constitutional requirement of 'cases' and 'controversies.'") (citing *Aetna Life Insurance Co.* v. *Haworth*, 300 U.S. 227, 239-40 (1937); *see also Franchise Tax Bd. of California* v. *Constr. Laborers Vacation Trust*, 463 U.S. 1, 17 (1983) (the Declaratory Judgment Act "was intended to affect only the remedies available in a federal district court, not the court's jurisdiction.").[6]

"There is nothing unique about suits brought under the DJA that requires a special jurisdictional analysis." *Ord* v. *District of Columbia*, 587 F.3d 1136, 1147 (D.C. Cir. 2009) (BROWN, J., dissenting in part), and there is no reason why Article III should govern Declaratory Judgment Cases differently than it does all other types of cases. Standing is standing; it either exists, or it does not. While it is true that Congress has enacted a wide variety of statutes (including Section 1983) for resolving "cases or controversies" for different government actors, this unremarkable observation has no relevance to Schrader's standing.[7] An administrative denial

---

[6] These cases notwithstanding, the court in *Hodgkins* v. *Holder*, 677 F. Supp. 2d 202 (D.D.C. 2010), *appeal docketed and pending*, No. 10-5062 (D.C. Cir. Mar. 5, 2010), observed that this principle has not been strictly followed. *Id.* at 205, n.1. In *Golden* v. *Zwickler*, 394 U.S. 103, 108-110, for example, a plaintiff's prior arrest failed to support a Declaratory Judgment action where the plaintiff could not show an arrestable offense was likely to reoccur. But whether "strictly observed" or not, the principle certainly applies to a case like this one that implicates an administrative denial.

[7] Notably, there is no difference between the Declaratory Judgment Act's provisions for granting declaratory and injunctive relief, and the same relief sought by and awarded in *Parker* under Section 1983. None of the *Parker* plaintiffs sought money damages for past injuries, and

is an injury-in-fact for Article III purposes; thus, the government's denial of Schrader's liberty interest in possessing a firearm here triggers standing under the Declaratory Judgment Act.

Defendants also claim that certain of Schrader's pleadings are vague. While Schrader pleads both that he is a citizen of Georgia (Am. Compl. ¶ 1) and that he has been denied a "local" attempt to obtain firearms (Am. Compl. ¶ 14), Defendants argue that the word "local" is "imprecise and can encompass multiple states, and State gun laws could supply independent ground for preventing Plaintiff Schrader from purchasing or possessing firearms." Def. Br. at 18. But the full pleadings reveal otherwise. Schrader pleads the specific NICS transaction number for his failed firearms transaction (Am. Compl. ¶ 15), and that transaction reveals a "State ID Number" associated with Georgia. SMF ¶ 15; *see also* Schrader Decl., Ex. A. Schrader is fully qualified to possess firearms under Georgia law. Am. Compl. ¶ 8; *see also State* v. *Langlands*, 276 Ga. 721, 724-725 (Ga. 2003) (holding that Georgia's felon-in-possession statute cannot be extended to cover out-of-state misdemeanor convictions). Thus, Defendants' argument fails.

### B.      Plaintiff Second Amendment Foundation Has Standing.

Defendants also argue that Plaintiff SAF lacks standing. Def. Br. at 20-24. This too is mistaken; SAF has both organizational and representational standing to sue in this case.

The Court need not reach the issue of SAF's standing, because Schrader plainly has standing. On identical facts, the District of Maryland rejected a challenge to SAF's standing when another of its members plainly had standing to bring suit. "In cases where, as here, plaintiffs seek injunctive and declaratory relief, so long as 'at least one individual plaintiff . . .

---

the *Parker* court did not reach the merits of plaintiffs' separate Declaratory Judgment Act claim, most likely because it was unnecessary to do so.

has demonstrated standing,' a court 'need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit.'" *Woollard* v. *Sheridan*, ___ F. Supp. 2d __, 2010 U.S. Dist. LEXIS 137031 at *2 n.1 (D. Md. Dec. 29, 2010) (citing *Village of Arlington Heights* v. *Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977) and *Watt* v. *Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981)) (other citations omitted)). The D.C. Circuit ordinarily follows this rule. *See Animal Legal Def. Fund* v. *Glickman*, 154 F.3d 426, 429 (D.C. Cir. 1998) (en banc).

With respect to organizational standing, "[t]here is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Warth* v. *Seldin*, 422 U.S. 490, 511 (1975). And when an organization is forced to spend resources, devoting its time and energy to dealing with certain conduct, it has standing to challenge that conduct. *See*, *e.g.*, *Havens Realty Corp.* v. *Coleman*, 455 U.S. 363 (1982).

SAF educates, researches, and publishes about gun control and its consequences. It has to educate its members, and the public, about the government's enforcement of gun laws. When people have questions about the government's firearms policies, they turn to SAF. SAF routinely expends resources responding to inquiries about the applicability of 18 U.S.C. § 922(g)(1) under a variety of circumstances, including those similar to plaintiff Schrader's. Am. Compl. at ¶ 17. The government's enforcement of the challenged provisions thus directly impacts the organization. *Fair Employment Council* v. *BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994); *Haitian Refugee Ctr.* v. *Gracey*, 809 F.2d 794, 799 (D.C. Cir. 1987). Accordingly, SAF has organizational standing in this case to sue on its own behalf.

Defendants cite the recent district court decision in *Hodgkins* v. *Holder*, which concluded that SAF lacked organizational standing, and that "its voluntary act of teaching cannot plausibly be the basis for a claim of constitutional injury." 677 F. Supp. 2d at 206. As Defendants note, *Hodgkins* has been appealed to and argued before the D.C. Circuit, which presently has the case under advisement. Def. Br. at 16, n.10. Plaintiffs respectfully submit that *Hodgkins* is in conflict with the authority cited above.

With regard to representational standing, an association has standing to bring suit on behalf of its members when:

> (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*United Food & Commercial Workers Union Local 751* v. *Brown Group, Inc.*, 517 U.S. 544, 553 (1996) (citation omitted).

In this respect, SAF's case for representational standing is identical to that which the D.C. Circuit found sufficient for challenging a gun control law in *Fraternal Order of Police* v. *United States* ("FOP"), 152 F.3d 998 (D.C. Cir. 1998). In *FOP*, the only question was whether chief law enforcement officers, who were members of the FOP, could assert the rights of their employees. Answering this question in the positive, the D.C. Circuit found the FOP satisfied all three prongs of representational standing. Since Schrader and other SAF members have standing to challenge the law (SAF believes many of its members are directly impacted by the application of 18 U.S.C. § 922(g)(1) to misdemeanor offenses), the presence of individual plaintiffs is not strictly necessary. Accordingly, SAF has representational standing to sue on behalf of Schrader and other members similarly situated.

15

## II.   FEDERAL LAW DOES NOT PROHIBIT ORDINARY COMMON LAW MISDEMEANANTS FROM POSSESSING FIREARMS.

### A.   The Text Of The Federal Felon-In-Possession Statute Demonstrates That Uncodified Common Law Misdemeanor Offenses—Which Are Not "Punishable" By Any Specified Statutory Criteria—Are Not Disqualifying Offenses

The relevant language of the federal felon-in-possession statute prohibits any person convicted of "a crime punishable by imprisonment for a term exceeding one year" from possessing firearms, 18 U.S.C. § 922 (g)(1), with an exception for "any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less." 18 U.S.C. § 921(a)(20). Because uncodified common-law offenses are not "punishable by" *any* particular statutory criteria, they do not fall within the purview of the law.

The term "punishable" is not defined by statute and should therefore be given its ordinary meaning, consistent with its purpose and placement in the overall statutory scheme. *Baily* v. *United States*, 516 U.S. 137, 144-145 (1995). In general terms, "punishable" may be defined as "deserving of, or liable to, punishment : capable of being punished by law or right." WEBSTER'S NEW INTERNATIONAL DICTIONARY 1843 (3rd ed. 1961). But its meaning is also subject to subtle but important variations, depending on whether used in reference to a person (*e.g.*, "a punishable offender") or an offense (*e.g.*, "a crime punishable by death").

Black's Law Dictionary recognizes this distinction with separate entries for each—the former meaning "subject to a punishment," but the latter defined as "giving rise to a *specified* punishment." BLACK'S at 1353 (emphasis added).  It is this latter definition—referring to "specified punishment[s]"—that Congress used here. Quite plainly, the statute speaks not of predicate persons, but of predicate crimes—*i.e.*, those that are "punishable by" a specified

punishment range. *See id.* (providing as exemplary usage: "a felony *punishable by* imprisonment for up to 20 years") (emphasis added). An offense "giv[es] rise to a specified punishment," whereas its offender is "subject to" that "specified punishment."

Properly understood, then, the applicability of the felon-in-possession ban turns on the predicate crime's *specified* length of potential punishment—a traditional legislative determination. This interpretation is further compelled by the federal scheme's structural reliance on the judgment of the convicting jurisdiction's legislature. By affirmatively specifying a punishment term equaling or exceeding two years (in the case of a misdemeanor) or exceeding one year (in the case of any other offense), a State legislature renders a judgment about the seriousness of the corresponding offense. Congress has chosen this legislative assessment as its trigger. *See Small* v. *United States*, 544 U.S. 385, 392 (2005) (noting that Congress' exemption of state misdemeanor crimes punishable by less than two years imprisonment is "presumably based on the determination that such state crimes are not sufficiently serious or dangerous so as to preclude an individual from possessing a firearm.") (majority opinion); *see also id.* at 403 ("It was eminently reasonable for Congress to use convictions punishable by imprisonment for more than a year . . . as a proxy for dangerousness.") (THOMAS, J., dissenting).

This reading is also most congruent with the spirit of federalism that permeates the federal scheme, empowering a State's legislature to decide the extent to which it will expose those within its jurisdiction to the reach of the federal gun control laws. The State remains the final authority on how harshly it chooses to punish its own crimes, and Congress has deferred to the wisdom of that localized judgment. *See United States* v. *McKenzie*, 99 F.3d 813, 820 (7th Cir. 1996) ("[W]hile states may vary on what offenses are punishable by a term exceeding one

year, it does not alter Congress' intent to keep guns out of the hands of anyone that a given state determines to be a felon.").

The government's reading fails to do these values justice. Allowing the federal felon-in-possession statute to encompass state common law crimes for which no legislative judgment has been expressed would grant Defendants a power that has been statutorily entrusted to the States. Notably, Maryland's own State gun control laws show a disinclination to ban guns from ordinary common law misdemeanants. Maryland's gun control statute closely tracks federal law, except that its wording prohibits gun ownership by a person convicted of a "misdemeanor in the State that carries a *statutory* penalty of more than 2 years." *See* MD. PUBLIC SAFETY CODE ANN. §§ 5-101, 5-133 (emphasis added). Maryland's specific requirement of a "statutory" penalty strongly suggests its intent to keep common law misdemeanants outside the scope of its own gun control laws. It would make little sense to place those same individuals within the reach of a federal gun control scheme that specifically depends on the reach of State law.

Simply put,  Schrader's conviction for simple common law misdemeanor assault was not "punishable by . . . a term exceeding one year"; it had no specified punishment criteria at all.

**B.    The Government's Reading Of The Felon-In-Possession Statute Fundamentally Alters Its Structure.**

Of course, a statute's text is not read in isolation, but in the context of its broader overall structure. A "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." *Deal* v. *United States*, 508 U.S. 129, 132 (1993). As one treatise observes:

> A statute is passed as a whole and not in parts or sections and is animated by one general purpose and intent. Consequently, each part or section should be construed in connection with every other part or section to produce a harmonious whole. Thus, it is not proper to

18

confine interpretation to the one section to be construed. It has also been held that the court will not only consider the particular statute in question, but also the entire legislative scheme of which it is a part.

Norman J. Singer, 2A SUTHERLAND ON STATUTORY CONSTRUCTION § 46:5, at 189 205 (7th ed. 2008) (collecting cases); *see also Castillo* v. *United States*, 530 U.S. 120, 124 (2000) ("The statute's structure clarifies any ambiguity inherent in its literal language"). The government's proposed interpretation here would clash with the structure of the felon-in-possession statute and vastly expand its reach.

The overarching design of the federal gun control scheme reveals no intent to impose a blanket firearms ban on common law misdemeanants. As noted above, Congress has applied the firearms ban to certain unambiguously-specified categories of misdemeanor convictions. In 1996, for example, Congress passed 18 U.S.C. § 922(g)(9) to ban gun ownership to anyone convicted of a "misdemeanor crime of domestic violence." Congress did so to "close [a] dangerous loophole" that had previously permitted many domestic abusers to own firearms—*i.e.*, those whose domestic abuse crimes had not resulted in felony convictions. *Hayes*, 129 S. Ct. at 1087. Congress' explicit reference to this special category of misdemeanor convictions shows that when it wants to reach beyond traditional felonies, it does so clearly. Without a clear statement from Congress, there is no basis for elevating  Schrader's conviction for *ordinary* assault and battery to the same level as a conviction for *domestic violence* assault and battery—the misdemeanor-level category of offenses that Congress has chosen to address. That Schrader's conviction ultimately resulted in nothing more than a $100 fine further demonstrates its incongruity with a statute aimed squarely at felony-level offenders.

* * *

19

The Supreme Court's most recent pronouncements on the federal firearms statutes further illustrate how ordinary, common sense constructions generally prevail over hypertechnical ones.[8] Just two years ago, the Court decided the case of *United States* v. *Hayes*, 129 S. Ct. 1079 (2009), interpreting the provision of the federal gun ban that applies to persons convicted of a "misdemeanor crime of domestic violence." That term is statutorily-defined to include (among other things) any offense that "has, as an element, the use . . . of physical force . . . committed by a [domestic partner]." 18 U.S.C. § 921(a)(33)(A). Hayes—who had been convicted in West Virginia of battering his spouse—attempted to argue that a predicate offense must have, as a discrete element, the requirement of a domestic relationship. *Hayes*, 129 S. Ct. at 1083. Because the crime of battery is not specifically limited to domestic situations, Hayes argued, his conviction for battery against his wife should not trigger the statute. *Id*. The Court rejected this argument, concluding that limiting "misdemeanor crime[s] of domestic violence" to only those relatively few crimes that have a domestic relationship as an actual element of the offense would not be a reasonable interpretation of a statute aimed at keeping firearms away from domestic violence situations. *Id*. at 1087-88.

Continuing this theme, the Court last term decided *Johnson* v. *United States*, 130 S. Ct. 1265 (2010), interpreting a provision of the federal Armed Career Criminal Act that imposes an enhanced sentence on any person who illegally possesses a firearm after having three or more convictions for a "violent felony." *See* 18 U.S.C. § 924(e)(1). To qualify as a violent felony, a

---

[8] *See*, *e.g.*, 2A SUTHERLAND at § 45:12, 94-99 (explaining that it is a "well established principle of statutory interpretation that the law favors rational and sensible construction," and "it has been called a golden rule of statutory interpretation that, when one of several possible interpretations produces an unreasonable result, that is a reason for rejecting that interpretation in favor of another which would produce a reasonable result").

predicate crime must have an element of "physical force"—a term undefined by the statute. The government had urged the Court to adopt a broad common-law definition, which would have included "even the slightest offensive touching." *Johnson*, 130 S. Ct. at 1271. But in a 7-2 opinion, the Court disagreed, reasoning that a "violent felony" must include some aspect of violent force, and that it made little sense to borrow a *common law misdemeanor* definition of force for purposes of defining a "*violent felony*." *Id*. In rejecting the government's broad proposed construction, the Court cautioned that "[u]ltimately, context determines meaning, and we do not force term-of-art definitions into contexts where they plainly do not fit and produce nonsense." *Id*. at 1270 (citations and quotations omitted).

In much the same way, Defendants' sweeping interpretation of the felon-in-possession statute produces the nonsensical result of lumping all ordinary common law misdemeanants into a heightened category reserved for felons and domestic abusers. In interpreting a statute, a court should "adopt that sense of words which best harmonizes with [the statute's] context and promotes [the] policy and objectives of [the] legislature." *King* v. *St. Vincent's Hospital*, 502 U.S. 215, 221, n.10 (1991) (citing *United States* v. *Hartwell*, 73 U.S. 385 (1868)). Those objectives did not include depriving ordinary misdemeanants of their firearms rights.

### C.     Legislative History Confirms That The Government's Reading of the Felon-In-Possession Statute Was Not Contemplated By The Enacting Congress.

Some courts will look to the legislative purpose of a statute in cases "where the effect of a statute on the situation at hand is unclear either because the situation was unforeseen at the time when the act was passed, or the statutory articulation of the rule or policy is so incomplete that it cannot clearly be said to speak to the situation in issue." 2A Sutherland § 45:9, at 59. And while the use of legislative history as a general tool of statutory construction will sometimes evoke

21

controversy, even noted textualists have sanctioned its use for the narrow purpose of verifying

that an untenable proposed statutory construction was in fact never contemplated by the

legislature.

> We are confronted here with a statute which, if interpreted literally, produces an absurd, and perhaps unconstitutional, result. Our task is to give some alternative meaning to the [word at issue] that avoids this consequence . . .  I think it entirely appropriate to consult all public materials, including the background of [the rule at issue] and the legislative history of its adoption, *to verify that what seems to us an unthinkable disposition . . . was indeed unthought of*, and thus to justify a departure from the ordinary meaning of the [word at issue]. For that purpose, however, it would suffice to observe that counsel have not provided, nor have we discovered, a shred of evidence that anyone has ever proposed or assumed such a bizarre disposition.

*Green* v. *Bock Laundry Mach. Co.*, 490 U.S. 504, 527 (1989) (SCALIA, J., concurring) (emphasis

added); *see also Small*, 544 U.S. at 393 ("The statute's lengthy legislative history confirms the

fact that Congress did not consider whether foreign convictions should or should not serve as a

predicate to liability under the provision here at issue.") (holding such foreign convictions

inapplicable under the felon-in-possession statute).

The recorded legislative history behind the Federal Gun Control Act of 1968 act is fairly

sparse. As the Supreme Court has explained, the law was "added by way of a floor amendment . .

. and thus was not a subject of discussion in the legislative reports." *Lewis* v. *United States*, 445

U.S. 55, 62 (1980); *see also United States* v. *Batchelder*, 442 U.S. 114, 120 (1979); *Scarborough*

v. *United States*, 431 U.S. 563, 569-570 (1977); *United States* v. *Bass*, 404 U.S. 336, 344, and n.

11 (1971). However, "[w]hat little legislative history there is that is relevant reflects an intent to

impose a firearms disability on any felon based on the fact of conviction." *Lewis*, 445 U.S. at 62

(emphasis added). Senator Long, who introduced and directed the passage of the Act, explained:

> So, under Title VII, every citizen could possess a gun until the commission of his first felony.  Upon his conviction, however, Title VII would deny every assassin, murderer,

22

> thief and burglar of the right to possess a firearm in the future except where he has been
> pardoned by the President or a State Governor and had been expressly authorized by
> his pardon to possess a firearm.

114 Cong. Rec. 14773 (1968) (emphasis added); *see also Lewis*, 445 U.S. at 62-63 ("Inasmuch as

Senator Long was the sponsor and floor manager of the bill, his statements are entitled to

weight.") (citation omitted).

Much like the situations presented in *Green* and *Small*, the legislative history behind the

federal felon-in-possession ban reveals no evidence that its enacting Congress contemplated the

bizarre and (as outlined below) unconstitutional result of banning firearm possession from

anyone ever convicted of a common law misdemeanor, simply for want of any specified statutory

criteria. To the contrary, Congress appears to have focused squarely on keeping guns away from

dangerous felons.

**D.      The Fourth Circuit's Approach**

The Fourth Circuit appears to be the only federal appeals court to have considered the

applicability of the federal felon-in-possession ban to common law misdemeanants. In 1973, a

panel of that court concluded that a Maryland conviction for common law misdemeanor assault

and battery was not "properly classified as a 'felony' within the meaning of the federal statute."

*United States* v. *Schultheis*, 486 F.2d 1331, 1335 & n.2 (4th Cir. 1973) (noting the "peculiar

characteristics of Maryland's common law simple assault"). Observing that the statute is "silent

regarding its application to common law convictions," the court held that it would look to the

actual sentence imposed to appraise the seriousness of the conviction in such cases. *Id*. at 1334.

Thus, only a common law misdemeanor conviction resulting in an actual sentence of two years or

greater would trigger the statute.

In 1998, however, *Schultheis* was overruled by an *en banc* panel of the court in *United States* v. *Coleman*, 158 F.3d 199 (4th Cir. 1998). Most of the *Coleman* court's analysis was dedicated to the separate issue of whether a common-law assault conviction may properly qualify as a "violent felony" for purposes of the related Armed Career Criminal Act. But the court also reconsidered the *Schultheis* practice of looking to the actual sentence imposed in cases implicating common law predicate convictions. In overruling *Schultheis*, the court cited various non-common-law cases reasoning that the proper focus should be "whether the offense is 'punishable' by a term of imprisonment greater than two years—not whether the offense 'was punished' by such a term of imprisonment." *Id*. at 203-04. The court did not discuss the peculiarities of uncodified common law crimes (which are not "punishable by" any specified punishment criteria), but nevertheless concluded that the "plain wording of the statute applies equally when the potential term of imprisonment is established by the common law and limited only by the prohibition on cruel and unusual punishments as when the range of possible terms of imprisonment is determined by a statute." *Id*. at 204. A dissenting opinion warned that the majority "would blindly lump into the same category the most trivial and the most heinous assaults, thereby defeating the clear Congressional desire to exclude minor transgressions of the law from the sweep of" the federal felon-in-possession statute. *Id*. at 205 (WIDENER, J., dissenting) (citing *Schultheis*, 486 F.2d at 1333).

While *Coleman* is not controlling in this jurisdiction, it should not carry persuasive value either. For one, the *Coleman* majority engaged in only a cursory analysis of the statute's text, dedicating just three sentences to the issue. *See id*. at 203-04. *Coleman* was also decided without the benefit of the Supreme Court's recent opinions in *Johnson* and *Hayes* (discussed above), both

24

of which emphasize reasonable interpretations of the federal gun laws over hypertechnical ones. And *Coleman* also anteceded the 1996 congressional expansion of the felon-in-possession ban to misdemeanor crimes of domestic violence, which further confirmed Congress' intent to reach only narrow classes of misdemeanants.

Perhaps most significantly, though, *Coleman* predated the Supreme Court's landmark decision in *District of Columbia* v. *Heller*, 554 U.S. 570 (2008), which held that the Second Amendment protects an individual right to keep and bear arms. As outlined in Part III below, *Coleman*'s broad interpretation of the statute would violate the Second Amendment.[9] Even the prospect of this constitutional difficulty suffices to reject that interpretation. *See* Norman J. Singer, 2A SUTHERLAND ON STATUTORY CONSTRUCTION § 45.11, at 87 (7th ed. 2008) ("the fact that one among alternative constructions would involve serious constitutional difficulties is reason to reject that interpretation in favor of another.") (collecting cases).

### E.     The Rule Of Lenity Further Confirms That Common Law Misdemeanor Convictions Do Not Trigger The Felon-In-Possession Statute

Finally, the government's broad proposed construction of the felon-in-possession statute is further undermined by the traditional rule of lenity, which cautions that any nonobvious reading of a penal statute should be strictly construed against the government:

> It is an ancient rule of statutory construction that penal statutes should be strictly construed against the government or parties seeking to enforce statutory penalties and in favor of the persons on whom penalties are sought to be imposed. This simply means that

---

[9] Notably, a recent Fourth Circuit opinion has vacated and remanded on Second Amendment grounds the conviction of an individual charged with illegally possessing a firearm after being convicted of a misdemeanor crime of domestic violence. *See United States* v. *Chester*, 628 F.3d 673, 674 (4th Cir. 2010) (holding that the lower court erred in failing to scrutinize 18 U.S.C. § 922(g)(9) under the requirements of the Second Amendment). Thus, *Coleman*'s continuing viability in the wake of *Heller* is questionable even within the Fourth Circuit.

words are given their ordinary meaning and that any reasonable doubt about the meaning is decided in favor of anyone subjected to a criminal statute. This canon of interpretation has been accorded the status of a constitutional rule under principles of due process, not subject to abrogation by statute.

Norman J. Singer, 3 SUTHERLAND ON STATUTORY CONSTRUCTION § 59:3, at 167-75 (7th ed. 2008) (collecting cases); *see also id*. at 187-88 (discussing the Supreme Court's adoption of the "rule of lenity.")

The federal felon-in-possession law is a criminal statute, carrying penalties of up to 10 years imprisonment. *See* 18 U.S.C. § 924(a)(2). Because Congress cannot be said to have contemplated (let alone clearly elucidated) a firearms ban on all common law misdemeanants, any effort to construe the statute to that effect must fail. *See Bass*, 404 U.S. at 347-48 ("In various ways over the years, we have stated that when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite.") (citations and quotations omitted).

* * *

In sum, there is no basis for expanding the reach of the federal felon-in-possession statute to include simple uncodified common law misdemeanor offenses.

**F.    Even Assuming The Government's Reading, Schrader's Federal Prohibition Was Lifted When Maryland Statutorily Restored His State Civil Rights.**

Even if one were to assume that  Schrader's common law misdemeanor conviction did in fact fall within the ambit of the felon-in-possession law, a statutory escape hatch would exempt him from its reach.

A person convicted of an otherwise disqualifying offense becomes exempt from the federal firearms ban if his or her civil rights are restored by the convicting jurisdiction. 18 U.S.C. § 921(a)(20). This exemption is available "unless such . . . restoration of civil rights expressly provides" that he or she will continue to be subject to a firearms disqualification. *Id*. The applicable "civil rights" are those to vote, hold elective office, and serve on a jury, *see United States* v. *Bost*, 87 F.3d 1333, 1335 (D.C. Cir. 1996); *see also Logan*, 552 U.S. at 27-28, and their restoration depends on the law and practices of the convicting jurisdiction. *See Caron* v. *United States*, 524 U.S. 308, 313 (1998). States have adopted a wide variety of acceptable practices for restoring such rights—"[s]ome states restore civil rights by statute; others authorize officials to issue certificates of restoration to felons after a specified period; still others restore rights in a piecemeal fashion by a combination of statutes or by certificate and statute." *Bost*, 87 F.3d at 1335 (citations and quotations omitted). Finally, the civil rights restoration exemption "do[es] not cover the case of an offender who lost no civil rights" as a consequence of his or her conviction. *Logan*, 552 U.S. at 37 (emphasis added). To properly be deemed "restored" under the statute, a right must be taken away and then given back. *Id*. at 31-32.

Because  Schrader's conviction for common law assault and battery was neither a felony nor an "infamous crime," he never lost his civil rights to vote or to run for public office,[10]  but he did lose his right to serve on a jury. *See United States* v. *El*, 5 F.3d 726, 734 (4th Cir. 1993) (analyzing a Maryland common law assault conviction in the context of the civil rights restoration exception). Prior to 2006, Maryland law did not restore the right to serve on a jury to

---

[10] Running for elective office in Maryland simply requires the candidate to "be a registered voter at an address that satisfies any residence requirement for the office . . . " MD. ANN. CODE ART. EL, § 5-202; see also MD. CONST. ART. 1 § 12.

27

a person convicted of any crime "punishable by a fine of more than $500, or by imprisonment for more than six months, or both." *See* Committee Note, MD. COURTS AND JUDICIAL PROCEEDINGS CODE ANN. § 8-103.

But in 2006, the Maryland legislature rewrote the statute and narrowed the jury service disability to persons who have "been convicted, in a federal or State court of record, of a crime punishable by imprisonment exceeding 6 months *and received a sentence of imprisonment for more than 6 months*; or . . . [h]as a charge pending, in a federal or State court of record, for a crime punishable by imprisonment exceeding 6 months." MD. COURTS AND JUDICIAL PROCEEDINGS CODE ANN. § 8-103 (emphasis added). Because  Schrader was not sentenced to serve *any* time in jail as a result of his 1968 common law misdemeanor conviction, this 2006 statute restored to him his right to serve on a Maryland jury.

Moreover, § 8-103 does not contain any language expressly limiting his right to own a firearm.[11] Thus,  Schrader has regained all of his civil rights for purposes of 18 U.S.C. § 921(a)(20) and his conviction can no longer function as a predicate offense under the felon-in-possession statute. *See Bost*, 87 F.3d at 1338 ("The State of Ohio issued Bost a

---

[11] The D.C. Circuit has held that a court should look only to the relevant restoration document—*e.g.*, the actual statute or certificate—in determining whether a State has "expressly limit[ed]" a convict's firearms rights. *United States* v. *Bost*, 87 F.3d 1333, 1336 (D.C. Cir. 1996). Other U.S. Courts of Appeals have held that a court should look to the entirety of the State's law. *See id.* at 1335 (discussing split of authority). It is noted, however, that  Schrader's case appears to comply with even this latter rule. In relevant part, Maryland's State gun control laws disqualify firearm possession from any individual convicted of a "crime of violence" or a "misdemeanor in the State that carries a statutory penalty of more than 2 years." *See* MD. PUBLIC SAFETY CODE ANN. §§ 5-101, 133. But  Schrader's common law misdemeanor conviction did not have a "statutory penalty." Moreover, the "crime[s] of violence" provision is defined with an enumerated list of offenses that does not include common law assault and battery. *See id.* at § 5-101(c).

certificate that restored his right to serve on juries and to hold public office. His right to vote was automatically restored by statute. Because neither the certificate nor the statute contains any language expressly limiting his right to possess a firearm, we conclude that Bost is not subject to prosecution under section 922(g).")

## III.   THE IMPOSITION OF A FIREARMS BAN ON ORDINARY COMMON LAW MISDEMEANANTS VIOLATES THE SECOND AMENDMENT.

### A.   The Supreme Court's *Heller* Decision Changed The Relevant Doctrinal Framework For Analyzing Government Action Implicating The Right To Keep And Bear Arms

#### 1.   The Supreme Court's decisions in *Heller* and *McDonald*

In 2008, the Supreme Court decided *District of Columbia* v. *Heller*, 554 U.S. 570 (2008), its first substantial analysis of the Second Amendment's original public meaning. Striking down the District of Columbia's categorical ban on handgun possession, the Court engaged in a detailed analysis of the Second Amendment's text and history and concluded that it protects an individual right to keep and bear arms for lawful purposes that include self-defense. *Id*. at 592.

In so doing, the Court explained that the Second Amendment (much like the First and Fourth Amendments) codifies a *pre-existing* right to keep and bear arms—one that must be defined in accordance with its historical background. *Id*. Not surprisingly then, the Court noted that this pre-existing right was historically subject to certain pre-existing limitations on its scope. From "Blackstone through the 19th-century cases," the right to keep and bear arms was never treated as "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id*. at 626 (citations omitted). Rather, it protected the use of certain types of weapons, for certain lawful purposes.

The Court declined to undertake an "exhaustive historical analysis . . . of the full scope of the Second Amendment," but it did provide some guidance as to its pre-existing limitations. *Id*. at 626-27. For example, the sorts of "arms" protected by the Second Amendment did not include all weapons, but only those that were "in common use at the time." *Id*. at 627 (quoting *United States* v. *Miller*, 307 U.S. 174, 179 (1939)). Thus, the right did not protect dangerous and unusual weapons that were "not typically possessed by law abiding citizens for lawful purposes." *Id*. at 625; *accord United States* v. *Tagg*, 572 F.3d 1320, 1326 (11th Cir. 2009) (holding that pipe bombs are not protected weapons under the Second Amendment).

The Court also disclaimed that nothing in its opinion "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27. The Court identified those particular regulatory measures as "presumptively lawful," but also explained that it was not providing an exhaustive list. *Id*. at 627, n.26.

Finally, the Court declined to adopt a particular level of scrutiny for analyzing the Second Amendment right. *Id*. at 2821. Because the District of Columbia had imposed an absolute ban on handgun ownership that could not survive any level of heightened scrutiny, the Court found it unnecessary to decide this question and left it open for future cases. *Id*. at 634-35. The Court did, however, expressly rule out the possibility of rational basis review. *Id*. at 628, n.27.

At present, only one court in this jurisdiction has taken up the task of deciding upon an appropriate level of scrutiny.  Its opinion—*Heller* v. *District of Columbia*, 698 F. Supp. 2d 179

(D.D.C. 2010), *appeal docketed and pending*, No. 10-7036 (D.C. Cir. April 2, 2010) ("*Heller*
*II*")—ultimately adopted a standard of intermediate scrutiny.

> ### 2.    **The applicable doctrinal framework**

In the wake of *Heller*, most courts have followed a two-step doctrinal approach to cases
potentially implicating the Second Amendment. *See*, e.g., *United States* v. *Marzzarella*, 614 F.3d
85, 89 (3d Cir. 2010); *United States* v. *Reese*, 627 F.3d 792, 800 (10th Cir. 2010).

The first step is to consider whether the particular exercise of government power
regulates conduct falling within the actual scope of the Second Amendment at all. *See*, *e.g.*,
*Marzzarella*, 614 F.3d at 89; *Chester*, 628 F.3d at 680; *see also Heller II*, 698 F. Supp. 2d at 188
(explaining that the appropriate level of scrutiny "will come into play, of course, only in cases in
which the law implicates the core Second Amendment right . . . "). Courts typically do this by
examining whether the law at issue implicates a "core" Second Amendment right—such as the
right of "law abiding, responsible citizens to use arms in defense of hearth and home" identified
by the Supreme Court in *Heller*. *Heller*, 554 U.S. at 635; *Heller II*, 698 F. Supp. 2d at 188;
*Marzzarella*, 614 F.3d at 92; *see also United States* v. *Rene E.*, 583 F.3d 8, 12-16 (1st Cir. 2009)
(upholding the constitutionality of a federal ban on juvenile handgun possession after conducting
a historical analysis and concluding that juveniles fall outside the scope of the Second
Amendment's core protections).

If the government action falls outside the scope of the Second Amendment, then the
analysis goes no further. But if found to intrude upon a core component of the right to keep and
bear arms, the second step requires application of the appropriate level of judicial scrutiny. *See*,

*e.g.*, *Heller II*, 698 F. Supp. 2d at 188; *Chester*, 628 F.3d at 681-682; *Marzzarella*, 614 F.3d at 89; *Reese*, 627 F.3d at 800-801.

Courts are divided on what the appropriate level of scrutiny should be. Some have concluded that the right to keep and bear arms is entitled to strict scrutiny, based on its status as a fundamental, constitutionally-enumerated right deeply rooted in our nation's history and traditions. *United States* v. *Engstrum*, 609 F. Supp. 2d 1227, 1231-32 (D. Utah 2009); *State of Wisconsin* v. *Schultz*, No. 10-CM-138, slip. op. (Wis. Ct. App. Oct. 12, 2010). Other courts have applied a form of intermediate scrutiny, usually after looking to *Heller*'s disclaimer about the presumed constitutionality of felon dispossession laws and concluding it to be inconsistent with strict scrutiny review. *Heller II*, 698 F. Supp. 2d at 186-88; *United States* v. *Skoien*, 587 F.3d 803, 811-812 (7th Cir. 2009) *vacated* 614 F.3d 638 (7th Cir. 2010) (en banc). Still others have reasoned that the Second Amendment might implicate different levels of scrutiny, depending on the nature of the law challenged. *Marzzarella*, 614 F.3d at 96 (applying intermediate scrutiny to a firearms serial number regulation after surveying First Amendment jurisprudence and noting that "[s]trict scrutiny is triggered by content-based restrictions on speech in a public forum," but "content-neutral time, place, and manner restrictions in a public forum trigger a form of intermediate scrutiny") (citations omitted); *Chester*, 628 F.3d at 683 (4th Cir. 2010) (applying intermediate scrutiny where the "claim is not within the core right identified in *Heller*—the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense"); *United States* v. *Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (declining to "adopt a level of scrutiny applicable to every disarmament challenge . . . ").

32

As outlined in greater detail below, Plaintiff Schrader prevails under either test, but urges this court to adopt the strict scrutiny approach—the evaluative test most consistent with the Supreme Court's fundamental rights jurisprudence.

**B.      Schrader's Core Second Amendment Rights Are Implicated By The Government's Application Of The Felon-In-Possession Ban**

There can be little doubt that § 922(g)(1)'s total ban on firearms possession implicates Schrader's core Second Amendment rights.  Schrader has been denied the ability to possess a shotgun and handgun for self-defense. SMF ¶¶ 11-13. Thus, the government's imposition of the § 922(g)(1) comprehensive firearms ban against him goes directly to the heart of the Second Amendment "liberty to keep and carry arms." *Heller*, 554 U.S. at 604.

**C.      The Application Of 18 U.S.C. § 922(g)(1) To  Schrader Cannot Survive Independent Review Under Any Appropriate Level Of Scrutiny**

As applied against  Schrader, the government's categorical lifetime firearms ban cannot survive any appropriate standard of review, regardless of whether the ban is evaluated under strict or intermediate scrutiny. While Plaintiffs urge that strict scrutiny is most appropriate for reasons discussed below, both relevant standards are analyzed in turn.

**1.      A complete firearms ban applied to an ordinary common law misdemeanant like  Schrader cannot survive strict scrutiny—the appropriate level of Second Amendment scrutiny**

**(a)      The core of the right to keep and bear arms is fundamental and entitled to strict scrutiny review**

It is well-established that any law encroaching upon a core "fundamental right"—a right "deeply rooted" in "our Nation's history, legal traditions, and practices"—must be evaluated under a strict scrutiny standard that generally requires it to be "narrowly tailored to serve a compelling state interest." *Washington* v. *Glucksberg*, 521 U.S. 702, 720-721 (1997); *see also*

33

*Reno* v. *Flores*, 507 U.S. 292, 302 (1993) (substantive due process "forbids the government to infringe certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.") (citations omitted).

Operating under this *Glucksberg* framework, the Supreme Court last term examined the right to keep and bear arms and declared it "fundamental." *McDonald*, 130 S. Ct. at 3042 (majority opinion) & 3059 (THOMAS, J. concurring). Indeed, *Heller*'s exhaustive historical analysis of the right confirmed its deeply rooted status in our Nation's history, legal traditions, and practices. Beginning with its historical origins in England, and continuing from the time of the Founding to the present day, the right of the people to keep and bear arms has always enjoyed primary standing in the history of the United States. *See generally Heller*, 554 U.S. 570; *McDonald*, 130 S. Ct. at 3036-42.

Moreover, the Second Amendment's special status as an enumerated constitutional right provides further weighty evidence of its fundamental character. The Supreme Court has long referred to the various provisions of the Bill of Rights as fundamental and entitled to elevated scrutiny. *See, e.g., Grosjean* v. *American Press Co., Inc.*, 297 U.S. 233, 243-44 (1936) (speaking of "certain fundamental rights, safeguarded by the first eight amendments against federal action" as protected by the Fourteenth Amendment) (emphasis added); *United States* v. *Carolene Prod. Co.*, 304 U.S. 144, 153 n.4 (1938) (elevated scrutiny for enumerated rights); *Planned Parenthood* v. *Casey*, 505 U.S. 833, 847 (1992) (explaining that "all *fundamental rights* comprised within the term liberty are protected by the Federal Constitution from invasion by the States," and that the "most familiar of the substantive liberties" are those "already guaranteed to the individual against

34

federal interference by the *express provisions of the first eight Amendments to the Constitution*")
(citations and quotations omitted) (emphasis added).

Finally, the *Heller* opinion itself explicitly recognized the right to keep and bear arms as
"*fundamental* for English subjects" at the time of the founding. 554 U.S. at 593 (emphasis
added). Like the other provisions of the Bill of Rights, the Second Amendment was an attempt to
answer the objections of Anti-Federalists who worried that the new Constitution would be used
to deprive the people of rights traditionally considered to be the rights of Englishmen. *Id*. at 598-
99; *McDonald*, 130 S. Ct. at 3036-37. This right fundamental for English subjects is thus
fundamental for American citizens as well.

Like *Heller*, the *McDonald* opinion stopped short of elucidating a level of scrutiny. But
given the Second Amendment's status as a fundamental right, there is no apparent basis for a
standard less than strict scrutiny in evaluating a law implicating core Second Amendment rights.

> **(b)** **Violent felons were historically outside the protective scope of
> the right to keep and bear arms; *Heller*'s dictum concerning
> the presumed constitutionality of felon dispossession laws is
> entirely consistent with strict scrutiny**

In *Heller II*, this court evaluated the Second Amendment under an intermediate level of
scrutiny after concluding that the Supreme Court's dictum concerning the presumed
constitutionality of felon-in-possession laws would be inconsistent with the stringent
requirements of strict scrutiny. 698 F. Supp. 2d at 187; *see also Skoien*, 587 F.3d at 811 (same)
*vacated* 614 F.3d 638 (en banc). *Heller II* also concluded that the right to keep and bear arms was
not a fundamental right, reasoning that the Supreme Court would have explicitly declared it such
if it was. 698 F. Supp. 2d at 187. This latter conclusion was superceded by the Supreme Court's
intervening decision in *McDonald* v. *Chicago*, 130 S. Ct. at 3042 & 3059.

35

Plaintiffs respectfully disagree with the reasoning of *Heller II*. As noted above, the Supreme Court's observations about the presumed constitutionality of felon-in-possession laws are best read as limitations on the *scope* of the Second Amendment. From a historical perspective, convicted felons stood outside the protective scope of the Second Amendment. *See United States* v. *Emerson*, 270 F.3d 203, 227 n.21 (5th Cir. 2001) ("We also note that recognition that the Second Amendment does not prohibit legislation such as [the federal felon-in-possession ban] is in no way inconsistent with an individual rights model. . . . [Just as] the First Amendment does not permit the publication of libels, the Second Amendment is not infringed by laws prohibiting the carrying of concealed weapons") (citations and quotations omitted). Thus, just as categorical bans on unprotected speech are entirely consistent with the First Amendment, *see*, *e.g.*, *New York* v. *Ferber*, 458 U.S. 747 (1982), so too are felon dispossession laws consistent with the Second—even under the framework of strict scrutiny.

Indeed, modern scholarship confirms *Heller*'s treatment of felons, or at least, violent felons, as unprotected by the Second Amendment. At common law, felons suffered a form a civil death, forfeiting their liberties as punishment for their crimes. Convicted felons were also subject to forfeiture of all property, *see* 4 W. Blackstone, Commentaries On The Laws Of England 94 (1769) (hereinafter "Blackstone"), which would presumably include any arms that they might possess.  A recent law review article explains:

> [T]here is every reason to believe that the Founding Fathers would have deemed persons convicted of any of the common law felonies not to be among "the [virtuous] people" to whom they were guaranteeing the right to arms. At common law, felons were essentially stripped of property and other rights: "A felon who had broken the social contract no longer had any right to social advantages, including transfer of  property . . . ." A felon "could not own any property himself, nor could [his heirs] claim through him."

Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 HASTINGS L.J. 1339, 1360-61 (2009) (citations omitted).[12]

Most other scholarship has also concluded that violent felons lie outside the protections of the Second Amendment. *See* Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204, 266 (1984) ("The constitutionality of [felon dispossession laws] cannot seriously be questioned on a theory that felons are included within 'the people' whose right to arms is guaranteed by the second amendment. Felons simply did not fall within the benefits of the common law right to possess arms. That law punished felons with automatic forfeiture of all goods, usually accompanied by death."); Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 TENN. L. REV. 461, 480 (1995) (concluding that under a classical republican model, "felons, children, and the insane were excluded from the right to arms precisely as (and for the same reasons) they were excluded from the franchise—though some (women for example) who lacked the right to vote nonetheless possessed the right to arms."); Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection of Judges Reign?*, 36 OKLA L. REV. 65, 96 (1983) ("Colonial and English societies

---

[12] *See also* J.W. Cecil Turner, KENNY'S OUTLINES OF CRIMINAL LAW 93 (16th ed. 1952), which observes that:

> Amongst indictable crimes, the common law singled out some as being so conspicuously heinous that a man adjudged guilty of any of them incurred—not as any express part of his sentence but as a consequence that necessary ensued upon it—a forfeiture of property, whether of his lands or of his goods or of both (in the case of treason). Such crimes came to be called "felonies." The other, and lesser, crimes were known as "transgressions" or "trespasses," and did not obtain their present name of misdemeanours until a much later date. A felony is, therefore, a crime which either involved by common law such a forfeiture, or else has been placed by statute on the footing of those crimes which did involve it.

of the eighteenth century, as well as their modern counterparts, have excluded infants, idiots, lunatics, and felons [from possessing firearms].”); Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right to “Bear Arms”*, 49 LAW & CONTEMP. PROBS. 151 (1986) (“violent criminals, children, and those of unsound mind may be deprived of firearms . . . .”).[13]

But while violent felons may forfeit the protections of the Second Amendment, there is no basis for concluding that ordinary misdemeanants do as well. *Heller* makes no mention of misdemeanor crimes in its discussion of presumptively constitutional firearms laws. *Heller*, 554 U.S. at 626-27. To be sure, the opinion was careful to note that this list was non-exhaustive. *Id*. at 627 n.26. But if the Court were inclined to exclude *all* convicts—felons and misdemeanants alike—from the protection of the Second Amendment, it would be unusual to limit its discussion to felons.

Moreover, there is no historical correlation between Schrader’s particular conviction for simple assault and battery and a felony-level offense.[14] At common law, all forms of battery were classified as misdemeanor crimes. *See* 4 Blackstone 216-18 (1769); *see also Johnson*, 130 S. Ct.

---

[13] Of course, the felon classification was historically reserved for violent, extreme crimes. *See generally* C. Kevin Marshall, *Why Can’t Martha Stewart Have a Gun?*, 32 HARV. J.L. & PUB. POL’Y 695, 714-28 (2009) (questioning the historical compatibility of blanket felon dispossession laws with the right to keep and bear arms); *see also* Adam Winkler, *Heller’s Catch 22*, 56 UCLA L. REV. 1551, 1562-65 (2009) (same); *Williams*, 616 F.3d at 692 (“The academic writing on the subject of whether felons were excluded from firearm possession at the time of the founding is inconclusive at best . . .”) (citation and quotation omitted).

[14] Plaintiffs do not foreclose the possibility that certain misdemeanor crimes that raise heightened societal dangers might be analogized to felony-level offenses. *See, e.g.*, *United States v. White*, 593 F.3d 1199, 1205-1206 (11th Cir. 2010) (upholding against facial challenge the federal firearms ban on any person convicted of a “misdemeanor crime of domestic violence” after analogizing it to the presumptively-constitutional felon-in-possession ban.)

at 1271. So too were convictions for the related offense of "affray"[15]—a common law

misdemeanor defined as "the fighting of two or more persons in some public place, to the terror

of his majesty's subjects." *See* 4 Blackstone 144 (1769).

Viewed in the proper historical context, then, *Heller*'s disclaimer about felon-in-

possession laws is most naturally read as a limitation on the right's *scope*, not its applicable level

of scrutiny. Because violent felons traditionally fell outside the protections of the Second

Amendment, the government may impose felon-level restrictions without intruding on its core.

But any entrenchment upon these core protections must withstand strict scrutiny to survive.

> **(c)     A complete firearms ban applied to an ordinary common law
> misdemeanant like  Schrader cannot survive strict scrutiny
> review**

Applying strict scrutiny, the government's application of an absolute ban on  Schrader's

right to possess a firearm cannot be justified under the Second Amendment. A law subject to

strict scrutiny must be narrowly tailored to achieve a compelling governmental interest. *See*, *e.g.*,

*Grutter* v. *Bollinger*, 539 U.S. 306, 326 (2003). And while "[s]trict scrutiny is not strict in theory,

but fatal in fact," *id*. (internal quotation marks omitted), it is nevertheless an "exacting standard

and deliberately difficult to pass, in deference to the primacy of the individual liberties the

Constitution secures." *Skoien*, 587 F.3d at 811 n. 5. In the First Amendment context, for

example, a court applying strict scrutiny must ask whether "the challenged regulation is the least

restrictive means among available, effective alternatives." *Ashcroft* v. *ACLU*, 542 U.S. 656, 666

(2004) (emphasis added). "If a less restrictive alternative would serve the Government's purpose,

---

[15] Notably, affray continues to be a viable common law criminal offense in the State of
Maryland. *See Hickman* v. *State*, 193 Md. App. 238, 253 (2010).

the legislature must use that alternative." *United States* v. *Playboy Entm't Group*, 529 U.S. 803,

813 (2000). Strict scrutiny requires a "detailed examination, both as to ends and as to means."

*Parents Involved in Cmty. Sch.* v. *Seattle Sch. Dist. No. 1*, 551 U.S. 701, 743 (2007) (quotation

and citation omitted). And in *any* as-applied challenge, the challenger should be permitted to

"present facts about himself and his background that distinguish his circumstances from those of

persons historically barred from Second Amendment protections." *Barton*, 2011 U.S. App.

LEXIS 4111, No. 09-2211, at *13. For example,

> a felon convicted of a minor, non-violent crime might show that he is no more dangerous
> than a typical law-abiding citizen. Similarly, a court might find that a felon whose crime
> of conviction is decades-old poses no continuing threat to society. The North Carolina
> Supreme Court did just that in *Britt* v. *State*, 363 N.C. 546 (N.C. 2009), finding that a
> felon convicted in 1979 of one count of possession of a controlled substance with intent
> to distribute had a constitutional right to keep and bear arms, at least as that right is
> understood under the North Carolina Constitution. *Id*. at 323.

*Id*. at *13-14.

Here, the government seeks to apply against Schrader an absolute ban on the possession

of any firearm for any reason. Far from being narrowly tailored, the firearms ban imposed by §

922(g)(1) is essentially the most restrictive regulatory scheme imaginable. The government has

made no individualized finding that Schrader's possession of a firearm presents any sort of

danger to society. Moreover, the ban is for life, and provides no effective vehicle for reacquiring

his rights. While the law theoretically allows an affected party to petition the Attorney General

for relief of the disability, see 18 U.S.C. § 925(c), this "relief provision has been rendered

inoperative," as Congress has repeatedly barred the Attorney General from using appropriated

funds to investigate or act upon any such petitions. *See Logan*, 552 U.S. at 28 n.1. This leaves

Schrader's Second Amendment right entirely eviscerated, with no effective means of restoration.

Such a scheme is plainly incompatible with the requirements of strict scrutiny. *Cf. Gonzales* v. *O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 433 (2006) ("It is established in our strict scrutiny jurisprudence that a law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited") (quotations and citations omitted).

The government is also unable to provide a "compelling interest" for dispossessing an ordinary misdemeanant like  Schrader of his firearms rights. The government has made no finding that Schrader's possession of a firearm poses any danger to society at all. To the contrary, its mechanical application of the federal gun ban against him is based on a single misdemeanor conviction that occurred over forty years ago as a 20-year-old serviceman.

Finally, as explained in greater detail below, the government will not be permitted to proffer ad hoc justifications for applying the ban against  Schrader, but will instead be required to defend the ban under the actual justifications contemplated by Congress. These justifications—which fail to take the Second Amendment into account at all—do not rise to anywhere near the level of a compelling governmental interest.

> **2.**     **A complete firearms ban applied to an ordinary common law misdemeanant like  Schrader can also not survive review under intermediate scrutiny**

Even were this court to conclude that the right to keep and bear arms is not entitled to strict scrutiny, the government would be similarly unable to meet its burden under an intermediate scrutiny standard of review. As set forth by this court in *Heller II*, intermediate scrutiny is an "an exacting measure of scrutiny" that will apply to a regulation that "implicates the core Second Amendment right, namely, the right of law abiding, responsible citizens to use

arms in defense of hearth and home." 698 F. Supp. 2d at 188 (citation and quotation omitted).

Intermediate scrutiny requires a court to determine "whether the measure is substantially related

to an important governmental interest." *Id*.; *see also Clark* v. *Jeter*, 486 U.S. 456, 461 (1988)

(same). And "[s]ignificantly, intermediate scrutiny places the burden of establishing the required

fit squarely upon the government." *Chester*, 628 F.3d at 683 (citing *Bd. of Trs.* v. *Fox*, 492 U.S.

469, 480-481 (1989)).

In *Heller II*, this court upheld against a Second Amendment challenge the District of

Columbia's firearms registration scheme, finding it to be substantially related to the

government's interest in preventing crime and promoting public safety. *Id*. at 190-91. The

District had conducted hearings, heard testimony, and made various factual findings. The District

ostensibly chose the registration scheme after balancing the government's interest in promoting

public safety with the constitutional right of the people to keep firearms for purposes of self

defense. *Id*. at 190-93. Moreover, the plaintiffs in that case were evidently not prohibited from

owning firearms, but simply burdened with the administrative costs and inconveniences of the

registration scheme.

In this case, however,  Schrader has been entirely stripped of his core Second Amendment

rights to "to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635. The government

has made no individualized findings that he poses a threat to public safety, and will be able to

identify no other important governmental interest for banning his possession of firearms.

In applying intermediate scrutiny in the context of gender classifications, the Supreme

Court has explained that the "burden of justification is demanding and it rests entirely on the

State." *United States* v. *Virginia*, 518 U.S. 515, 533 (1996). More importantly, the "justification must be genuine, not hypothesized or invented post hoc in response to litigation." *Id*.

In this case, the original 1968 passage of the felon-in-possession ban pre-dated *Heller*, and thus did not appear to reflect any considerations at all for the constitutional right of the people to keep and bear arms. Congress' relevant findings of fact appear to have focused instead on potential threats to interstate commerce and other issues unrelated to the Second Amendment. Of course, to the extent the federal firearms ban affects persons who fall outside the protection of the Second Amendment—*e.g.*, felons, the insane, juveniles, etc.—the scheme will not raise constitutional issues. But for an ordinary misdemeanant like Schrader, the Second Amendment will not permit the government to invent post hoc justifications for disarming him.

### CONCLUSION

The government's imposition of a categorical, lifetime ban on Mr. Schrader's ability to possess a firearm has no basis in federal law and violates his individual right to keep and bear arms. Accordingly, Plaintiffs are entitled to the removal of Schrader's firearms disability from the NICS database pursuant to 18 U.S.C. § 925A, and order permanently enjoining Defendants from enforcing a firearms ban on the basis of ordinary common law misdemeanor convictions.

Dated: March 11, 2011

Respectfully submitted,

Alan Gura (D.C. Bar No. 453449)
Thomas M. Huff (D.C. Bar No. 978294)
Gura & Possessky, PLLC
101 N. Columbus Street, Suite 405
Alexandria, VA 22314
703.835.9085/Fax 703.997.7665

By: /s/Alan Gura
Alan Gura
Attorneys for Plaintiffs

43