# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JEFFERSON WAYNE SCHRADER and | ) | |
| SECOND AMENDMENT FOUNDATION, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 10-1736 (RMC) |
| v. | ) | |
| | ) | |
| ERIC HOLDER, Attorney General, and | ) | |
| FEDERAL BUREAU OF INVESTIGATION, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS AND OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

This case potentially presents two straightforward questions:  (a) whether Plaintiff Schrader falls within the definition Congress set out in Sections 922(g)(1) and 921(a)(20)(B) prohibiting possession of firearms by people with certain qualifying criminal convictions; and (b) whether the particular statutory prohibition violates the Second Amendment.  Before reaching the merits, however, the Court must ensure that Plaintiffs have properly invoked this Court's jurisdiction,  *National Mining Ass'n v. Kempthorne*, 512 F.3d 702, 706 (D.C. Cir. 2008) (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)).

Plaintiffs have failed to demonstrate standing.  In response to Defendants' motion to dismiss this case, Plaintiffs filed a First Amended Complaint ("FAC") adding the United States as a defendant and filed a cross-motion for summary judgment.  *See* ECF Nos. 6, 9.  But Plaintiffs solved only one of the multiple impediments to maintaining this action identified in Defendants' motion.  Neither the First Amended Complaint nor Plaintiffs' opposition and cross-motion for summary judgment establish standing for the claims asserted.  Plaintiffs fail to respond to many of the standing arguments raised by Defendants.  Plaintiff Schrader's

declaration and its attachments demonstrate that the State of Maryland contributed the record of

his 1968 assault conviction to the National Instant Criminal Background Check ("NICS")

system.  Moreover, as applied to Plaintiff Schrader, Sections 922(g)(1) and 921(a)(20)(B) are

constitutional because the historical understanding of the scope of the Second Amendment

extends only to "law-abiding citizens," and he admits that he has not been one at all times.

*Heller v. District of Columbia*, 554 U.S. 570, 625 (2008).  Indeed, Schrader's conviction is what

brings him within the scope of the ban on possession of firearms enacted by Congress.  For its

part, Plaintiff Second Amendment Foundation ("SAF"), with no members other than Schrader

identified and no evidence in the record, fails to establish either its organizational or

representational standing.

But even were Plaintiffs able to surmount the standing hurdle, they cannot succeed.  The

operation of Sections 922(g)(1) and 921(a)(20)(B) does not turn on whether the underlying

conviction was for a violent crime, the actual sentence imposed, or the felony/misdemeanor

designation.  Rather, the dispositive criterion is whether, as a result of the conviction, the person

faced a potential sentence of more than two years in prison.  Plaintiff Schrader undisputedly

faced a potential prison sentence greater than two years as a result of his conviction for common

law assault in Maryland in 1968.  That Maryland has since codified the crime of assault or

altered its own interpretation of the consequences of an assault conviction is of no moment.

Accepting Plaintiffs' theories would exclude from the federal ban on possession of firearms

every person who was convicted of a common law crime which has since been codified with a

cap of less than two years imprisonment, regardless of the nature of the crime.  There is no

evidence that Congress intended that, and the plain language of the challenged provisions contradicts such an interpretation.

## I.      Defendants' Motion to Dismiss the First Claim For Failing to State a Claim Should Be Granted As Unopposed

Defendants moved to dismiss the First Claim for Relief under 18 U.S.C. § 925A for two separate reasons: (1) failure to name a proper defendant; and (2) failure to state a valid claim. Plaintiffs responded to the first ground by naming the United States as a defendant in the First Amended Complaint filed on February 18, 2011.  Because Plaintiffs fail to address the second ground for dismissal anywhere in their opposition to Defendants' motion to dismiss, they have conceded that the First Claim for Relief fails to state a claim.  *E.g., Stephenson v. Cox*, 223 F. Supp.2d 119, 121 (D.D.C. 2002) ("[W]hen a plaintiff files a response to a motion to dismiss but fails to address certain arguments made by the defendant, the court may treat those arguments as conceded, even when the result is dismissal of the entire case."); *see also Hill v. Norfolk & Western Ry. Co.*, 814 F.2d 1192, 1198 (7th Cir. 1987) ("The ostrich-like tactic of pretending that potentially dispositive authority against a litigant's contention does not exist is as unprofessional as it is pointless.").  Accordingly, the Court should dismiss the First Claim under Fed. R. Civ. P. 12(b)(6).

Merely identifying the United States as a proper defendant did not suffice for Plaintiff Schrader to state a valid claim under Section 925A.  As argument II, B in Defendants' Memorandum and the entire record demonstrates, Plaintiff Schrader's Maryland assault conviction, which actually involved violence, falls squarely within the scope of Sections 922(g)(1) and 921(a)(20)(B).  *See* Def.'s Mem.  at 9-13.  In those provisions, Congress defined the categories of citizens whose convictions for qualifying offenses would disqualify them from

keeping firearms.  Numerous other courts have held that the dispositive criterion for Section 922(g)(1) is the potential sentence, rather than the actual sentence imposed or the felony/misdemeanor designation.  *See id.*  Because there is no dispute in this case that Plaintiff Schrader is the same person who was convicted of the assault reflected in the NICS, Plaintiff Schrader cannot establish that the information in NICS about him is erroneous.

To the extent the Court considers Plaintiffs' arguments on the Second Amendment claim as applying to the Section 925A claim, Plaintiff Schrader still would not be able to escape dismissal.  Plaintiffs' assertion that federal law enforcement is incorrectly interpreting or applying the law (Pls.' Opp. at 21) misses the mark.  The pertinent question is whether the definition Congress set out in the federal statute to disqualify people Congress believed should not possess firearms includes Plaintiff Schrader, and it plainly does.  *United States v. Coleman*, 158 F.3d 199, 203-04 (4th Cir. 1998) (*en banc*); *United States v. Hassan El*, 5 F.3d 726, 732-33 (4th Cir. 1993), *cert. denied*, 114 S. Ct. 1374 (1994); *see United States v. Kirksey*, 138 F.3d 120, 123-26 (4th Cir. 1998) (Maryland common law assault can qualify as a "violent felony" for purposes of federal sentencing guidelines but does not do so *per se*), *cert. denied*, 119 S. Ct. 122 (1998); *United States v. Williams*, No. 09-00044-CG-C, 2009 U.S. Dist. LEXIS 70299, at *3 (S.D. Ala. Aug. 11, 2009).  Although Plaintiffs conjure distinct meanings supposedly in their favor concerning specified punishments, that is not how any court -- save one that reversed itself *en banc* -- has interpreted the relevant statutory provisions.  *See* Pls.' Opp. at 16-17.  No current caselaw supports Plaintiffs' position.

Indeed, the logical weakness in Plaintiffs' argument is revealed in their bold contention that "[b]ecause uncodified common-law offenses are not 'punishable by' *any* particular statutory

criteria, they do not fall within the purview of the law." Pls.' Opp. at 16. Under that view, no common law offense, regardless of its violence or seriousness, could serve as a predicate to firearms exclusion under federal law. Even staying purely within Maryland, there are common law offenses that it would defy common sense to believe Congress intended to allow those convicted of them to possess firearms. *See, e.g.*, *Hickman v. State*, 996 A.2d 974, 983 (Md. Ct. Spec. App. 2010) (holding that common-law affray continues to be a viable offense in Maryland); *Jones-Harris v. State*, 943 A.2d 1272, 1286-88 (Md. Ct. Spec. App. 2008) (upholding conviction for common-law offense of false imprisonment); *Schlamp v. State*, 891 A.2d 327 (Md. 2006) (discussing common-law offense of riot); *Purnell v. State*, 827 A.2d 68, 78 (Md. 2003) (Maryland also recognizes the common-law offense of resisting arrest).

Likewise, Plaintiffs' assertions about how Maryland law classifies the offense today or how a statute enacted in 2006 automatically restored Plaintiff Schrader's civil rights are irrelevant. The issue is the definition under federal law, not how Maryland classifies the offense now (as opposed to how it would have in 1968) or Plaintiff Schrader's characterization of himself as an "ordinary misdemeanant." *See* Pls.' Opp. at 26-27, 38.

For all these reasons, the Court should dismiss the First Claim for Relief.

## II.      Plaintiff Schrader Lacks Standing

Now that he has submitted his own declaration, it is clear that Plaintiff Schrader lacks standing to maintain this action at all.[1]  He fails to demonstrate that he is suffering any current injury.  In his declaration, Plaintiff Schrader describes two attempts he was involved in to obtain firearms back in late 2008-early 2009.  *See* Declaration of Jefferson Wayne Schrader ("Schrader Dec."), ¶¶ 9-12.  The events surrounding the latter of the two firearms acquisitions were completed a "short time" after June 3, 2009.  *Id.* ¶¶ 11-12.  This lawsuit was not filed until October 13, 2010 – approximately eighteen months later.  And Plaintiff Schrader's declaration fails to describe anything that happened to him in that lengthy intervening period that has any bearing on his claims.  In every sense then, Plaintiff Schrader merely establishes, at most, a past injury he might have suffered.  A past injury is insufficient to satisfy the criteria for standing because the injury must be actual or imminent.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 & n.1 (1992); *Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972) ("the 'injury in fact' test requires more than an injury to a cognizable interest.  It requires that the party seeking review be himself among the injured").

Plaintiff Schrader ultimately relies for standing almost entirely on his "wish to own firearms for the purpose of self-defense."  Schrader Dec. ¶ 2.  Plaintiff Schrader's declaration places no temporal bounds on his wish, and the Court may therefore presume that it has been longstanding because, at least at summary judgment, the evidence is to be viewed in the light

---

[1]  Defendants' motion to dismiss argued that Plaintiff Schrader lacked standing for purposes of the Second Claim for Relief.  Because his declaration fails to supply key facts which were omitted from the initial complaint (as well as the FAC), however, Defendants now respectfully submit that the standing arguments pertain equally to both claims.

most favorable to the non-moving party, *i.e.*, the government with reference to Plaintiffs' Cross-Motion.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  This abstract desire is the sort of widely-held grievance that courts typically reject for purposes of establishing a concrete injury.  *See Sierra Club v. Morton*, 405 U.S. at 739-40; *Evans v. Lynn*, 537 F.2d 571, 598 (2d Cir. 1976) ("[d]isagreement with government action or policy, however strongly felt, does not, standing alone, constitute an 'injury' in the Constitutional sense which is cognizable in the federal courts and susceptible of remedy by the judicial branch; it is a matter properly addressed to the Congress or the Executive.").  Because Plaintiff Schrader does not refine what kinds of firearms he believes are appropriate for purposes of self-defense, his "wish" could conceivably extend to a desire to possess weapons prohibited by federal firearms provisions not challenged here, *e.g.*, unregistered sawed-off shotguns.

Nothing in Plaintiff Schrader's declaration, moreover, suggests that he currently or imminently intends to obtain a firearm of any particular type or at any particular place or for any purpose.  As Defendants argued in their motion to dismiss, the absence of these facts prevents Plaintiff Schrader from establishing standing.  *See* Def.'s Mem. at 17-19.  Perhaps of greatest significance, nothing in Plaintiff Schrader's declaration suggests in any way even that he would revive his efforts to obtain the particular firearms he had obtained or attempted to obtain in 2008-2009.  Thus, Plaintiff Schrader has not described an injury inflicted by Defendants.  The speculative nature of these allegations fail to "clearly demonstrate" an "injury in fact" that is "concrete in both a qualitative and temporal sense," and "distinct and palpable."  *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990).  His silence underscores and reinforces the error identified by Defendants:  the Court remains in the dark about what Plaintiff Schrader might do or where,

and those facts are critical to standing because he may not rest on speculation, especially at the summary judgment stage.[2]  *See Douglas v. Preston*, 559 F.3d 549, 556 (D.C. Cir. 2009).

Plaintiff analogizes his circumstances to the denial of a registration certificate for a firearm the Supreme Court found sufficient for standing in *Parker v. District of Columbia*, 478 F.3d 370, 374 (D.C. Cir.  2007), *aff'd*, *District of Columbia v. Heller*, 554 U.S. 570 (2008).  *See* Pls.' Opp. at 9.  Schrader has asserted no right to any license or permit from any governmental entity. He alleges and states only that he "wishes to own firearms."  Schrader Dec. ¶ 2.  This is even less substantial than the claim to "a general right to handgun ownership" that the D.C. Circuit found inadequate in *Parker.  See* 478 F.3d at 376.  And, in any event, such generalized assertions of right are insufficient to satisfy constitutional standing requirements.  The Supreme Court has "consistently held that a plaintiff raising only a  generally available grievance about government . . . and seeking relief that no more directly and tangibly benefits him than it does the public at large . . . does not state an Article III case or controversy."  *Lujan*, 504 U.S. at 573-74.

In *Lujan*, one of the plaintiffs asserted she had traveled to the locale at issue in the past and had "observed the traditional habitat of the endangered Nile crocodile there and intended to do so again, and hoped to observe the crocodile directly."  *Lujan*, 504 U.S. at 563.  Another plaintiff stated: she "intended to return to Sri Lanka in the future and hoped to be more fortunate

---

[2]  Plaintiff Schrader's resort to the futile acts doctrine improperly mixes apples and oranges.  *See* Pls.' Opp. at 11 n.5.  For purposes of this case, Plaintiff Schrader must establish his standing at the time the lawsuit was filed, and his failure to establish that he had specific plans to acquire or possess firearms (not necessarily through a purchase from a federally licensed source) may not be excused because he previously abandoned a firearms purchase.  Notably, Plaintiff Schrader has never indicated what became of the firearm that his companion supposedly obtained for his use.

in spotting at least the endangered elephant and leopard." *Id.* When asked in a deposition about specific plans to return to Sri Lanka, she said, "I intend to go back," though she did not know when. *Id.* at 564. The Supreme Court held that these vague assertions did not establish injury-in-fact:

> That the women "had visited" the areas of the projects before the projects commenced proves nothing. As we have said in a related context, "'Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.'" . . . . And the affiants' profession of an "inten[t]" to return to the places they had visited before – where they will presumably, this time, be deprived of the opportunity to observe animals of the endangered species – is simply not enough. Such "some day" intentions – without any description of concrete plans, or indeed even any specification of when the some day will be – do not support a finding of the "actual or imminent" injury that our cases require.

*Id.* (internal citations omitted); *see also Summers v. Earth Island Inst.*, 129 S. Ct. 1142, 1150 (2009) ("Accepting an intention to visit the National Forests as adequate to confer standing to challenge any Government action affecting any portion of those forests would be tantamount to eliminating the requirement of concrete, particularized injury in fact"). As the cases cited in Defendants' motion make clear, *see* Defs.' Mem. at 19, to impact him now, Plaintiff Schrader must be trying to or imminently intending to possess a firearm. By failing to state that, and instead relying entirely on a mere "wish to own firearms," Plaintiff Schrader lacks standing. Nothing in the challenged firearms provisions prohibits Plaintiff Schrader's ownership of firearms, only his possession.

Plaintiff Schrader's declaration, moreover, makes it clearer than the silence in the factual allegations in the First Amended Complaint did that he has failed to exhaust available administrative remedies. The Court need not and should not reach constitutional questions where they can be avoided, and this appears to be one of those cases. *See Whitehouse v. Illinois*

*Central R. Co.*, 349 U.S. 366, 373 (1955) (courts should "confine ourselves to deciding only what is necessary to the disposition of the immediate case."); *see also Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them"); *Ashwander v. TVA*, 297 U.S. 288, 346-347 (1936) (Brandeis, J., concurring) ("The Court will not anticipate a question of constitutional law in advance of the necessity of deciding it.  It is not the habit of the Court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case" (citations and internal quotation marks omitted)).  Nothing in the record suggests that Schrader has made any effort to overturn his 1968 Maryland conviction or request a pardon based on his honorable military service and otherwise clean criminal record.

"The [exhaustion of administrative remedies] doctrine provides 'that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.'"  *McKart v. United States*, 395 U.S. 185, 193 (1969) (quoting *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50-51 (1938)).  The purpose of the exhaustion requirement is to "avoid[] [the] premature interruption of the administrative process . . . to let the agency develop the necessary factual background upon which decisions should be based, [a]nd since agency decisions are frequently of a discretionary nature or frequently require expertise, the agency should be given the first chance to exercise that discretion or to apply that expertise." *McKart*, 395 U.S. at 193-94; *Burt Lake Band of Ottawa & Chippewa Indians v. Norton*, 217 F. Supp. 2d 76, 78 (D.D.C. 2002) ("In cases where Congress has allocated decision-making responsibility to the Executive branch, petitioning parties are required to exhaust all available

administrative remedies before seeking judicial relief.") (citation omitted), *appeal dismissed*, No. 02-5341, 2002 WL 31778064 (D.C. Cir. Dec. 4, 2002).  The exhaustion requirement also promotes judicial efficiency because the agency may decide the matter in favor of the plaintiff and obviate the need for judicial review.  *McKart*, 395 U.S. at 195.

Here, the letter dated June 3, 2009 from the Federal Bureau of Investigation ("FBI") (attached as Exhibit A to the Schrader Dec.), directs Plaintiff Schrader to Maryland state authorities if he has any dispute with his conviction.  Plaintiff Schrader admits the conviction, as well as the underlying misconduct, so his first line of recourse is to present his arguments for why the conviction should not continue to be valid or held against him to the State of Maryland.

Accordingly, the Court should find that Plaintiff Schrader fails to establish his standing to bring this case.

## III.    Plaintiff SAF Also Lacks Standing

As an initial matter, it is worth noting that Plaintiff SAF presents no evidence in support of its own standing.  Instead, Plaintiff SAF relies only on the allegations in the FAC[3] and many of the same arguments it made in favor of SAF's standing it *Hodgkins v. Holder*, 677 F. Supp. 2d 202, 203 (D.D.C. 2010), *appeal docketed and pending*, No. 10-5062 (D.C. Cir. Mar. 5, 2010).

---

[3] For purposes of Defendants' motion to dismiss, the Court should assess Plaintiff SAF's standing "on the assumption that the  allegations of the complaint relevant to standing are true." *Young America's Foundation v. Gates*, 573 F.3d 797, 799 (D.C. Cir. 2009).  However, "parties invoking jurisdiction at summary judgment may not rest on mere allegations, but must set forth by affidavit or other evidence specific facts demonstrating standing."  *See Shays v. FEC*, 414 F.3d 76, 84 (D.C. Cir. 2005) (citation and internal quotation marks omitted); *Lujan*, 504 U.S. 555, 561 (1992) ("[s]ince they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each [standing] element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.").  Accordingly, the absence of any evidence from Plaintiff SAF precludes granting its cross-motion for summary judgment.

*See* Pls.' Opp. at 14.  Because both cases arise in at least similar factual contexts, this Court may

find the D.C. Circuit's decision in *Hodgkins* instructive, but it will not be dispositive because "an

inquiry into standing is a highly case-specific endeavor," *Public Citizen v. FTC*, 869 F.2d 1541,

1546 (D.C. Cir. 1989) (citation and quotation marks omitted), requiring "careful judicial

examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to

an adjudication of the particular claims asserted[.]"  *Allen v. Wright*, 468 U.S. 737, 752 (1984).

In this case, Plaintiff SAF asserts that it has both organizational and representational

standing to sue.  *See* Pls.' Opp. at 13.  SAF alleges (without any evidentiary support) that it

educates its members and the public about the government's enforcement of gun laws in general,

and 18 U.S.C. § 922(g)(1), but without any particular reference to the application of the specific

provisions specifically challenged here:  Section 922(g)(1) in conjunction with Section

921(a)(20)(B).  *See id*. at 14.  It is thus too far a leap for SAF to contend, as it does, that "[t]he

government's enforcement of the challenged provisions thus directly impacts the organization."

*Id*.

SAF also fails to offer even an estimate of how many of its members, including Plaintiff

Schrader, would possess firearms but for their past conviction of a common law misdemeanor

offense within the scope of Section 921(a)(20)(B).  All Plaintiff Schrader has said is that he did

not consummate a handgun purchase in early 2009, but he does not cite the federal firearms

prohibition as the sole reason for his conduct, or describe any other efforts he has taken to have

his Maryland conviction altered.  *See* Schrader Dec. ¶ 12.

In support of its organizational standing, Plaintiff SAF cites *Fair Employment Council v.

BMC Mktg. Corp.*, 28 F.3d 1268 (D.C. Cir. 1994), and *Haitian Refugee Ctr. v. Gracey*, 809 F.2d

794 (D. C. Cir. 1987).  *See* Pls.' Opp. at 14.  In the first case, the D.C. Circuit determined that

Article III standing had been established by an organization alleging that the defendant's

"discriminatory actions interfered with" the organization's "community outreach, counseling,

and research projects," requiring the organization "to expend resources to counteract BMC's

alleged discrimination."  *Nat'l Treasury Employees Union*, 101 F.3d at 1429 (quoting *Fair

Employment  Council*, 28 F.3d at 1276 (brackets and ellipses omitted)).  In the latter case,

however, the D.C. Circuit found that neither the members nor the nonprofit membership

corporation had standing to sue and affirmed the District Court's dismissal of the case.  *Haitain

Refugee Ctr.*, 794 F.2d at 816.[4]  The FAC contains no facts to support an injury here.  Unlike the

pleading in *Haitian Refugee Center*, which was decided prior to the more stringent pleading

standard adopted in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 & n.3 (2007), and

*Ashcroft v. Iqbal*, 129 S. Ct. 1927 (2009), the FAC here contains no facts to support the

conclusion that SAF has been injured.  *See* FAC, ¶¶ 2, 17.  *Haitian Refugee Center* presented a

challenge to a specific interdiction program; SAF alleges that it challenges the amorphous

concept of federal gun control.   It is fair to say that Plaintiff SAF has failed to provide the Court

with any information about its activities.  Other than perhaps espousing a sincere opposition to

all federal gun control provisions that hamper possession of firearms, the record is devoid of any

---

[4]  As to Plaintiffs' pinpoint citation to page 799 of the reported decision in *Haitian
Refugee Center*, the most that can be said of that portion is that it accepts that the organization
had established an injury for purposes of Article III standing.  *See* Pls.' Opp. at 14.  As set forth
in Defendants' opening brief, injury is only one of the three elements of standing, and the D.C.
Circuit further stated that "whether HRC's alleged injury is a mere generalized grievance need
not be decided since the court's cases are less than entirely clear in this area and the discussion
of the other standing requirements suffices to deny the Center's standing."  *Haitian Refugee
Center*, 809 F.2d at 799 n.2.

evidence (as distinguished from conclusory statements) that the challenged statutes have affected the activities of the Foundation in any manner.  Under the cases cited by Defendants, that is insufficient to establish standing.

In support of its representational standing, Plaintiff SAF claims to be "identical" to the organization of police officers in *Fraternal Order of Police v. United States*, 152 F.3d 998 (D.C. Cir. 1998) ("*FOP*"), *reh'g granted*, 159 F.3d 1362 (D.C. Cir. 1998), *and on reh'g*, 173 F.3d 898 (D.C. Cir. 1999), *cert. denied*, 528 U.S. 928 (1999).  *See* Pls.' Opp. at 15.  But Plaintiffs' comparison to the standing found for an organization of police officers is flawed.  In *FOP*, the D.C. Circuit found that the Fraternal Order of Police had representational standing to assert claims on behalf of its members who were chief law enforcement officers ("CLEOs") where, among other things, FOP alleged that compliance with the challenged law resulted in the disqualification of subordinate officers, thereby injuring the CLEOs by forcing them to take affirmative action.  *See id.* at 1000-01.  No such injury is alleged here.  Because the organization represented existing police officers being required to undertake an action, they were not comparable to Plaintiff SAF because SAF is not being forced to do anything by the challenged statutes.

Because neither plaintiff is able to demonstrate appropriate standing, the Court should dismiss this case for lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).

**IV.     The Court Should Deny Plaintiffs' Cross-Motion For Summary Judgment Because The Challenged Provisions Do Not Violate the Second Amendment**

### A.     There Are Genuine Disputes of Material Facts

Defendants attach their response to Plaintiffs' Statement of Undisputed Material Facts and Defendants' Statement of Material Facts in Dispute to Defendants' Opposition to Plaintiffs' Cross-Motion for Summary Judgment, filed herewith, and incorporate it here by reference.

### B.     The Challenged Statutory Provision Is Constitutional

At the outset, if the Court reaches this point at all, it is worth noting that several courts have summarily rejected similar as-applied challenges to Section 922(g)(1) based on the presumption of the constitutionality of firearms prohibitions recognized in *Heller*, and reaffirmed in *McDonald*.  *See United States v. Khami*, No. 08-2437, 2010 U.S. App. LEXIS 1649, at **17-21 (6th Cir. Jan. 26, 2010) (citing *Heller* and summarily rejecting facial and as-applied challenges § 922(g)(1)), *cert. denied*, 130 S. Ct. 3345 (2010); *United States v. Schultz*, No. 1:08-CR-75-TS, 2009 U.S. Dist. LEXIS 234, at *3-7 (N.D. Ind. Jan. 5, 2009) (same); *United States v. Henry*, No. 08-20095, 2008 U.S. Dist. LEXIS 60780, at *1-3 (E.D. Mich. Aug. 7, 2008) (citing *Heller* and summarily rejecting an as-applied challenge to § 922(g)(1)).  Because Plaintiff Schrader's admitted crime was subject to a term of imprisonment exceeding one year, which qualifies it as a felony under the definition in federal law, he should be considered to be a convicted felon for purposes of his Second Amendment challenge.  *See Coleman*, 158 F.3d at 203-04.  Plaintiffs' Opposition and Cross-Motion fail to distinguish *Coleman*, and merely attempt to avoid it as non-binding on this Court.

### 1.      Legal Framework and Analysis

Whether Section 922(g)(1) in conjunction with Section 921(a)(20(B) is constitutional is a

question of law.  Plaintiffs' challenge with respect to Plaintiff Schrader fails because, as set forth

below, these provisions are constitutional as applied to him under any level of scrutiny.

Ordinarily, a party may not facially challenge a law that is constitutional as applied to him.  *See*

*Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973) ("Embedded in the traditional rules governing

constitutional adjudication is the principle that a person to whom a statute may constitutionally

be applied will not be heard to challenge that statute on the ground that it may conceivably be

applied unconstitutionally to others, in other situations not before the Court").[5]

The Supreme Court in *Heller* left open the question of the precise level of scrutiny

applicable to Second Amendment claims.  Although the *Heller* Court made clear that rational

basis review is not the standard of review for Second Amendment challenges, the Court also

implicitly rejected strict scrutiny review in this context.  *See Heller*, 128 S. Ct. at 2851 (Breyer,

J., dissenting) ("[T]he majority implicitly, and appropriately, rejects [a "strict scrutiny test] by

broadly approving a set of laws ... whose constitutionality under a strict scrutiny standard would

---

[5]  Exercising judicial restraint in a facial challenge "frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretation of statutes in areas where their constitutional application might be cloudy."  *Washington State Grange v. Washington State Republican Party*, 128 S. Ct. 1184, 1190 (2008)(quoting *United States v. Raines*, 362 U.S. 17, 22 (1960)).  "Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the facts to which it is to be applied."  *Id.* (citations omitted). "Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution. We must keep in mind that a ruling of unconstitutionality frustrates the intent of the elected representatives of the people."  *Id.* (citations omitted).

be far from clear."). Post-*Heller*, almost every court to examine the issue has held held that

Second Amendment challenges do not trigger strict scrutiny.[6] But Defendants respectfully

submit that the analysis in those decisions is incorrect. Other courts found it unnecessary to

select a standard of review because they found that a particular provision of 922 (g) passed all

standards of review.[7]

Although counsel for Defendants is unaware of any United States Court of Appeals

decision which has addressed the constitutionality of Section 922(g)(1) in conjunction with

Section 921(a)(20)(B) either pre- or post-*Heller*, several Courts of Appeals, including the Fourth

Circuit, have rejected constitutional challenges to other provisions of Section 922(g) based on

the

---

[6] *See, e.g., United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010) (and cases cited therein); *United States v. Bledsoe*, No. SA-08-cr-13(2)-XR, 2008 WL 3538717 at *3 (W.D. Tex. Aug. 8, 2008) ("Given that the Supreme Court declined to set a standard for which to evaluate Second Amendment regulations, this Court finds unwarranted Defendant's assertion that strict scrutiny, the most exacting form of scrutiny available, be used to evaluate the statutes in question in this case."); *United States v. Chafin*, No. 2:08-00129, 2008 WL 4951028, at *2 n.3 (S.D. W.Va. Nov. 18, 2008) ("An in-depth analysis is likewise unwarranted concerning defendant's contention that any post-*Heller* firearm restriction must satisfy strict constitutional scrutiny. The law appears otherwise."); *United States v. Miller*, No. 08-CR-10097, 2009 WL 499111, at *6 (W.D. Tenn. Feb. 26, 2009) (defendant challenging 18 U.S.C. § 922(g) (1) "cannot invoke strict scrutiny through a fundamental rights theory."); *United States v. Radencich*, No. 3:08-CR-00084(01)RM, 2009 WL 127648, at *4 (N.D. Ind. Jan. 20, 2009); *United States v. Schultz*, No. 1:08-CR-75-TS, 2009 WL 35225, at *5 (N.D. Ind. Jan. 5, 2009); *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010), *cert. denied*, 131 S. Ct. 958 (2011). *But see United States v. Engstrum*, 609 F.Supp.2d 1227 (D. Utah 2009), *overruled in United States v. Reese*, 627 F.3d 792 (10th Cir. 2010).

[7] *See, e.g., United States v. Luedtke*, No. 08-cr-189, 2008 WL 4951140 (E.D. Wis. Nov. 18, 2008); *United States v. Erwin*, No. 1:07-CR-556(LEK), 2008 WL 4534058, at *2 n.2 (N.D.N.Y. Oct. 6, 2008); *United States v. Knight*, No. 07-127-P-H, 2008 WL 4097410 (D. Me. Sept. 4, 2008).

*Heller* opinion.[8]  In particular, nearly every court to address the constitutionality of Section

922(g)(9), prohibiting possession of a firearm by people convicted of misdemeanors of domestic

violence, post-*Heller* has found that statute constitutional.[9]  In addition, the Fourth Circuit

declined to decide whether and to what extent the Second Amendment right recognized in *Heller*

applies outside the home, but rejected under an intermediate scrutiny standard a defendant's

challenge to his conviction for possessing a loaded handgun in a motor vehicle within a national

park area, in violation of 36 C.F.R. § 2.4(b)).  *United States v. Masciandaro*, --- F.3d ----, 2011

WL 1053618, *7-*17 (4th Cir. Mar. 24, 2011).

Regardless of which level of scrutiny applies, the United States's interest in uniformly

reducing threats to society is sufficient to survive Plaintiffs' constitutional challenges.

Intermediate scrutiny typically requires some showing that the challenged law is "substantially

related to an important government objective."  *See, e.g., Clark v. Jeter*, 486 U.S. 456, 461

(1988).  "As to weapons possession, the Federal Government has an interest in a single, national,

protective policy, broader than required by state law."  *Caron v. United States*, 524 U.S. 308,

---

[8] *United States v. Williams*, 616 F.3d 685 (7th Cir. 2010); *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010); *United States v. McRobie*, No. 08-46322009 WL 82715, at *1 (4th Cir. Jan. 14, 2009) (per curium); *United States v. Brunson*, 292 Fed. Appx. 259, at **1 (4th Cir. Sept. 11, 2008) (per curium); *United States v. Stucky*, No. 08-0291-Cr. 2009 WL 692116, at *1 (2d Cir. March 18, 2009); *United States v. Anderson*, No. 08-40160, 2009 WL 330263, at *2 (5th Cir. Feb. 11, 2009); *United States v. Frazier*, No. 07-6135, 2008 WL 4949153 (6th Cir. Nov. 19, 2008); *United States v. Irish*, 285 Fed. Appx. 326, at *1 (8th Cir. July 31, 2008) (per curium); *United States v. Brye*, No. 08-12578, 2009 WL 637553, at *1 (11th Cir. March 13, 2009) (per curium).

[9] *See, e.g.*, *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) (*en banc*); *United States v. Booker*, 570 F.Supp. 2d 162 (D. Me. 2008); *United States v. Wyman*, No. CR-08-154-B-W, 2009 WL 426293, at *1 (D. Me. Feb. 20, 2009); *United States v. White*, No. 07-00361-WS, 2008 WL 3211298, at *1 (S.D. Ala. Aug. 6, 2008).  *But see United States v. Chester*, 628 F.3d 673, 692 (4th Cir. 2010).

309 (2007).  "State gun control laws were found 'inadequate to bar possession of firearms from those most likely to use them for unlawful purposes.'"  *Scarborough v. United States*, 431 U.S. 563, 575 n.11 (1977) (quoting 114 Cong. Rec. 14774) (1968)).

### 2.    Plaintiffs' Argument For Strict Scrutiny Should Be Rejected

Plaintiffs' argument in favor of applying strict scrutiny to § 922(g)(1) and § 921(a)(20)(B), namely, that the Second Amendment protects a "fundamental" right, is misguided.  *See* Pls.' Opp. at 33-39.  Courts "do not apply strict scrutiny whenever a law impinges upon a right specifically enumerated in the Bill of Rights."  *United States v. Chester*, 628 F.3d 673, 682 (4th Cir. 2010); *accord United States v. Marzzarella*, 614 F.3d 85, 96 (3d Cir. 2010) ("Strict scrutiny does not apply automatically any time an enumerated right is involved."), *cert. denied*, 131 S. Ct. 958 (2011).  Although strict scrutiny is sometimes applied to constitutional claims that involve enumerated and fundamental rights, less demanding scrutiny is frequently applied as well.  See Adam Winkler, *Fundamentally Wrong About Fundamental Rights*, 23 Const. Comment. 227, 233 (Summer 2006) ("All incorporated rights may be fundamental, but not all incorporated rights trigger strict scrutiny.  As noted above, there is no strict scrutiny found in Fourth Amendment doctrine, Sixth Amendment doctrine, or in the case law emerging from the incorporated provisions of the Eighth Amendment.").

Moreover, even in contexts where strict scrutiny sometimes applies, such as the right to free speech, the Supreme Court will, depending on the nature of the restriction at issue, use a more deferential standard of review.  *See Marzzarella*, 614 F.3d at 96 ("[T]he right to free speech, an undeniably enumerated fundamental right, is susceptible to several standards of scrutiny, depending upon the type of law challenged and the type of speech at issue. We see no

reason why the Second Amendment would be any different."); *Chester*, 628 F.3d at 682; Adam

Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683, 695 (2007); Ashutosh

Bhagwat, *The Test That Ate Everything: Intermediate Scrutiny in First Amendment*

*Jurisprudence*, 2007 U. Ill. L. Rev. 783, 786-800 (2007).

Thus, simply because the Supreme Court in *McDonald v. City of Chicago*, 130 S. Ct.

3020, 3042 (2010), held that the right to keep and bear arms is "fundamental" and applicable to

the states, such a conclusion does not affect the level of constitutional scrutiny appropriate for

resolution of Plaintiffs' claim.  Indeed, *McDonald* makes that clear by declining (as did *Heller*)

to consider the "standard of scrutiny" question.

For those reasons, every appellate court to have considered arguments like Plaintiffs' has

rejected strict scrutiny.  *See, e.g., Reese*, 627 F.3d at 801-802 (upholding 18 U.S.C. § 922(g)(8)

under intermediate scrutiny); *United States v. Yancey*, 621 F.3d 681, 682-687 (7th Cir. 2010)

(upholding 18 U.S.C. § 922(g)(3), which disarms unlawful drug users, under intermediate

scrutiny review); *United States v. Williams*, 616 F.3d 685, 692-694 (7th Cir.) (upholding 18

U.S.C. § 922(g)(1), as applied to violent felons, under intermediate scrutiny), *cert. denied*, 131 S.

Ct. 805 (2010); *Marzzarella*, 614 F.3d at 95-101 (upholding 18 U.S.C. § 922(k), which prohibits

possession of a firearm with an obliterated serial number, under intermediate scrutiny); *see also*

*United States v. Rene E.*, 583 F.3d 8, 12-13 (1st Cir. 2009) (upholding 18 U.S.C. § 922(x)(2)(A),

which prohibits juveniles from possessing handguns, under a historical analysis).[10]

---

[10]  Indeed, nearly every federal district court has rejected the argument as well.  The sole
reported decision finding otherwise is *United States v. Engstrum*, 609 F. Supp. 2d 1227 (D. Utah
2009), which *upheld* the constitutionality of Section 922(g)(9) under strict scrutiny (making its
perfunctory discussion of the appropriate standard of scrutiny unnecessary to the holding).  In
any event, *Engstrum* does not reflect the law in the Tenth Circuit.  *See Reese*, 627 F.3d at 801-02

Indeed, the application of strict scrutiny in this case would be inconsistent with the historical understanding of the right to keep and bear arms. *See United States v. Brown*, 715 F. Supp.2d 688, 695-98 (E.D. Va. 2010) (canvassing the history and finding that persons who commit misdemeanor crimes of domestic violence fall outside the scope of the Second Amendment).  As noted above, the founding generation accepted extensive restrictions on who could keep and bear arms, and specifically understood the need to disarm criminals and other dangerous people.  *See also Chester*, 628 F.3d at 682-83 (rejecting claim that strict scrutiny should apply because § 922(g)(9) burdened his Second Amendment right to possess a firearm in his home for self defense and finding that the claim was outside of the core right identified in *Heller* — the right of a law-abiding, responsible citizen — by virtue of the defendant's criminal history as a domestic violence misdemeanant).  Nor would a strict scrutiny approach be easy to reconcile with *Heller* itself.  While the Supreme Court declined to identify a particular standard of review, its conclusion that specific forms of firearms regulations were "presumptively lawful" under the Second Amendment displays a degree of deference to Congress that is inconsistent with strict scrutiny review.  *See Heller*, 554 U.S. at 688 (Breyer, J., dissenting).

The strict scrutiny approach would also disregard the nature of both the Second Amendment right and the government's interest in regulating its use.  While firearms undeniably serve lawful purposes, including the "core lawful purpose of self-defense," *Heller*, 554 U.S. at

---

(applying intermediate scrutiny).  Indeed, in *Engstrum* itself, the Tenth Circuit disagreed with the district court's approach.  After concluding that strict scrutiny applied to the defendant's Second Amendment claim, the district court decided to instruct the jury that "if you find that the Defendant did not pose a prospective risk of violence, he may not be deprived of his Second Amendment rights[.]"  The Tenth Circuit granted the government's petition for a writ of mandamus to preclude this instruction, and concluded that no such individualized inquiry was required.  *In re United States*, 578 F.3d 1195, 1197-1200 (10th Cir. 2009) (unpublished order).

630, in the wrong hands they also pose a serious risk of injury or death.  By contrast, other rights that sometimes trigger strict scrutiny, such as the right to free speech, rarely pose public safety concerns, and where they do, strict scrutiny is not applied.  *See id.*, 554 U.S. at 689-90 (Breyer, J., dissenting) (citing cases).  Moreover, in limiting the possession of firearms by those who may be incapable of using them responsibly, the government performs its "cardinal civic responsibilit[y]" to protect the health, safety and welfare of its citizens.  *Department of Revenue of Ky. v. Davis*, 553 U.S. 328, 342 (2008).  Accordingly, such laws should not trigger any presumption of an "invidious" motive, unlike other government actions (such as classifications based on race or content based regulations of speech) that automatically trigger strict scrutiny review.  Winkler, 105 Mich. L. Rev. at 700-03.

For all these reasons, strict scrutiny is no more appropriate than rational basis review here.  Instead, intermediate scrutiny should apply.

### 3. Sections 922(g)(1) and 921(a)(20)(B) Are Substantially Related to the Important Governmental Interests in Protecting Public Safety and Combating Violent Crime

To satisfy intermediate scrutiny, "a statutory classification must be substantially related to an important governmental objective."  *Clark*, 486 U.S. at 461.  Protecting public safety and combating crime are well-established *compelling* governmental interests.  *See United States v. Salerno*, 481 U.S. 739, 748, 750 (1987) (noting that the Supreme Court has "repeatedly held that the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest" and that the government's "general interest in preventing crime is compelling"); *Schall*, 467 U.S. 253, 264 (1984) ("The legitimate and

compelling state interest in protecting the community from crime cannot be doubted.") (citation and internal punctuation omitted).

Several relevant factors should properly influence intermediate scrutiny review as applied here.  First,

> intermediate scrutiny, by definition, permits legislative bodies to paint with a broader brush than strict scrutiny.  The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments varies up or down with the novelty and plausibility of the justification raised.  As a consequence, the degree of fit between the registration scheme in this case and the well-established goal of promoting public safety need not be perfect; it must only be substantial.

*Heller v. Dist. of Columbia*, 698 F. Supp. 2d 179, 191 (D.D.C. 2010) (citations and internal punctuation omitted).  Second, in order to advance its compelling interests in combating crime and protecting public safety, Congress may need to make "predictive judgments" about the risk of dangerous behavior.  Such judgments are entitled to "substantial deference" by the courts. *Turner Broadcasting Sys. v. FCC*, 512 U.S. 622, 665 (1994).  Moreover, the primary role in making such judgments properly falls to Congress, not the courts, because Congress is "far better equipped than the judiciary" to collect, weigh, and evaluate the relevant evidence, and to formulate appropriate firearms policy in response.  *Id*. at 665-66.

The risks associated with firearm possession by violent misdemeanants are obvious, and therefore the plainly legitimate sweep of § 922(g)(1) in conjunction with § 921(a)(20(B) is equally obvious.  Persons convicted of violent assault, by their conduct, demonstrate an unwillingness to respect and abide by the law.  Prohibiting those who are not law-abiding citizens from possessing firearms serves the United States's important and compelling interest in protecting its citizens.  This interest is especially acute where one's illegal conduct involves violence against another person.  This is true whether or not a firearm was used in the predicate

misdemeanor offense.  For example, most felonies are not committed with firearms, yet all convicted felons are prohibited from possessing firearms by § 922(g)(1).

In fact, a Bureau of Justice Statistics study from 2002 ("BJS Recidivism Statistics" attached as Exhibit A) chronicles re-arrests among 272,111 prisoners within the first three years of release.[11]  The study found that among those who had been released after serving jail time for violent offenses, 61.7% were re-arrested and 39.9% were re-convicted.  *See* Table, page 8.  Among those who had served jail time for violent assault in particular, 65.1% were re-arrested and 44.2% were re-convicted.  *Id.*  The data further demonstrates that of the 65.1% that were re-arrested after being released from violent assault-related sentences, 31.4% of them were re-arrested for another violent offense, and 22% were re-arrested for another assault offense in particular.  *Id.* at 9.  As the study states, "the  released assaulter was the one most likely to be rearrested for assault."  *Id.*

A study by the National Institute of Justice followed over 1500 subjects, all of whom "sought to purchase a handgun from a federally licensed firearm dealer in California during 1989-1991 and who had at least one conviction… for a violent misdemeanor that became grounds for denial of handgun purchase in 1991."  *See* Exhibit B at 1.  The study found that "denial of handgun purchase was associated with a moderate decrease in risk of arrest for new gun and/or violent crimes," even taking into account gender, age and criminal history.  *Id.* at 42.

---

[11]  The Court may properly take judicial notice of such materials, as other appellate courts have done in upholding related provisions of Section 922(g).  *See, e.g.*, *Reese*, 627 F.3d at 802-03 (upholding 18 U.S.C. § 922(g)(8), which disarms persons subject to domestic violence protective orders); *Williams*, 616 F.3d at 692-94 (upholding 18 U.S.C. § 922(g)(1), as applied to violent felons); *Yancy*, 621 F.3d at 682-87 (upholding 18 U.S.C. § 922(g)(3), which disarms unlawful drug users).

Based on the foregoing, the Defendants' interest in prohibiting possession firearms by persons convicted of misdemeanors punishable by up to two years in prison is both important and compelling.  Prohibiting such persons from possessing firearms serves the important and compelling government interest of keeping firearms away from presumptively risky persons.

### 4.     The Effect of The Challenged Provisions is Not Illogical

The application of Sections 922(g)(1) and 921(a)(20(B) does not produce "nonsensical" results, as Plaintiffs claim.  *See* Pls.' Opp. at 21.  In support of this argument, Plaintiffs emphasize the supposed harshness of a lifetime ban on possessing firearms on Plaintiff Schrader, whom they quaintly characterize as "an ordinary common law misdemeanant."  *Id*. at 39; *see also id.* at 40, 41. Given the dangers associated with assault misdemeanants possessing firearms, it is not necessary for Congress to draw distinctions based on the underlying facts of the qualifying  conviction.  *See* Pls.' Opp. at 40.  People who resort to physical aggression quickly when a dispute arises, introduce an element of unpredictability into society in general and into firearm possession in particular, and therefore it is entirely proper for Congress to prohibit all people convicted of "any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less" from possessing firearms.  18 U.S.C. § 921(a)(20)(B).  Moreover, statutes that prohibit firearm possession need not require an individualized prediction of danger, as Plaintiffs posit.  *See* Pls.' Opp. at 40.  For example, § 922(g)(1), which *Heller* expressly excepted from its holding, prohibits convicted felons from possessing firearms-even if the underlying crime is a non-violent felony.  This fact has led one district court to note that, "[i]f anything, as a predictor of firearm misuse, the definitional net cast by § 922(g)(9) is tighter than the next cast by § 922(g) (1)."  *Booker*, 570 F.Supp.2d at 164; *see*

*also Skoien*, 614 F.3d at 641 ("[S]ome categorical disqualifications are permissible: Congress is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons, nor need these limits be established by evidence presented in court.").

Plaintiffs' argument regarding the alleged historical differences between convicted felons and misdemeanants in the context of lost rights misses the point. *See* Pls.' Opp. at 36-38. *Heller* itself does not suggest that Congress could only disarm criminals only if they fall outside the scope of the Second Amendment as understood at the time of its adoption.   Indeed, as Justice Breyer noted in dissent, the majority specifically did not base its approval of the Second Amendment "exceptions" on proof of "colonial analogues." *Heller*, 554 U.S. at 721-22. Nonetheless, as the discussion below demonstrates, in acknowledging Congress's authority to disarm criminals, *Heller* was consistent with the history of the right to arms as it developed in England and the American colonies.

*Heller* identified the right protected by the 1689 English Declaration of Rights as "the predecessor of our Second Amendment." *Id*. at 592-93.  This document provided "That the subjects which are Protestants may have arms for their defense suitable to their conditions and as allowed by law."  1 W. & M., c. 2, § 7, in 3 Eng. Stat. at Large 441 (1698).

It is undisputed that both before and after its adoption, the English government retained the power to disarm individuals it viewed as dangerous.  First, the right specifically excluded Catholics, who were viewed as potentially disloyal, and were frequently disarmed on this basis. *See Heller*, 128 S. Ct. at 2792.  Moreover, "like all written English rights" this right to arms

"was held only against the Crown, not Parliament."  *Id.* at 2798.  Thus, some Protestants had a right to arms, but only as "allowed by law."[12]

More significantly for present purposes, the English Declaration of Rights did not repeal the 1662 Militia Act, which authorized lieutenants of the militia (appointed by the King) to disarm "any person or persons" judged "dangerous to the Peace of the Kingdome."  13 & 14 Car. 2, c. 3, § 1 (1662) (Eng.).  Indeed, although perceived misuse of this Act partially motivated the adoption of a right to arms in the 1689 Declaration of Rights, subsequent efforts to revise the Militia Act were "a failure," and the Act "was to remain in force with only insignificant changes for many years to come."  Joyce Lee Malcolm, *To Keep and Bear Arms*, 123 (1994); *accord* Patrick J. Charles,  *"Arms for Their Defence"?: An Historical, Legal, and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated In McDonald v. City of Chicago*, 57 Clev. State L. Rev. 351, 373, 376, 382-83, 405 (2009). Moreover, this act was employed not only against "papists," but also against any others who were viewed as "disaffected or dangerous."  Charles, 57 Clev. State L. Rev. at 376-78.

Because individuals could be disarmed without any adjudication of  wrongdoing, it is unsurprising that they could also forfeit their right to keep or use firearms following conviction of a crime.  Malcolm, for example, notes that a Nottinghamshire labourer was bound "not to shoot again for seven years" after a misdemeanor conviction for "shooting with hailshot." Malcolm, *supra*, at 10.   As for those caught committing more serious crimes, forfeiture of

---

[12]   By providing that Protestants could have arms "suitable to their conditions" and "as allowed by law," the Declaration of Rights apparently provided only a small minority of upper class Protestants a right to arms.  Lois Schwoerer, *To Hold And Bear Arms: The English Perspective*, 76 Chicago-Kent L. Rev. 27, 47-48, 59 (2000).

firearms was apparently a given.  English criminal law was notoriously harsh, prescribing both

forfeiture of all property (including, presumably, any firearms) and, frequently, execution for the

innumerable crimes designated as felonies.  4 William Blackstone, *Commentaries on the Laws of

England*, 95 (1769) (hereinafter *Blackstone*) (felonies "subject the committers of them to

forfeitures"), *id*. at 385 (same); *id*. at 19 (counting 160 acts "to be felonies without benefit of

clergy," *i.e.*, "worthy of instant death").

In the Colonies, as well, governments frequently disarmed those they perceived as

dangerous, and such restrictions were not viewed as inconsistent with the right to bear arms.

Again unsurprisingly, the inhabitants whose firearm ownership was most restricted were those

thought to pose the greatest risk to the nascent societies, namely, Native Americans and those of

African descent (both slave and free).  Malcolm, *supra*, at 140-41; Robert J. Cottrol and

Raymond T. Diamond, *The Second Amendment: Towards an Afro-Americanist Reconstruction*,

80 Georgetown L.J. 309, 323-27 (1991).   In addition, as in England, at least one colony

disarmed Catholics.   Robert Churchill, *Gun Regulation, the Police Power, and the Right to Keep

Arms in Early America: the Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139,

157 (2007) (Virginia).

Colonial governments also disarmed persons who refused to swear a loyalty oath.  Saul

Cornell, *Commonplace or Anachronism: the Standard Model, the Second Amendment, and the

Problem of History in Contemporary Constitutional Theory*, 16 Const. Comment. 221, 228-29

(1999); Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun

Control in America* 28-30 (2006).  The Pennsylvania example is instructive.  In 1776,

Pennsylvania adopted a constitution that affirmed that "the people have a right to bear arms for

the defense of themselves and the state." Pa. Const., Decl. of Rights, Art. XIII. Shortly

thereafter, Pennsylvania passed a series of Test Acts that had the potential to disarm up to forty

percent of the citizens. Cornell, 16 Const. Comment at 228; *see also* Churchill, 25 Law &

History Rev. at 159 n.49 (describing a December 1775 Connecticut statute disarming any person

defaming the acts of Congress or the state assembly). According to historian Saul Cornell, these

Test Acts showed that the right to bear arms was viewed as "limited to those members of the

polity who were deemed capable of exercising it in a virtuous manner." Saul Cornell, *"Don't*

*Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky.

L. Rev. 657, 672 (2002).

As for convicted criminals, Colonial societies do not appear to have categorically

prohibited their ownership of firearms. *See, e.g.*, C. Kevin Marshall, *Why Can't Martha Stewart*

*Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 696-728 (2009). Of course, some felony

offenders were disarmed by application of the forfeiture rules inherited from English law.

Moreover, local justices of the peace had the power to seize arms involved in an "affray," *i.e.*, a

public assault or fight. *See* Conductor Generalis: Or The Office, Duty and Authority of Justices

of the Peace 10, 12 (1788).

The absence of statutes disarming criminals more generally does not show that Colonial

societies believed they had a right to bear arms, but rather may only reflect a "lack of political

demand." *See* Nelson Lund, *The Second Amendment, Heller, and Originalist Jurisprudence*, 56

U.C.L.A. L. Rev. 1343, 1354 (2009). Indeed, there appear to have been strong policy reasons

preventing the wholesale disarming of criminals in Colonial societies. In the early years, "the

colonies were small, struggling communities," "profoundly isolated, teetering on the brink of

starvation, and at the edge of the wilderness."  Lawrence M. Friedman, *Crime and Punishment in American History*  23 (1993).  For such societies, every able bodied individual was critical to the community's survival.  Accordingly, while those guilty of the most serious crimes – and recidivists – were executed, *id.* at 41-42, colonists convicted of lesser offenses were permitted to return to the community after serving their punishment.  *Id.* at 31.  As for gun ownership, conditions sometimes mandated that all colonists be armed.   Edmund S. Morgan, *American Slavery, American Freedom: The Ordeal of Colonial Virginia*, 239-240 (1st Ed. 1975) .  Indeed, Colonial societies sometimes encouraged (or required) that "every able-bodied white man" be armed due to the constant menace of Indian attack or slave revolt.  Don B. Kates, *Handgun Prohibition And The Originalist Meaning Of The Second Amendment* , 82 Mich. L. Rev. 204, 214 (1983).  As long as these dangers persisted, systematically disarming a class of colonists who could handle firearms was not likely to be in the colonies' self-interest.

At the same time, the documentary record surrounding the adoption of the Constitution confirms that the right to keep and bear arms was limited to "law-abiding and responsible" citizens.  Most significantly, the Pennsylvania anti-federalist faction offered the following proposal at the Pennsylvania Convention:

> That the people have a right to bear arms for the defense of themselves and their own state or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them, unless for crimes committed, or real danger of public injury from individuals; * * * .

The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, 1787, reprinted in 2 Schwartz, *The Bill of Rights, A Documentary History* 665 (1971).  The *Heller* Court found this Pennsylvania Minority proposal

to be both "highly influential" and a "precursor" to the Second Amendment.  *Heller*, 128 S.Ct. at 2804.

One recent commentator has dismissed this proposal as not "especially probative" because "it was offered by opponents of the Constitution, and its text is not reflected in the Second Amendment as proposed and ratified."  Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1375 (2009).  But the Pennsylvania anti-federalists opposed the Constitution in 1787 because it failed to include a Bill of Rights.  Accordingly, their proposal demonstrates that, at the time the Constitution was adopted, even ardent supporters of guaranteeing an individual right to keep and bear arms recognized that criminals and other dangerous individuals should not enjoy its benefits.  Moreover, although the Second Amendment itself proved more "succinct[ ]" than the Pennsylvania proposal, *Heller*, 128 S.Ct. at 2835 (Stevens, J., dissenting), the latter remains probative of how the Amendment's supporters viewed the balance between public security and the right to keep and bear arms.  *See Heller*, 128 S.Ct. at 2804 (reaffirming that "the Bill of Rights codified venerable, widely understood liberties"); Stephen P. Halbrook, *The Founders' Second Amendment* 273 (2008) (arguing that the Second Amendment did not need to contain "an explicit exclusion of criminals from the individual right to keep and bear arms [ ] because this * * * was understood.").

Citing to Blackstone, Plaintiffs contend that, "[a]t common law, all forms of battery were classified as midemeanor crimes."  Pls.' Opp. at 38.  This is misleading.  Blackstone does relate that "crime" in "common usage" sometimes "denote[d] such offences as are of a deeper and more atrocious dye," than the "smaller faults, and omissions of less consequence" called

"misdemeanours."  4 Blackstone 5.  This usage was by no means universal.  *See* T. Sheridan, *A Complete Dictionary of the English Language* (1796) (hereinafter *Sheridan*) (defining a "crime" as "[a]n act contrary to right; an offence"); Samuel Johnson, *Dictionary of the English Language* (5th ed. 1773) (hereinafter *Johnson*) (defining "crime" as "An act contrary to right; an offence; a great fault").  Indeed, Blackstone himself acknowledged this broader usage, which he described as "proper[ ]."  4 Blackstone 5.

In any event, the proper question is one of danger, not lost rights. Misdemeanants, like convicted felons, pose an unacceptable risk of firearm misuse.  Just because a particular class of persons was, or was not, prohibited from possessing firearms when the Constitution was ratified does not mean that the same result should apply today.  *See Skoien*, 614 F.3d at 640 ("[T]he legislative role did not end in 1791. That some categorical limits are proper is part of the original meaning, leaving to the people's elected representatives the filling in of details.").  Likewise, just because misdemeanants and felons historically lost different types of rights upon conviction does not prevent Congress from properly prohibiting firearm possession by misdemeanants today. *See id.*  ("[W]e do take from *Heller* the message that exclusions need not mirror limits that were on the books in 1791. This is the sort of message that, whether or not technically dictum, a court of appeals must respect, given the Supreme Court's entitlement to speak through its opinions as well as through its technical holdings.").

Nor does the rule of lenity afford Plaintiffs any refuge.  *See* Pls.' Opp. at 25.  That rule does not apply unless the statute is ambiguous to begin with, and these sections are not.  *See Barber v. Thomas*, 130 S. Ct. 2499, 2508 (2010) ("[T]he rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a 'grievous ambiguity or

uncertainty' in the statute, such that the Court must simply 'guess as to what Congress intended.'" (citations omitted)).  Here, the statute is clear, and it leaves nothing for the Court to wonder about.

### C.     Plaintiffs' Statutory Interpretation Is Incorrect

Plaintiffs' legal theory depends on linguistic nuances in statutory language excluding those convicted of offenses "punishable" by a specified length.  *See* Pls.' Opp. at 16-17. Although Plaintiffs intimate that an interpretation of Section 921(a)(20)(B) by federal law enforcement creates the problem, their problem is that Congress created a definition of felon that sweeps in people like Plaintiff Schrader.  Nothing about the inclusion of people convicted of violent assaults is nonsensical.  Congress is entitled to make predictive judgments, and predicting that people convicted of crimes serious enough to have sentences specified in Section 921(a)(20(B) might misuse firearms is reasonable.  *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 665 (1994) ("Sound policymaking often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete empirical support may be unavailable.").  Indeed, the legislative history that Plaintiffs identify (Pls.' Opp. at 26) undercuts their own argument that Congress must have intended otherwise.

The key statutory language here is found in Sections 922(g)(1) and 921(a)(20)(B).  Under Section 921(a)(20)(B), the term "crime punishable by imprisonment for a term exceeding one year," as used in Section 922(g)(1), is defined to exclude "any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less."  The statute does not specify whether the State classification at the time of the offense

controls, but that certainly makes sense and is perfectly consistent with the language of the statute.

Plaintiff Schrader argues that the exception is not triggered here because there was no statutory maximum penalty for misdemeanor assault at the time of his conviction.  Among other things, Plaintiff Schrader argues that this purported conclusion is compelled by the alleged definition of "punishable by"; "the spirit of federalism that permeates the federal scheme";  the "overarching design of the federal gun control scheme"; and the legislative history of the Federal Gun Control Act of 1968.  *See* Pls.' Opp. at 16-23.

This is incorrect for multiple reasons.  First and foremost, Plaintiffs' interpretation is at odds with the plain language of Section 921(a)(20)(B).  The operative phrase "punishable by a term of imprisonment of two years or less" contains no requirement that the punishment have a statutory maximum or otherwise be statutorily limited.  Under the Plaintiffs' purported interpretation, the words "as prescribed statute" or similar words are impermissibly read into the statute.  Rather, Plaintiffs' Opposition and Cross-Motion largely fails to address the actual language of the statutes, and essentially ignores the numerous decisions applying these provisions to conclude that the operation of Sections 922(g)(1) and 921(a)(20)(B) turns on the potential punishment, rather than the actual punishment received.  *See* Defs.' Mem. at 9-12. Instead of attempting to distinguish these cases or deal with them some other way, Plaintiffs' Opp. And Cross-Motion attempt to divert the Court's attention to non-textual arguments such as the statute's purported legislative history.  Significantly, the actual language of Sections 922(g)(1) and 921(a)(20)(B) and the cases interpreting these statutes favor Defendants.

Second, and relatedly, Plaintiff Schrader fails to adequately respond to the Fourth

Circuit's *en banc* decision in *United States v. Coleman*, 158 F.3d 199, 203-04 (4th Cir. 1998),

which Defendants argued is directly on point and Plaintiffs fail to dispute.  Plaintiffs merely

point out that *Coleman* is not controlling, and that the decision should be afforded little weight

because the Fourth Circuit  purportedly engaged in a "cursory analysis of the statute's text."

Pls.' Opp. at 24.    But that analysis is sufficient, and perhaps its brevity signals the clarity of the

matter.  In suggesting that the nine Circuit Court judges in the Fourth Circuit got it wrong in

*Coleman*, Plaintiffs further argue *Coleman* runs afoul of *Heller*, and that the Fourth Circuit's

own decision in *United States v. Chester* questions Coleman's continued viability.  *See* Pls.'

Opp. at 25 & n.9.

To the contrary, the analysis in *Coleman* is consistent with the plain language of Sections

922(g)(1) and 921(a)(20)(B) and is in accord with how other courts have interpreted the statutes.

Moreover, *Heller* does not involve the question raised in this case about whether  a specific

offense implicates Section 922(g)(1).  Even to the extent *Heller* may be relevant, it undermines

Plaintiffs' argument given the *Heller* presumption language and the myriad post-*Heller* decisions

that have uniformly rejected Second Amendment challenges to 922(g)(1).  *See Williams v.*

*United States*, 616 F.3d 685, 693 (7th Cir. 2010) (collecting cases), *cert. denied*, No. 10-593,

2010 U.S. App. LEXIS 9533 (U.S. Dec. 6, 2010).  *United States v. Chester*, 628 F.3d 673 (4th

Cir. 2010) is even less illuminating because it does not even address Section 922(g)(1) but,

instead, involves an entirely different statute, Section 922(g)(9).

Plaintiffs also insist that an absolute, lifetime ban on a person in Planitiff Schrader's

position of having an assault conviction from when he was twenty years old produces a

nonsensical result.  *See* Pls.' Opp. at 21.  The ban would cease to exist if Plaintiff could get his

Maryland conviction expunged, set aside, or made the subject of a pardon – things he has not

apparently tried to do.  For now, however, because Maryland common law assault did not have a

punishment cap, it is simply untrue to describe Plaintiff Schrader's assault conviction as an

offense "punishable by a term of imprisonment of two years or less," and therefore, his

possession of firearms violates Section 922(g)(1) through a plain reading of the statutes.

### D. Plaintiff Schrader Cannot Fit Through the "Escape Hatch" In 18 U.S.C. § 921(a)(20) Because He Never Lost His Maryland Civil Rights

Although there are no allegations in either the complaint or the FAC concerning the

status of Plaintiff Schrader's civil rights, Plaintiffs' Opposition and Cross-Motion asserts for the

first time that Section 922(g)(1) does not apply to him because he allegedly had his civil rights

restored in Maryland.  *See* Pls.' Opp. at 26-29.  This argument depends on a portion of Section

921(a)(20) precluding the application of Section 922(g)(1) to convictions for which a person

"has had civil rights restored."  *See* 18 U.S.C. § 921(a)(20).  "It is generally agreed that the

'civil rights' referred to in Section 921(a)(20) are the rights to vote, to hold elective office, and to

serve on a jury."  *United States v. Bost*, 87 F.3d 1333, 1335 (D.C. Cir. 1996) (citation omitted).

Significantly, however, the Supreme Court has held that the civil rights restoration language of

Section 921(a)(20) does not apply to a person who lost no civil rights as a result of his or her

conviction.  *Logan v. United States*, 552 U.S. 23, 37 (2007) ("we hold that the words 'civil rights

restored' do not cover the case of an offender who lost no civil rights.").[13]

---

[13]  As noted above, the avenue of relief for people who never had their civil rights removed is to have the conviction expunged, overturned or made the subject of a pardon.

In this case, the question becomes whether Plaintiff Schrader ever had his civil rights removed by the assault conviction. Plaintiff Schrader concedes that his assault conviction did not result in him losing his right to vote or to run for public office. *See* Pls.' Opp. at 27. In his brief, he contends that he initially lost, but then had restored, his right to serve on a jury through the operation of a statute amended in 2006: Md. Code Ann. § 8-103. *See id.* at 27-28. Contrary to Plaintiff Schrader's argument, however, the pre-2006 version of the statute did not deprive him of his right to serve on a jury. The pre-2006 version of the statute, then codified at Md. Code Ann. § 8-207(b), precluded jury service for any person who "[h]as a charge pending against him for a crime punishable by a fine of more than $500, or by imprisonment for more than six months, or both, or has been convicted of such a crime **and has received a sentence of a fine of more than $500, or of imprisonment for more than six months, or both,** and has not been pardoned." *Owens v. State*, 906 A.2d 989, 1007-08 (Md. App. 2006) (quoting Md. Code Ann. Section 8-207(b)) (emphasis added), *aff'd*, 924 A.2d 1072 (Md. 2007). Because Plaintiff Schrader received less than a five hundred dollar fine and no term of imprisonment, he falls outside the scope of the pre-2006 version of the statute on which he relies, and he never lost his right to serve on a jury under Maryland law.

Indeed, Schrader's argument appears to be based solely on his selective quoting from the actual text of the pre-2006 version of the statute. Schrader's response omits the bolded language from the discussion of the statute. *United States v. Hassan El*, 5 F.3d 726 (4th Cir. 1993), cited by Plaintiffs, does not help. While Hassan El did lose his right to serve on a jury, he was sentenced to three years' imprisonment (although suspended) which, unlike Plaintiff Schrader, put him within the reach of pre-2006 Md. Code Ann. § 8-207(b).

In sum, Plaintiff Schrader received no jail time and was fined $100 (plus $9 in court costs). As a result, he did not lose his right to serve on a jury under the pre-2006 version of Md. Code Ann. § 8-103, and he concedes that the post-2006 version found at Md. Code Ann. § 8-103 does not cover him. And, as Plaintiffs further concede, civil rights that were not lost cannot be restored. *See* Pls.' Opp. at 27. Accordingly, Plaintiff Schrader does not fall within the exception in 18 U.S.C. § 921(a)(20) to the ban on firearms possession.

## Conclusion

For all these reasons, the Court should grant Defendants' motion to dismiss and deny Plaintiffs' Cross-Motion for Summary Judgment.

Dated: April 7, 2011.

Respectfully submitted,

RONALD C. MACHEN JR., D.C. BAR # 447889
United States Attorney

RUDOLPH CONTRERAS, D.C. BAR # 434122
Civil Chief

By:   /s/ *Jane M. Lyons*
JANE M. LYONS, D.C. Bar. # 451737
Assistant United States Attorney
555 Fourth St., N.W. - Room E4104
Washington, D.C.  20530
Phone: (202) 514-7161
jane.lyons@usdoj.gov