**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JEFFERSON WAYNE SCHRADER, et al., | ) | |
| | ) | Case No. 10-CV-1736-RMC |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ERIC HOLDER, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' SECOND MOTION TO DISMISS AND IN SUPPORT OF
PLAINTIFFS' RENEWED CROSS-MOTION FOR SUMMARY JUDGMENT**

**COME NOW** the Plaintiffs, Jefferson Schrader and the Second Amendment Foundation,

Inc., by and through undersigned counsel, and submit their Memorandum of Points and

Authorities in Opposition to Defendants' Motion to Dismiss the Second Amended Complaint

and in Support of Plaintiffs' Renewed Cross-Motion for Summary Judgment on both asserted

claims for relief.

Dated: July 1, 2011                    Respectfully submitted,

                                       Alan Gura (D.C. Bar No. 453449)
                                       Thomas M. Huff (D.C. Bar No. 978294)
                                       Gura & Possessky, PLLC
                                       101 N. Columbus Street, Suite 405
                                       Alexandria, VA 22314
                                       703.835.9085/Fax 703.997.7665

                                   By: /s/ Thomas M. Huff
                                       Thomas M. Huff

                                       Attorneys for Plaintiffs

# TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

A.   The Relevant Federal Legislative Framework. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

B.   Plaintiff Jefferson Schrader and the Second Amendment Foundation. . . . . . . . . . . . . . 6

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

I.   STANDARDS OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    A.   Motion To Dismiss Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    B.   Summary Judgment Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

II.   PLAINTIFFS HAVE STANDING TO SUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A.   Plaintiff Schrader has standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    B.   Plaintiff Second Amendment Foundation has standing. . . . . . . . . . . . . . . . . . . . 16

III.   FIRST CLAIM FOR RELIEF—SCHRADER IS ENTITLED TO THE REMOVAL
     OF HIS FIREARMS DISABILITY BECAUSE 18 U.S.C. § 922(g)(1) DOES NOT
     PROHIBIT ORDINARY COMMON LAW MISDEMEANANTS FROM
     PURCHASING OR POSSESSING FIREARMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    A.   The Text Of The Federal Felon-In-Possession Statute Demonstrates That
       Uncodified Common Law Misdemeanor Offenses—Which Are Not
       "Punishable" By Any Specified Statutory Criteria—Are Not Disqualifying
       Offenses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    B.   The Government's Reading Of The Felon-In-Possession Statute
       Fundamentally Alter Its Structure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    C.   The Recorded Legislative History Confirms That The Government's Reading
       Was Unthought Of By The Enacting Congress. . . . . . . . . . . . . . . . . . . . . . . . . . 24

    D.   The Fourth Circuit's Approach. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

i

E.      The Rule Of Lenity Further Confirms That Common Law Misdemeanor
          Convictions Do Not Trigger The Felon-In-Possession Statute. . . . . . . . . . . . . . 28

IV.     SECOND CLAIM FOR RELIEF—THE GOVERNMENT'S APPLICATION OF A
        FIREARMS BAN AGAINST ORDINARY COMMON LAW MISDEMEANANTS
        VIOLATES THE SECOND AMENDMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        A.      The Supreme Court's *Heller* Decision Changed The Relevant Doctrinal
                Framework For Analyzing Government Action Implicating The Right To
                Keep And Bear Arms. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

                1.      The Supreme Court's decisions in *Heller* and *McDonald*. . . . . . . . . . . . 30

                2.      The applicable doctrinal framework. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

        B.      Schrader's Core Second Amendment Rights Are Implicated By The
                Government's Application Of The Felon-In-Possession Ban. . . . . . . . . . . . . . . 35

        C.      The Application Of 18 U.S.C. § 922(g)(1) To Schrader Cannot Survive
                Independent Review Under Any Appropriate Level Of Scrutiny. . . . . . . . . . . . 35

                1.      A complete firearms ban applied to an ordinary common law
                        misdemeanant like Schrader cannot survive strict scrutiny—the
                        appropriate level of Second Amendment scrutiny. . . . . . . . . . . . . . . . . . . 36

                        a.      The core of the right to keep and bear arms is fundamental
                                and entitled to strict scrutiny review. . . . . . . . . . . . . . . . . . . . . . . 36

                        b.      Common law felons were historically outside the protective
                                scope of the right to keep and bear arms; *Heller*'s dictum
                                concerning the presumed constitutionality of felon
                                dispossession laws is entirely consistent with strict scrutiny. . . . . 37

                        c.      A complete firearms ban applied to ordinary common law
                                misdemeanants like Schrader cannot survive strict scrutiny. . . . . 41

                2.      A complete firearms ban applied to an ordinary common law
                        misdemeanant like Schrader also fails review under intermediate
                        scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

# TABLE OF AUTHORITIES

**Cases**

*Abbott* v. *United States*,
 131 S. Ct. 18 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Aktieselskabet AF 21 November 2001* v. *Fame Jeans Inc.*,
 525 F.3d 8 (D.C. Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Anderson* v. *Liberty Lobby, Inc.*,
 477 U.S. 242 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Arrington* v. *United States*,
 473 F.3d 329 (D.C. Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Ashcroft* v. *ACLU*,
 542 U.S. 656 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Baily* v. *United States*,
 516 U.S. 137 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Bd. of Trs.* v. *Fox*,
 492 U.S. 469 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Bloate* v. *United States*,
 130 S. Ct. 1345 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Britt* v. *State*,
 363 N.C. 546 (N.C. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Carr* v. *United States*,
 130 S. Ct. 2229 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Castillo* v. *United States*,
 530 U.S. 120 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Cent. Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n*,
 447 U.S. 557 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Clark* v. *Jeter*,
 486 U.S. 456 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Deal* v. *United States*,
    508 U.S. 129 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Dearth* v. *Holder*,
    --- F.3d ---, 2011 U.S. App. LEXIS 7737 (D.C. Cir. April 15, 2011). . . . . . . . . . . . . 11-17

*Dickerson* v. *New Banner Institute, Inc.*,
    460 U.S. 103 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*District of Columbia* v. *Heller*,
    554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 28, 30-32, 35-37, 40, 44

*Environmental Action, Inc.* v. *FERC*,
    939 F.2d 1057 (D.C. Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Fair Employment Council* v. *BMC Mktg. Corp.*,
    28 F.3d 1268 (D.C. Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Fraternal Order of Police* v. *United States*,
    152 F.3d 998 (D.C. Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Gonzales* v. *O Centro Espirita Beneficente Uniao do Vegetal*,
    546 U.S. 418 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Green* v. *Bock Laundry Mach. Co.*,
    490 U.S. 504 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Grosjean* v. *American Press Co., Inc.*,
    297 U.S. 233 (1936). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Grutter* v. *Bollinger*,
    539 U.S. 306 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Haitian Refugee Ctr.* v. *Gracey*,
    809 F.2d 794 (D.C. Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Havens Realty Corp.* v. *Coleman*,
    455 U.S. 363 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Heller* v. *District of Columbia*, ("*Heller II*")
    698 F. Supp. 2d 179 (D.D.C. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33, 35, 43, 44

*Herbert* v. *National Academy of Sciences*,
  974 F.2d 192 (D.C. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Hickman* v. *State*,
  193 Md. App. 238 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Highland Renovation Corp.* v. *Hanover Ins. Group*,
  620 F. Supp. 2d 79 (D.D.C. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Hodgkins* v. *Holder*,
  677 F. Supp. 2d 202 (D.D.C. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Johnson* v. *United States*,
  130 S. Ct. 1265 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 28, 40

*King* v. *St. Vincent's Hospital*,
  502 U.S. 215 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Lewis* v. *United States*,
  445 U.S. 55 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*Logan* v. *United States*,
  552 U.S. 23 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 42

*McDonald* v. *City of Chicago*,
  130 S. Ct. 3020 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 36, 37

*New York* v. *Ferber*,
  458 U.S. 747 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Nordyke* v. *King*,
  2011 U.S. App. LEXIS 8906 (9th Cir. May 2, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Parents Involved in Cmty. Sch.* v. *Seattle Sch. Dist. No. 1*,
  551 U.S. 701 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Parker* v. *District of Columbia*,
  478 F.3d 370 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15

*Planned Parenthood of S.E. Pa.* v. *Casey*,
  505 U.S. 833 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

v

*Reno* v. *Flores*,
     507 U.S. 292 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Robinson* v. *State*,
     353 Md. 683 (Md. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Scarborough* v. *United States*,
     431 U.S. 563 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 45

*Scarborough* v. *United States*,
     431 U.S. 563 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Simms* v. *State*,
     288 Md. 712 (Md. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Small* v. *United States*,
     544 U.S. 385 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 25

*State of Wisconsin* v. *Schultz*,
     No. 10-CM-138, slip. op. (Wis. Ct. App. Oct. 12, 2010) . . . . . . . . . . . . . . . . . . . . . . . 33

*State* v. *Langlands*,
     276 Ga. 721 (Ga. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Tooley* v. *Napolitano*,
     586 F.3d 1006 (D.C. Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United Food & Commercial Workers Union Local 751* v. *Brown Group, Inc.*,
     517 U.S. 544 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States* v. *Barton*,
     633 F.3d 168 (3d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 42

*United States* v. *Bass*,
     404 U.S. 336 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 29

*United States* v. *Batchelder*,
     442 U.S. 114 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States* v. *Carolene Prod. Co.*,
     304 U.S. 144 (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States* v. *Chester*,
  628 F.3d 673 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 32-34, 44

*United States* v. *Coleman*,
  158 F.3d 199 (4th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States* v. *Emerson*,
  270 F.3d 203 (5th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States* v. *Engstrum*,
  609 F. Supp. 2d 1227 (D. Utah 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States* v. *Hartwell*,
  73 U.S. 385 (1868). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States* v. *Hayes*,
  129 S. Ct. 1079 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 22, 23, 28

*United States* v. *Logan*,
  453 F.3d 804 (7th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States* v. *Marzzarella*,
  614 F.3d 85 (3d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32-34

*United States* v. *Masciandaro*,
  638 F.3d 458 (4th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States* v. *McKenzie*,
  99 F.3d 813 (7th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States* v. *Miller*,
  307 U.S. 174 (1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States* v. *Playboy Entm't Group*,
  529 U.S. 803 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*United States* v. *Reese*,
  627 F.3d 792 (10th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

*United States* v. *Rene E.*,
  583 F.3d 8 (1st Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States* v. *Schultheis*,
  486 F.2d 1331 (4th Cir. 1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

*United States* v. *Skoien*,
  614 F.3d 638 (7th Cir. 2010) (en banc). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States* v. *Tagg*,
  572 F.3d 1320 (11th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States* v. *Virginia*,
  518 U.S. 515 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States* v. *White*,
  593 F.3d 1199 (11th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States* v. *Williams*,
  616 F.3d 685 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 40

*Warth* v. *Seldin*,
  422 U.S. 490 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Washington* v. *Glucksberg*,
  521 U.S. 702 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Woollard* v. *Sheridan*,
  --- F. Supp. 2d ---, 2010 U.S. Dist. LEXIS 137031 (D. Md. Dec. 29, 2010). . . . . . . . . . 17

## Constitutional Provisions

U.S. CONST. amend. II. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## Federal Statutes

18 U.S.C. § 921(a)(20)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 19

18 U.S.C. § 921(a)(33)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

18 U.S.C. § 922(g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6

18 U.S.C. § 922(g)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 5, 8, 9, 17-19, 35, 42

18 U.S.C. § 922(g)(9). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6, 22

18 U.S.C. § 924(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 29

18 U.S.C. § 924(e)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

18 U.S.C. § 925(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

18 U.S.C. § 925A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 19, 29, 45

28 U.S.C. § 2201(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Fed. R. Civ. P. 12(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

Fed. R. Civ. P. 12(b)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 18, 30

Fed. R. Civ. P. 56. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## State Statutes

MD. CRIMINAL LAW CODE ANN. § 10-201. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

MD. CRIMINAL LAW CODE ANN. § 3-202. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

MD. CRIMINAL LAW CODE ANN. § 3-203. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

MD. PUBLIC SAFETY CODE ANN. § 5-101. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

MD. PUBLIC SAFETY CODE ANN. § 5-133. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## Other Authorities

114 Cong. Rec. 14773 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Adam Winkler, *Heller's Catch 22*,
    56 UCLA L. REV. 1551 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

BLACK'S LAW DICTIONARY (9th ed., 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 19, 20

C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*,
    32 HARV. J.L. & PUB. POL'Y 695 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and
    Criminological Considerations*, 60 HASTINGS L.J. 1339 (2009). . . . . . . . . . . . . . . 38

Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 TENN. L. REV. 461 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

J.W. Cecil Turner, KENNY'S OUTLINES OF CRIMINAL LAW (16th ed. 1952). . . . . . . . . . . . . . . . . 39

Norman J. Singer, SUTHERLAND ON STATUTORY CONSTRUCTION (7th ed. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 25, 28, 29

Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection of Judges Reign?*, 36 OKLA L. REV. 65 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right to "Bear Arms"*, 49 LAW & CONTEMP. PROBS. 151 (1986). . . . . . . . . . . . . . 40

W. Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND (1769). . . . . . . . . . . . . . 38, 40, 41

WEBSTER'S NEW INTERNATIONAL DICTIONARY (3rd ed. 1961). . . . . . . . . . . . . . . . . . . . . . . . . 19

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' SECOND MOTION TO DISMISS AND IN SUPPORT OF
PLAINTIFFS' RENEWED CROSS-MOTION FOR SUMMARY JUDGMENT**

**PRELIMINARY STATEMENT**

Rarely have the federal courts been confronted with as expansive a reading of the federal firearms laws as the one asserted by the government in this case. Since enacting the earliest firearms disqualification laws in 1938, Congress has consistently made such prohibitions narrow in scope. Leaving the vast majority of individuals unaffected, federal gun bans are aimed only at those persons who have lost their gun rights due to the occurrence of a statutorily-enumerated disqualification event—*e.g.*, a felony conviction, a finding of mental incompetence, a dishonorable discharge from military service, or an addiction to a controlled substance. *See* 18 U.S.C. § 922(g). More recently, Congress has also extended the disqualification to a narrow subclass of misdemeanants: those convicted of committing acts of violence within domestic relationships. *See* 18 U.S.C. § 922(g)(9).

The government in this case seeks to override that tailored legislative scheme by stretching the reach of the felon-in-possession statute—which bans firearm possession by any person convicted of a "crime punishable by imprisonment for a term exceeding one year," 18 U.S.C. § 922(g)(1)—to cover *all common law misdemeanors*: uncodified offenses that simply have no statutory punishment criteria at all. Under the government's view, any offense that lacks such punishment criteria will be *per se* classifiable as a felony. The absence of a legislative judgment on the matter can be simply ignored.

The government's sweeping interpretation, however, finds little support in the structure, history, and text of the federal gun control scheme. Congress chose the word "punishable"—a

1

term that necessarily refers to *specified* punishments—to describe predicate offenses that a convicting jurisdiction's legislature has affirmatively deemed serious enough to warrant a prison sentence exceeding one year. The federal system relies on this localized legislative judgment to properly function. Moreover, the overarching structure of the federal scheme (which unambiguously specifies certain heightened categories of misdemeanor offenses) demonstrates that when Congress wishes to reach non-felons, it does so clearly. This is further confirmed by the recorded legislative history, which reveals that no one in Congress contemplated—let alone intended—a categorical firearms ban on common law misdemeanants.

The failings of the government's interpretation are particularly illustrated by the facts of this case. In 1968, Plaintiff Jefferson Schrader was convicted of simple common law misdemeanor assault and battery for his involvement in a minor fistfight while a 20-year-old Navy serviceman. His only punishment was a $100 fine, he received no jail time, and he has had no meaningful encounters with law enforcement since. But because the common law misdemeanor for which he was convicted had no legislatively-capped punishment range, the government is treating him as it would a convicted felon for the purpose of federal law, banning him for life from possessing any firearm for any purpose, and listing his name in the federal government's National Instant Criminal Background Check ("NICS") database—administered by Defendant Holder—as disqualified from owning firearms.

Plaintiffs respectfully submit that the government's expansive reading of § 922(g)(1) is mistaken. But even assuming that the federal scheme could be read to encompass common law misdemeanants, its attempted application against Schrader fails constitutional scrutiny under the Second Amendment. As the Supreme Court has recognized in the cases of *District of Columbia*

v. *Heller*, 554 U.S. 570 (2008) and *McDonald* v. *City of Chicago*, 130 S. Ct. 3020 (2010), the Second Amendment protects a fundamental, individual right to keep and bear arms for purposes that include self-defense. While subject to the historical limitations on its scope—common law felons, for example, were likely unprotected—there can be little doubt that its protections reach ordinary misdemeanants like Schrader. And under any level of heightened scrutiny appropriate for a constitutionally enumerated fundamental right, the government's enforcement against Schrader of a categorical lifetime ban on firearms possession cannot survive review. Accordingly, Schrader is entitled to summary judgment for the removal of his firearms disability from the NICS database, and a declaratory judgment that his 1968 Maryland common law misdemeanor assault conviction is not disabling under federal law.

Finally, there is no merit to the government's argument that Schrader lacks standing to bring his Second Amendment claim. Because the government lists Schrader in the NICS database as firearms disqualified, Schrader is unable to purchase or possess the shotgun and handgun that he presently intends to keep in his home for self-defense. Indeed, his two prior attempts to purchase these firearms were thwarted by "denial decisions" by Defendant FBI. These administrative denials provide a straightforward and uncontroversial source of standing: Schrader's disqualification classification in the NICS database represents an ongoing injury-in-fact that prevents him from exercising his constitutional right to keep and bear arms. As the D.C. Circuit has recently confirmed, an administrative denial of this sort creates an "actual controversy" with the government that the Declaratory Judgment Act entitles him to resolve in court. Nor does SAF lack organizational and representational standing on these facts, assuming the issue of its standing need even be reached.

3

The material facts of this case are straightforward and undisputed. Accordingly, Defendants' Motion to Dismiss the Second Amended Complaint should be denied, and Plaintiffs' Renewed Cross-Motion for Summary Judgment should be granted.

## STATEMENT OF FACTS

### A.     The Relevant Federal Legislative Framework

Congress has created a federal legislative scheme that bans narrow groups of disqualified persons from possessing firearms. Beginning with the Federal Firearms Act of 1938, Congress originally proscribed the receipt across state lines of firearms by persons convicted of certain violent offenses. The scheme was expanded in 1961 to include all felons, and rewritten again in 1968 to cover the "possession" (rather than mere receipt across state lines) of a firearm.[1] *See United States* v. *Barton*, 633 F.3d 168, 173 (3d Cir. 2011) (discussing history of federal firearms laws); *United States* v. *Skoien*, 614 F.3d 638, 640-41 (7th Cir. 2010) (en banc) (same). This "felon-in-possession" ban became one of the earliest significant federal gun laws.

In 1986, however, Congress chose to ease back a number of federal firearms restrictions when it passed the Firearm Owners' Protection Act. Among other things, it had become concerned with the Supreme Court's recent opinion in *Dickerson* v. *New Banner Institute, Inc.*, 460 U.S. 103 (1983), which had held that even an expunged state felony conviction would disqualify a person from gun ownership. Congress superceded *Dickerson* by shrinking the scope

---

[1] In passing the Federal Gun Control Act of 1968, Congress also issued factual findings about firearms-related hazards associated with "veterans who are discharged under dishonorable conditions, mental incompetents, aliens who are illegally in the country, and former citizens who have renounced their citizenship," and banned firearms possession from each of these groups of persons as well. *See Scarborough* v. *United States*, 431 U.S. 563, 571 n.10 (1977) (quoting congressional findings of fact).

of the felon-in-possession law: a new statutory provision was enacted that expressly exempts all pardoned or expunged convictions, as well as those for which a convict's civil rights have been restored. 18 U.S.C. § 921(a)(20). This exemption applies unless the relevant "pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms." *Id.*; *see also Logan* v. *United States*, 552 U.S. 23, 27-28 (2007) (discussing history of the Firearm Owners' Protection Act); *United States* v. *Logan*, 453 F.3d 804, 806-807 (7th Cir. 2006) (same).

The Firearm Owners' Protection Act also significantly reorganized the federal firearms laws. The felon-in-possession ban was re-codified at 18 U.S.C. § 922(g)(1), where it currently applies to any person convicted of "a crime punishable by imprisonment for a term exceeding one year"—a standard modern demarcation for felony crimes.[2] Statement of Undisputed Material Facts [Dkt. # 22-3] ("SMF") at ¶ 1. The ban specifically exempts from its reach any state misdemeanor crime that is "punishable by a term of imprisonment of two years or less." 18 U.S.C. § 921(a)(20)(B). Thus, with respect to any State conviction, the applicability of the felon-in-possession ban will turn on how severely that State has chosen to punish the offense at issue. Violation of the ban is a criminal offense punishable by a prison sentence of up to ten years. *See* 18 U.S.C. § 924(a)(2); SMF at ¶ 2.

---

[2] *See, e.g.*, BLACK'S LAW DICTIONARY, 694 (9th ed., 2009) (hereinafter "BLACK'S") (defining felony as "[a] serious crime usu. punishable by imprisonment for more than one year or by death. Examples include murder, rape, arson, and burglary."). Accordingly, the Supreme Court and other courts generally refer to § 922(g)(1) as the "felon-in-possession" statute, though the statute itself does not use that terminology. *See, e.g., Abbott* v. *United States*, 131 S. Ct. 18, 23 (2010) (GINSBURG, J.); *Carr* v. *United States*, 130 S. Ct. 2229, 2234, n.1 (2010) (SOTOMAYOR, J.); *Bloate* v. *United States*, 130 S. Ct. 1345, 1350 (2010) (THOMAS, J.); *see also* Def. Br. [Dkt. #20] at 3, n.1.

In 1996, Congress expanded slightly the federal firearms ban to cover a narrow class of misdemeanants: those convicted of any "misdemeanor crime of domestic violence." 18 U.S.C. § 922(g)(9). As the Supreme Court has explained, domestic violence abusers raised unique concerns that Congress wished to address:

> Existing felon in possession laws, Congress recognized, were not keeping firearms out of the hands of domestic abusers, because "many people who engage in serious spousal or child abuse ultimately are not charged with or convicted of felonies." 142 Cong. Rec. 22985 (1996) (statement of Sen. Lautenberg). By extending the federal firearm prohibition to persons convicted of "misdemeanor crime[s] of domestic violence," proponents of § 922(g)(9) sought to "close this dangerous loophole." *Id*., at 22986.

*United States* v. *Hayes*, 129 S. Ct. 1079, 1087 (2009). Beyond this special case, however, Congress has shown no predilection for extending the gun ban to ordinary misdemeanants.

## B.    Plaintiff Jefferson Schrader and the Second Amendment Foundation

Plaintiff Jefferson Schrader is a 63-year-old United States citizen who presently intends to purchase and possess a handgun and long gun for self-defense within his home. SMF at ¶¶ 3, 8. He does not face any of the typical disqualifying barriers under the federal gun control laws. Schrader is not under indictment, has never been convicted of a felony or misdemeanor crime of domestic violence, is not a fugitive from justice, is not an unlawful controlled substance user or addict, has never been adjudicated as a mental defective or committed to a mental institution, has not been discharged from the Armed Forces under dishonorable conditions, has never renounced his citizenship, and has never been the subject of a restraining order relating to an intimate partner. *Id*. at ¶ 4; *cf*. 18 U.S.C. § 922(g) (defining categories of persons prohibited from possessing firearms). He is also fully qualified to possess firearms under the laws of Georgia—his State of citizenship. SMF at ¶ 4.

The government, however, is prohibiting Schrader from purchasing or possessing

firearms based on a 1968 common law misdemeanor conviction for simple assault and battery. *Id*. at ¶ 17. While Schrader received only a $100 fine as punishment, *id*. at ¶ 7, assault and battery in Maryland was at that time a *common law* misdemeanor[3]—as such, it was uncodified and simply had no statutory sentencing criteria. Theoretically, its punishment was limited only by the Eighth Amendment's ban on cruel and unusual punishment. *See Simms* v. *State*, 288 Md. 712, 714 (Md. 1980). The government is now treating this simple misdemeanor conviction as "a crime punishable by imprisonment for a term exceeding one year," thus placing Schrader in the same category as a convicted felon for purposes of the federal felon-in-possession statute. SMF at ¶ 17.

Schrader's conviction occurred in 1968 in Annapolis, Maryland, where he was stationed with the United States Navy. *Id*. at ¶ 5. He was 20 years old. *Id*. at ¶ 8. While walking peaceably one night in July of that year, he was violently attacked by a street gang that claimed he had entered their territory. *Id*. at ¶ 5. A week or two later, on July 23rd, Schrader was again walking peaceably in Annapolis when he encountered one of the gang members who had previously assaulted him. *Id*. at ¶ 6. A dispute broke out between the two men, and Schrader punched his assailant. *Id*. A nearby police officer arrested Schrader, and charged him with common law assault and battery and disorderly conduct—both simple misdemeanor offenses. *Id*. A week later on July 31st, he was found guilty of misdemeanor assault and battery and received a $100 fine,

---

[3] Today, the offense of common law assault and battery no longer exists in Maryland, having been abrogated by statute in 1996. *See Robinson* v. *State*, 353 Md. 683, 686-687 (Md. 1999). Maryland currently has two forms of statutory assault. First Degree Assault is a felony punishable by up to 25 years imprisonment, and covers any assault that causes (or attempts to cause) serious physical injuries or that is carried out with a firearm. MD. CRIMINAL LAW CODE ANN. § 3-202. Second Degree Assault, a misdemeanor punishable by up to 10 years imprisonment, covers all other forms of assault. *Id*. at § 3-203. Disorderly conduct is a misdemeanor punishable by up to 60 days in jail. *Id*. at § 10-201.

which he paid. *Id*. at ¶ 7. He was not sentenced to any jail time. *Id*. Schrader later completed a tour of Vietnam, and was honorably discharged from the Navy. *Id*. at ¶ 9. He has not had any further police encounters, save one traffic infraction. *Id*.

More than 40 years later in November of 2008, Schrader learned that the federal government's NICS computer system listed him as legally ineligible to purchase or keep a firearm when his companion attempted pay for a shotgun for him as a gift from a Georgia firearms dealer. *Id*. at ¶¶ 11-12. That transaction resulted in a "denial decision" by Defendant FBI when Schrader's name appeared in the NICS database. *Id*. at ¶ 12. Around the same time, Schrader had also ordered a handgun from a Georgia firearms dealer to keep for self-defense; this transaction too was met with a denial decision by the FBI. *Id*. at ¶¶ 11, 13.

Schrader inquired with the FBI (the administrator of the NICS system) as to why his firearms transaction had been cancelled. On June 3, 2009, the FBI advised Schrader via written correspondence that it had made a "denial decision" of his attempted transaction pursuant to 18 U.S.C. § 922(g)(1), on the basis of his 1968 Maryland misdemeanor common law assault conviction. *Id*. at ¶¶ 14-15. The letter included a copy of Schrader's FBI identification record, which listed a "State ID Number" corresponding to the State of Georgia. *Id*. at ¶ 16. Agent Lance Greer further advised him to dispose of or surrender any firearms he might possess or face criminal prosecution. *Id*. at ¶ 14. As a result, Schrader disposed of the shotgun and it is no longer in his possession. *Id*. Schrader also cancelled the order for his denied handgun transaction and never took possession of the gun. *Id*.

On October 13, 2010, Schrader filed the present suit, seeking an injunction ordering Defendants to remove his firearms disability from NICS pursuant to 18 U.S.C. § 925A. Compl.

8

[Dkt. #1]. Schrader also seeks an order permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing 18 U.S.C. § 922(g)(1) to encompass any simple uncodified common law misdemeanor offense on the grounds that it has no statutory punishment criteria. *Id*. On February 18, 2011, Plaintiffs filed an Amended Complaint to add the United States as an additional Defendant. Am. Compl. [Dkt. #6]. On May 27, 2011, Plaintiffs were granted leave to file a Second Amended Complaint to explicitly declare Schrader's "present intent" to possess the firearms that the government has blocked him from purchasing, and also to clarify minor factual details about the associated administrative denials under NICS. 2nd Am. Compl. [Dkt. #19].

Plaintiff Second Amendment Foundation ("SAF") is also a party in this case. SAF's members and supporters, including Plaintiff Schrader, are directly impacted by application of 18 U.S.C. § 921(g)(1) to common law misdemeanor offenses. SMF at ¶ 18. Additionally, SAF routinely expends resources responding to inquiries about the applicability of 18 U.S.C. § 921(g)(1) under a variety of circumstances, including those similar to Plaintiff Schrader's. *Id*.

## ARGUMENT

## I.   STANDARDS OF REVIEW

### A.   Motion To Dismiss Standard

Defendants have moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(6) & 12(b)(1). Under a Rule 12(b)(6) motion, a court will "construe[] the complaint liberally in the plaintiff's favor, accepting as true all of the factual allegations contained in the complaint, with the benefit of all reasonable inferences derived from the facts alleged." *Aktieselskabet AF 21*

*November 2001* v. *Fame Jeans Inc.*, 525 F.3d 8, 15 (D.C. Cir. 2008) (citations and quotations

omitted). Moreover, "when 'matters outside the pleadings are presented to and not excluded by

the court,'" the motion will be converted into one for summary judgment under Rule 56.

*Highland Renovation Corp.* v. *Hanover Ins. Group*, 620 F. Supp. 2d 79, 82 (D.D.C. 2009)

(*quoting* Fed. R. Civ. P. 12(d)).

On a Rule 12(b)(1) motion, a complaint will only be dismissed on jurisdictional grounds

if it is "patently insubstantial, presenting no federal question suitable for decision." *Tooley* v.

*Napolitano*, 586 F.3d 1006, 1009 (D.C. Cir. 2009) (citations and quotations omitted). In deciding

such a motion, "the court may consider the complaint supplemented by undisputed facts

evidenced in the record, or the complaint supplemented by undisputed facts plus the court's

resolution of disputed facts." *Herbert* v. *National Academy of Sciences*, 974 F.2d 192, 197 (D.C.

Cir. 1992) (citations omitted).

### B.     Summary Judgment Standard

Plaintiffs are cross moving for summary judgment. Summary judgment should be granted

if there is no genuine issue as to any material fact and the moving party is entitled to judgment as

a matter of law. Fed. R. Civ. P. 56. "A dispute over a material fact is genuine if the evidence is

such that a reasonable [fact-finder] could return a [decision] for the non-moving party."

*Arrington* v. *United States*, 473 F.3d 329, 333 (D.C. Cir. 2006) (*quoting Anderson* v. *Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if it might affect the outcome of the

action under the governing law. *Liberty Lobby Inc.*, 477 U.S. at 248.

### II.     PLAINTIFFS HAVE STANDING TO SUE

This is the government's second Motion to Dismiss. In their original motion [Dkt. # 5],

the government based much of their standing argument on the district court decision in *Hodgkins* v. *Holder*, 677 F. Supp. 2d 202 (D.D.C. 2010), which had concluded that standing was lacking under facts virtually identical to this case. *See*, *e.g.*, Def. Mot. to Dismiss at [Dkt. # 5] at 19-20. However, that decision was recently reversed in a unanimous published opinion of the D.C. Circuit in *Dearth* v. *Holder*, --- F.3d ---, 2011 U.S. App. LEXIS 7737 (D.C. Cir. April 15, 2011). With *Hodgkins* now reversed, the government resorts in its newest brief to distinguishing the very case it sought to analogize in its original motion. The government's efforts fail.

## A.     Plaintiff Schrader has standing

The government continues to argue that Plaintiff Schrader lacks standing to bring his Second Amendment claim under the Declaratory Judgment Act. Def. Br. [Dkt. # 20] at 11-14. The Declaratory Judgment Act was passed by Congress in 1934, granting federal courts the power to declare the rights of individuals as an independent form of judicial relief. In relevant part, it states:

> In a case of actual controversy within its jurisdiction, . . . [subject to certain enumerated exceptions not at issue here] . . . , any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a). The government acknowledges Schrader's thwarted past attempts to purchase firearms (*e.g.*, Def. Br. at 6), but claims that the Declaratory Judgment Act requires him also to plead "allegations concerning where Plaintiff Schrader might attempt future purchases or possession of firearms . . . ," *id*. at 11-12, and to make a pre-enforcement showing "that he has been singled out for prosecution." *Id*. at 14. As *Dearth* makes clear, these arguments are incorrect.

11

*Dearth* reversed *Hodgkins* v. *Holder*, 677 F. Supp. 2d 202, upon which Defendants relied

in support of their original Motion to Dismiss.[4] Much like the present case, *Hodgkins* had

concerned plaintiffs, including Plaintiff Second Amendment Foundation ("SAF"), who

challenged certain federal firearms laws under the Declaratory Judgment Act. Both had

affirmatively attempted to purchase firearms but their efforts to do so were blocked by operation

of federal law. The district court had concluded that these denied purchase attempts did not

establish an "actual controversy" under the Declaratory Judgment Act, but instead amounted to

"past injuries alone." *Hodgkins*, 677 F. Supp. 2d at 204-05.

But the D.C. Circuit's new opinion in *Dearth* reverses *Hodgkins*, holding that a plaintiff

does indeed establish standing under the Declaratory Judgment Act where "the Government

denied and continues to deny him the ability to purchase a firearm." *Dearth*, --- F.3d ---, 2011

U.S. App. LEXIS 7737 at *5. The D.C. Circuit found this injury analogous to that in *Parker* v.

*District of Columbia*, 478 F.3d 370, 376 (2007), which held that a plaintiff who "had been

'denied a registration certificate to own a handgun,'" *Dearth*, --- F.3d ---, 2011 U.S. App. LEXIS

7737 at *5 (quoting *Parker*, 478 F.3d at 376), would have standing to bring a Second

Amendment challenge. *Id*. And while the government had attempted (much like in its original

Motion to Dismiss here) to limit *Parker*'s holding to lawsuits implicating an actual "permit" or

"license" request from a government entity, *id*., the D.C. Circuit flatly rejected this argument:

As for its second effort to distinguish *Parker*, the Government places undue weight upon

---

[4] Despite the different captions, *Dearth* and *Hodgkins* are in fact the same case. Mr. Dearth was a second plaintiff before the district court and became lead plaintiff on appeal when Mr. Hodgkins dismissed himself from the lawsuit after moving back to the United States. *See* Consent Motion for Partial Dismissal [Dkt. # 1254382], *Dearth* v. *Holder*, Case No. 10-5062, (D.C. Cir. July 9, 2010).

our statement there that the plaintiff was "asserting a right to a registration certificate, the denial of which [was] his distinct injury." 478 F.3d at 376. More fundamentally, as we explained, the plaintiffs there were "claim[ing] a right to possess ... 'functional firearms[]' ... for self-defense in the home." *Id*. at 374. That is, the right to possess, not the right to a permit or license, was the substance of their claim. One of those plaintiffs had standing because, rather than alleging merely an intent to violate the District's gun laws, he had "invoked his rights under the Second Amendment to challenge the statutory classifications used to bar his ownership of a handgun." *Id*. at 376. Just so with Dearth, who raises a constitutional challenge to the regulatory and "statutory classifications" that bar him from acquiring a firearm. *Id*. That the regulatory regime does not provide for the Government's issuance of a permit or license is of no moment; *the challenged provisions have similarly thwarted Dearth's best efforts to acquire a firearm*.

*Id*. at *6-7 (emphasis added).

Plaintiffs respectfully submit that the present case is indistinguishable. Plaintiff Schrader is bringing statutory and constitutional challenges to certain government policies that have denied and continue to deny him the ability to purchase and possess firearms. Schrader has made two affirmative attempts to obtain firearms (a shotgun and a handgun), but both efforts have been thwarted by "denial decisions" by Defendants, who continue to list him in their NICS database as firearms disqualified. As *Dearth* makes clear, these administrative denials create an "actual controversy" that the Declaratory Judgment Act entitles him to resolve in an Article III court. And just as in *Dearth*, the challenged legal scheme here has "thwarted [Schrader's] best efforts to acquire a firearm." *Id*. at *7.

As described above, Schrader first attempted to obtain a firearm when his companion tried to buy him a shotgun as a gift. 2nd Am. Compl. at ¶ 14. A short time later, Schrader also attempted to order a handgun from a local firearms dealer in Georgia. *Id*. But because Defendants improperly list Schrader in the NICS database as legally ineligible to purchase firearms, Defendant FBI issued "denial decisions" against Schrader, prohibiting Schrader from purchasing and keeping the firearms. *Id*. at ¶¶ 15-16; *see also* SMF ¶ 14; Schrader Decl. [Dkt. # 22-1], Ex.

13

A. As the FBI wrote in a letter to Schrader:

> . . . The fingerprints you submitted are identical with those in a record that was used to *deny your firearm purchase* or pawn redemption. A copy of your FBI identification record is enclosed for your review. Unless additional materials in the form of certified court documentation are submitted, we are unable to reverse *our original denial decision*. Your *denial* indicates that you have been matched with the following federally prohibitive criteria under Title 18, United States Code, Sections 921(a)(20) and 922(g)(1): A person who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year or any state offense classified by the state as a misdemeanor and is punishable by a term of imprisonment of more than two years.
>
> If you wish to Challenge the accuracy of the record upon which the *denial* is based, you may apply directly to the original submitting agency for correction of the record. . . .

SMF ¶ 15; Schrader Decl., Ex. A (emphasis added). This administrative denial is indistinguishable from the one at issue in *Dearth*. Moreover, FBI Agent Lance Greer subsequently contacted Schrader and advised him to surrender or dispose of any firearms he might possess or face prosecution. 2nd Am. Compl. at ¶ 16. As a result, Schrader was compelled to dispose of the shotgun and to cancel the order for his denied handgun transaction. *Id*. at ¶¶ 15-16.

Further strengthening Schrader's position, the government in this case has taken the extra step of listing Schrader in its NICS database as firearms disqualified. This disqualification classification is both (1) current and ongoing (further contradicting the government's argument the Schrader has suffered only past injuries), and (2) specific to Schrader (further contradicting the government's argument that his injury is a mere generalized grievance). Because Schrader seeks correction of a NICS database record that specifically singles him out as disqualified from obtaining firearms, Schrader's case for standing is even stronger than that in *Dearth*.

The government fails to distinguish *Dearth* in any meaningful way. Instead it makes an unsupported claim that Schrader must plead even more particulars about his injury:

14

> Although the Complaint now vaguely alleges that "Mr. Schrader presently intends to purchase and possess a handgun and long gun for self-defense within his own home," (2nd Am. Compl. ¶ 1), there are no particulars either there or in the declaration he previously filed with this Court in this case about when, how, where, and what exactly he would purchase or possess so as to render this alleged injury truly "imminent."

Def. Br. at 12.

But the government is simply incorrect in claiming uncertainty over the "when," "how," and "what" questions: Schrader explicitly pleads that he "*presently* intends to *purchase and possess* a *handgun and long gun* for self-defense within his own home." 2nd Am. Compl. at ¶ 1 (emphasis added). The government provides no support for any additional requirements, and indeed does not even specify *what* additional "particulars" it believes that Schrader should be required to plead. But whatever the case, a simple review of the pleadings that successfully established standing in *Parker* v. *District of Columbia*, 478 F.3d at 376 and *Dearth* v. *Holder*, --- F.3d ---, 2011 U.S. App. LEXIS 7737, dispenses of the argument.

In *Dearth* v. *Holder*, for example, Mr. Dearth pleaded only the following sentence regarding his intent to obtain firearms:

> Mr. Dearth intends to purchase firearms within the United States, which he would store securely at his relatives' home in Mount Vernon, Ohio, and which he would access for lawful sporting purposes as well as for other purposes, including self-defense, while visiting the United States.

Compl. [Dkt. # 1] at § 11, Hodgkins v. Holder, Case No. 1:09-cv-00587-JR (D.D.C. March 23, 2009), Likewise, Mr. Heller's pleadings regarding his "present intent" were as follows:

> . . . Mr. Heller lawfully owns various firearms located outside the District of Columbia, including handguns and long guns, and *presently intends to possess a functional handgun and long gun for self-defense within his own home*, but is prevented from doing so only by defendants' active enforcement of unconstitutional policies complained of in this action. . . .

Compl. [Dkt. # 1] at § 2, *Parker* v. *District of Columbia*, Case 1:03-cv-00213-EGS (D.D.C.

15

February 10, 2003) (emphasis added). In neither case were the plaintiffs required by the D.C.

Circuit to plead additional "particulars" in order to "render th[e] alleged injury truly 'imminent.'"

Defendants also argue that certain of Schrader's pleadings are vague. While Schrader

pleads both that he is a citizen of Georgia (2nd Am. Compl. ¶ 1) and that he has been denied a

"local" attempt to obtain firearms (2nd Am. Compl. ¶ 14), Defendants argue that the word "local"

is "imprecise and can encompass multiple states, and State gun laws could supply independent

ground for preventing Plaintiff Schrader from purchasing or possessing firearms." Def. Br. at 13.

But the full pleadings reveal otherwise: Schrader pleads the specific NICS transaction number for

his failed firearms transaction (2nd Am. Compl. ¶ 15), and that transaction reveals a "State ID

Number" associated with Georgia.[5] SMF ¶ 16; Schrader Decl., Ex. A; *see also id*. at ¶¶ 9-10

(declaring that each thwarted transaction took place at "a local firearms dealer in Georgia.").

Schrader is fully qualified to possess firearms under Georgia law. 2nd Am. Compl. ¶ 8; *see also*

*State* v. *Langlands*, 276 Ga. 721, 724-725 (Ga. 2003) (holding that Georgia's felon-in-possession

statute cannot be extended to cover out-of-state misdemeanor convictions). Thus, Defendants'

argument fails.

### B.      Plaintiff Second Amendment Foundation has standing

Defendants also argue that Plaintiff SAF lacks standing. Def. Br. at 15-19. This too is

mistaken: SAF has both organizational and representational standing to sue in this case.

As explained by the D.C. Circuit in *Dearth*, the Court need not reach the issue of SAF's

standing at all: SAF was a secondary plaintiff in *Dearth* and the D.C. Circuit noted that "because

---

[5] And the government itself is well aware that both of Mr. Schrader's thwarted firearms transactions took place in Georgia: Defendant FBI has previously submitted a sworn Declaration of William L. Finch [Dkt. # 12-2] that explicitly declares as much. *See id*. at ¶¶ 5-6.

the SAF raises no issue not also raised by Dearth, need we decide whether it has standing."
*Dearth*, --- F.3d ---, 2011 U.S. App. LEXIS 7737 at n.* (citing *Environmental Action, Inc.* v.
*FERC*, 939 F.2d 1057, n.* (D.C. Cir. 1991)); *accord Woollard* v. *Sheridan*, --- F. Supp. 2d ---,
2010 U.S. Dist. LEXIS 137031 at *2, n.1 (D. Md. Dec. 29, 2010) ("Defendants also assert SAF
lacks standing to bring suit. I need not reach this issue, however, because it is undisputed that
Woollard has standing to bring a facial challenge to the Maryland statute.") (citing cases).

Regardless, with respect to organizational standing, "[t]here is no question that an
association may have standing in its own right to seek judicial relief from injury to itself and to
vindicate whatever rights and immunities the association itself may enjoy." *Warth* v. *Seldin*, 422
U.S. 490, 511 (1975). And when an organization is forced to spend resources, devoting its time
and energy to dealing with certain conduct, it has standing to challenge that conduct. *See*, *e.g.*,
*Havens Realty Corp.* v. *Coleman*, 455 U.S. 363 (1982).

SAF educates, researches, and publishes about gun control and its consequences. It has to
educate its members, and the public, about the government's enforcement of gun laws. When
people have questions about the government's firearms policies, they turn to SAF. SAF routinely
expends resources responding to inquiries about the applicability of 18 U.S.C. § 922(g)(1) under
a variety of circumstances, including those similar to plaintiff Schrader's. 2nd Am. Compl. at ¶
17. The government's enforcement of the challenged provisions thus directly impacts the
organization. *Fair Employment Council* v. *BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir.
1994); *Haitian Refugee Ctr.* v. *Gracey*, 809 F.2d 794, 799 (D.C. Cir. 1987). Accordingly, SAF
has organizational standing in this case to sue on its own behalf.

With regard to representational standing, an association has standing to bring suit on

behalf of its members when:

> (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*United Food & Commercial Workers Union Local 751* v. *Brown Group, Inc.*, 517 U.S. 544, 553 (1996) (citation omitted).

In this respect, SAF's case for representational standing is identical to that which the D.C. Circuit found sufficient for challenging a gun control law in *Fraternal Order of Police* v. *United States* ("FOP"), 152 F.3d 998 (D.C. Cir. 1998). In *FOP*, the only question was whether chief law enforcement officers, who were members of the FOP, could assert the rights of their employees. Answering this question in the positive, the D.C. Circuit found the FOP satisfied all three prongs of representational standing. Since Schrader and other SAF members have standing to challenge the law (SAF believes many of its members are directly impacted by the application of 18 U.S.C. § 922(g)(1) to misdemeanor offenses), the presence of individual plaintiffs is not strictly necessary. Accordingly, SAF has representational standing to sue on behalf of Schrader and other members similarly situated.

## III. FIRST CLAIM FOR RELIEF—SCHRADER IS ENTITLED TO THE REMOVAL OF HIS FIREARMS DISABILITY BECAUSE 18 U.S.C. § 922(g)(1) DOES NOT PROHIBIT ORDINARY COMMON LAW MISDEMEANANTS FROM PURCHASING OR POSSESSING FIREARMS

The government has moved under Fed. R. Civ. P. 12(b)(6) to dismiss Plaintiffs' first claim for relief, taking the apparent position that 18 U.S.C. 922(g)(1) bans all common law misdemeanants from possessing firearms. *See* Def. Br. at 19-24. As outlined below, this position cannot be supported by the structure, text, or recorded legislative history of the statute.

18

Accordingly, Plaintiffs are entitled to summary judgment on their first claim for relief under 18

U.S.C. § 925A for the removal of Schrader's firearms disability from the NICS computer

database, and the government's motion to dismiss the claim should be denied.

A.      **The Text Of The Federal Felon-In-Possession Statute Demonstrates That
        Uncodified Common Law Misdemeanor Offenses—Which Are Not
        "Punishable" By Any Specified Statutory Criteria—Are Not Disqualifying
        Offenses**

The relevant language of the federal felon-in-possession statute prohibits any person

convicted of "a crime punishable by imprisonment for a term exceeding one year" from

possessing firearms, 18 U.S.C. § 922 (g)(1), with an exception for "any State offense classified

by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two

years or less." 18 U.S.C. § 921(a)(20). Because uncodified common-law offenses are not

"punishable by" *any* particular statutory criteria, they do not fall within the purview of the law.

The term "punishable" is not defined by statute and should therefore be given its ordinary

meaning, consistent with its purpose and placement in the overall statutory scheme. *Baily* v.

*United States*, 516 U.S. 137, 144-145 (1995). In general terms, "punishable" may be defined as

"deserving of, or liable to, punishment : capable of being punished by law or right." WEBSTER'S

NEW INTERNATIONAL DICTIONARY 1843 (3rd ed. 1961). But its meaning is also subject to subtle

but important variations, depending on whether used in reference to a person (*e.g.*, "a punishable

offender") or an offense (*e.g.*, "a crime punishable by death").

Black's Law Dictionary recognizes this distinction with separate entries for each—the

former meaning "subject to a punishment," but the latter defined as "giving rise to a *specified*

punishment." BLACK'S at 1353 (emphasis added).  It is this latter definition—referring to

"specified punishment[s]"—that Congress used here. Quite plainly, the statute speaks not of

predicate persons, but of predicate crimes—*i.e.*, those that are "punishable by" a specified

punishment range. *See id.* (providing as exemplary usage: "a felony *punishable by* imprisonment

for up to 20 years") (emphasis added). An offense "giv[es] rise to a specified punishment,"

whereas its offender is "subject to" that "specified punishment."

Properly understood, then, the applicability of the felon-in-possession ban turns on the

predicate crime's *specified* length of potential punishment—a traditional legislative

determination. This interpretation is further compelled by the federal scheme's structural reliance

on the judgment of the convicting jurisdiction's legislature. By affirmatively specifying a

punishment term equaling or exceeding two years (in the case of a misdemeanor) or exceeding

one year (in the case of any other offense), a State legislature renders a judgment about the

seriousness of the corresponding offense. Congress has chosen this legislative assessment as its

trigger. *See Small* v. *United States*, 544 U.S. 385, 392 (2005) (noting that Congress' exemption

of state misdemeanor crimes punishable by less than two years imprisonment is "presumably

based on the determination that such state crimes are not sufficiently serious or dangerous so as

to preclude an individual from possessing a firearm.") (majority opinion); *see also id.* at 403 ("It

was eminently reasonable for Congress to use convictions punishable by imprisonment for more

than a year . . . as a proxy for dangerousness.") (THOMAS, J., dissenting).

This reading is also most congruent with the spirit of federalism that permeates the

federal scheme, empowering a State's legislature to decide the extent to which it will expose

those within its jurisdiction to the reach of the federal gun control laws. The State remains the

final authority on how harshly it chooses to punish its own crimes, and Congress has deferred to

the wisdom of that localized judgment. *See United States* v. *McKenzie*, 99 F.3d 813, 820 (7th

Cir. 1996) ("[W]hile states may vary on what offenses are punishable by a term exceeding one year, it does not alter Congress' intent to keep guns out of the hands of anyone that a given state determines to be a felon.").

The government's reading fails to do these values justice. Allowing the federal felon-in-possession statute to encompass state common law crimes for which no legislative judgment has been expressed would grant Defendants a power that has been statutorily entrusted to the States. Notably, Maryland's own State gun control laws show a disinclination to ban guns from ordinary common law misdemeanants. Maryland's gun control statute closely tracks federal law, except that its wording prohibits gun ownership by a person convicted of a "misdemeanor in the State that carries a statutory penalty of more than 2 years." *See* MD. PUBLIC SAFETY CODE ANN. §§ 5-101, 5-133 (emphasis added). Maryland's specific requirement of a "statutory" penalty strongly suggests its intent to keep common law misdemeanants outside the scope of its own gun control laws. It would make little sense to place those same individuals within the reach of a federal gun control scheme that specifically depends on the reach of State law.

Simply put, Schrader's conviction for simple common law misdemeanor assault was not "punishable by . . . a term exceeding one year"; it had no specified punishment criteria at all.

### B. The Government's Reading Of The Felon-In-Possession Statute Fundamentally Alters Its Structure

Of course, a statute's text is not read in isolation, but in the context of its broader overall structure. It is a "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." *Deal* v. *United States*, 508 U.S. 129, 132 (1993). As one treatise observes:

> A statute is passed as a whole and not in parts or sections and is animated by one general purpose and intent. Consequently, each part or section should be construed in connection with every other part or section to produce a harmonious whole. Thus, it is not proper to confine interpretation to the one section to be construed. It has also been held that the court will not only consider the particular statute in question, but also the entire legislative scheme of which it is a part.

Norman J. Singer, 2A SUTHERLAND ON STATUTORY CONSTRUCTION § 46:5, at 189 205 (7th ed. 2008) (collecting cases); *see also Castillo* v. *United States*, 530 U.S. 120, 124 (2000) ("The statute's structure clarifies any ambiguity inherent in its literal language"). The government's proposed interpretation here would clash with the structure of the felon-in-possession statute and vastly expand its reach.

The overarching design of the federal gun control scheme reveals no intent to impose a blanket firearms ban on common law misdemeanants. As noted above, Congress has applied the firearms ban to certain unambiguously-specified categories of misdemeanor convictions. In 1996, for example, Congress passed 18 U.S.C. § 922(g)(9) to prohibit gun ownership by any person convicted of a "misdemeanor crime of domestic violence." Congress did so to "close [a] dangerous loophole" that had previously permitted many domestic abusers to own firearms—*i.e.*, those whose domestic abuse crimes had not resulted in felony convictions. *Hayes*, 129 S. Ct. at 1087. Congress' explicit reference to this special category of misdemeanor convictions shows that when it wants to reach beyond traditional felonies, it does so clearly. Without a clear statement from Congress, there is no basis for elevating Schrader's conviction for *ordinary* assault and battery to the same level as a conviction for *domestic violence* assault and battery—the misdemeanor-level category of offenses that Congress has chosen to address. That Schrader's conviction ultimately resulted in nothing more than a $100 fine further demonstrates its incongruity with a statute aimed squarely at felony-level offenders.

22

* * *

The Supreme Court's most recent pronouncements on the federal firearms statutes further illustrate how ordinary, common sense constructions generally win out over hypertechnical ones.[6] Just two years ago, the Court decided the case of *United States* v. *Hayes*, 129 S. Ct. 1079 (2009), interpreting the provision of the federal gun ban that applies to persons convicted of a "misdemeanor crime of domestic violence." That term is statutorily-defined to include (among other things) any offense that "has, as an element, the use . . . of physical force . . . committed by a [domestic partner]." 18 U.S.C. § 921(a)(33)(A). Defendant Hayes—who had been convicted in West Virginia of battery against his spouse—attempted to argue that a predicate offense must have, as a discrete element, the requirement of a domestic relationship. *Hayes*, 129 S. Ct. at 1083. Because the crime of battery is not specifically limited to domestic situations, Hayes argued, his conviction for battery against his wife should not trigger the statute. *Id.* The Court rejected this argument, concluding that limiting "misdemeanor crime[s] of domestic violence" to only those relatively few crimes that have a domestic relationship as an actual element of the offense would not be a reasonable interpretation of a statute aimed at keeping firearms away from domestic violence situations. *Id.* at 1087-88.

Continuing this theme, the Court last term decided *Johnson* v. *United States*, 130 S. Ct. 1265 (2010), interpreting a provision of the federal Armed Career Criminal Act that imposes an enhanced sentence on any person who illegally possesses a firearm after having three or more

---

[6] *See, e.g.*, 2A SUTHERLAND at § 45:12, 94-99 (explaining that it is a "well established principle of statutory interpretation that the law favors rational and sensible construction," and "it has been called a golden rule of statutory interpretation that, when one of several possible interpretations produces an unreasonable result, that is a reason for rejecting that interpretation in favor of another which would produce a reasonable result").

convictions for a "violent felony." *See* 18 U.S.C. § 924(e)(1). To qualify as a violent felony, a predicate crime must have an element of "physical force"—a term undefined by the statute. The government had urged the Court to adopt a broad common-law definition, which would have included "even the slightest offensive touching." *Johnson*, 130 S. Ct. at 1271. But in a 7-2 opinion, the Court disagreed, reasoning that a "violent felony" must include some aspect of violent force, and that it made little sense to borrow a *common law misdemeanor* definition of force for purposes of defining a "*violent felony.*" *Id*. In rejecting the government's broad proposed construction, the Court cautioned that "[u]ltimately, context determines meaning, and we do not force term-of-art definitions into contexts where they plainly do not fit and produce nonsense." *Id*. at 1270 (citations and quotations omitted).

In much the same way here, Defendants' sweeping interpretation of the felon-in-possession statute produces the nonsensical result of lumping all ordinary common law misdemeanants into a heightened category reserved for felons and domestic abusers. In interpreting a statute, a court should "adopt that sense of words which best harmonizes with [the statute's] context and promotes [the] policy and objectives of [the] legislature." *King* v. *St. Vincent's Hospital*, 502 U.S. 215, 221, n.10 (1991) (citing *United States* v. *Hartwell*, 73 U.S. 385 (1868)). Those objectives did not include dispossessing ordinary misdemeanants of their firearms rights.

### C. The Recorded Legislative History Confirms That The Government's Reading Was Unthought Of By The Enacting Congress

Some courts will look to the legislative purpose of a statute in cases "where the effect of a statute on the situation at hand is unclear either because the situation was unforeseen at the time when the act was passed, or the statutory articulation of the rule or policy is so incomplete that it

cannot clearly be said to speak to the situation in issue." 2A Sutherland § 45:9, at 59. And while

the use of legislative history as a general tool of statutory construction will sometimes evoke

controversy, even noted textualists have sanctioned its use for the narrow purpose of verifying

that an untenable proposed statutory construction was in fact never contemplated by the

legislature. One example of this approach is outlined in a concurring opinion in *Green* v. *Bock*

*Laundry Mach. Co.*:

> We are confronted here with a statute which, if interpreted literally, produces an absurd, and perhaps unconstitutional, result. Our task is to give some alternative meaning to the [word at issue] that avoids this consequence . . . I think it entirely appropriate to consult all public materials, including the background of [the rule at issue] and the legislative history of its adoption, *to verify that what seems to us an unthinkable disposition . . . was indeed unthought of*, and thus to justify a departure from the ordinary meaning of the [word at issue]. For that purpose, however, it would suffice to observe that counsel have not provided, nor have we discovered, a shred of evidence that anyone has ever proposed or assumed such a bizarre disposition.

490 U.S. 504, 527 (1989) (SCALIA, J., concurring) (emphasis added); *see also Small*, 544 U.S. at

393 ("The statute's lengthy legislative history confirms the fact that Congress did not consider

whether foreign convictions should or should not serve as a predicate to liability under the

provision here at issue.") (holding such foreign convictions inapplicable under the

felon-in-possession statute).

   The recorded legislative history behind the Federal Gun Control Act of 1968 act is fairly

sparse. As the Supreme Court has explained, the law was "added by way of a floor amendment . .

. and thus was not a subject of discussion in the legislative reports." *Lewis* v. *United States*, 445

U.S. 55, 62 (1980); *see also United States* v. *Batchelder*, 442 U.S. 114, 120 (1979); *Scarborough*

v. *United States*, 431 U.S. 563, 569-570 (1977); *United States* v. *Bass*, 404 U.S. 336, 344, and n.

11 (1971). However, "[w]hat little legislative history there is that is relevant reflects an intent to

impose a firearms disability on any felon based on the fact of conviction." *Lewis*, 445 U.S. at 62

(emphasis added). Senator Long, who introduced and directed the passage of the Act, explained:

> So, under Title VII, every citizen could possess a gun until the commission of his first felony.  Upon his conviction, however, Title VII would deny every assassin, murderer, thief and burglar of the right to possess a firearm in the future except where he has been pardoned by the President or a State Governor and had been expressly authorized by his pardon to possess a firearm.

114 Cong. Rec. 14773 (1968) (emphasis added); *see also Lewis*, 445 U.S. at 62-63 ("Inasmuch as

Senator Long was the sponsor and floor manager of the bill, his statements are entitled to

weight.") (citation omitted).

Much like the situations presented in *Green* and *Small*, the legislative history behind the

federal felon-in-possession ban reveals no evidence that its enacting Congress contemplated the

bizarre and (as outlined below) unconstitutional result of banning firearm possession from

anyone ever convicted of a common law misdemeanor, simply for want of any specified statutory

sentencing criteria. To the contrary, Congress appears to have focused squarely on keeping guns

away from dangerous felons.

### D.      The Fourth Circuit's Approach

The Fourth Circuit, which presides over Maryland, appears to be the only federal appeals

court to have considered the applicability of the federal felon-in-possession ban to common law

misdemeanants. In 1973, a panel of that court concluded that a Maryland conviction for common

law misdemeanor assault and battery was not "properly classified as a 'felony' within the

meaning of the federal statute." *United States* v. *Schultheis*, 486 F.2d 1331, 1335 & n.2 (4th Cir.

1973) (noting the "peculiar characteristics of Maryland's common law simple assault").

Observing that the statute is "silent regarding its application to common law convictions," the

26

court held that it would look to the actual sentence imposed to appraise the seriousness of the conviction in such cases. *Id*. at 1334. Thus, only a common law misdemeanor conviction resulting in an actual sentence of two years or greater would trigger the statute.

In 1998, however, *Schultheis* was overruled by an *en banc* panel of the court in *United States* v. *Coleman*, 158 F.3d 199 (4th Cir. 1998). Most of the *Coleman* court's analysis was dedicated to the separate issue of whether a common-law assault conviction may properly qualify as a "violent felony" for purposes of the related Armed Career Criminal Act. But the court also reconsidered the *Schultheis* practice of looking to the actual sentence imposed in cases implicating common law predicate convictions. In overruling *Schultheis*, the court cited various non-common-law cases reasoning that the proper focus should be "whether the offense is 'punishable' by a term of imprisonment greater than two years—not whether the offense 'was punished' by such a term of imprisonment." *Id*. at 203-04. The court did not discuss the peculiarities of uncodified common law crimes (which are not "punishable by" any specified punishment criteria), but nevertheless concluded that the "plain wording of the statute applies equally when the potential term of imprisonment is established by the common law and limited only by the prohibition on cruel and unusual punishments as when the range of possible terms of imprisonment is determined by a statute." *Id*. at 204. A dissenting opinion warned that the majority "would blindly lump into the same category the most trivial and the most heinous assaults, thereby defeating the clear Congressional desire to exclude minor transgressions of the law from the sweep of" the federal felon-in-possession statute. *Id*. at 205 (WIDENER, J., dissenting) (citing *Schultheis*, 486 F.2d at 1333).

While *Coleman* is not controlling in this jurisdiction, it should not carry persuasive value

27

either. For one, the *Coleman* majority engaged in only a cursory analysis of the statute's text, dedicating just three sentences to the issue. *See id.* at 203-04. *Coleman* was also decided without the benefit of the Supreme Court's recent opinions in *Johnson* and *Hayes* (discussed above), both of which emphasize reasonable interpretations of the federal gun laws over hypertechnical ones. And *Coleman* also anteceded the 1996 congressional expansion of the felon-in-possession ban to misdemeanor crimes of domestic violence, which further confirmed Congress' intent to reach only narrow classes of misdemeanants.

Perhaps most significantly, though, *Coleman* predated the Supreme Court's landmark decision in *District of Columbia* v. *Heller*, 554 U.S. 570 (2008), which held that the Second Amendment protects an individual right to keep and bear arms. As outlined in Part IV below, *Coleman*'s broad interpretation of the statute would raise serious Second Amendment issues by denying that enumerated right to all common law misdemeanants.[7] The prospect of this constitutional difficulty alone is sufficient reason to reject that interpretation. *See* Norman J. Singer, 2A Sutherland On Statutory Construction § 45.11, at 87 (7th ed. 2008) ("the fact that one among alternative constructions would involve serious constitutional difficulties is reason to reject that interpretation in favor of another.") (collecting cases).

E.   **The Rule Of Lenity Further Confirms That Common Law Misdemeanor Convictions Do Not Trigger The Felon-In-Possession Statute**

Finally, the government's broad proposed construction of the felon-in-possession statute

---

[7] Notably, a recent Fourth Circuit opinion has vacated and remanded on Second Amendment grounds the conviction of an individual charged with illegally possessing a firearm after being convicted of a misdemeanor crime of domestic violence. *See United States* v. *Chester*, 628 F.3d 673, 674 (4th Cir. 2010) (holding that the lower court erred in failing to scrutinize 18 U.S.C. § 922(g)(9) under the requirements of the Second Amendment). Thus, *Coleman*'s continuing viability in the wake of *Heller* is questionable even within the Fourth Circuit.

is further undermined by the traditional rule of lenity, which cautions that any nonobvious

reading of a penal statute should be strictly construed against the government:

> It is an ancient rule of statutory construction that penal statutes should be strictly construed against the government or parties seeking to enforce statutory penalties and in favor of the persons on whom penalties are sought to be imposed. This simply means that words are given their ordinary meaning and that any reasonable doubt about the meaning is decided in favor of anyone subjected to a criminal statute. This canon of interpretation has been accorded the status of a constitutional rule under principles of due process, not subject to abrogation by statute.

Norman J. Singer, 3 SUTHERLAND ON STATUTORY CONSTRUCTION § 59:3, at 167-75 (7th ed.

2008) (collecting cases); *see also id.* at 187-88 (discussing the Supreme Court's adoption of the

"rule of lenity.")

The federal felon-in-possession law is a criminal statute, carrying penalties of up to 10

years imprisonment. *See* 18 U.S.C. § 924(a)(2). Because Congress cannot be said to have

contemplated (let alone clearly elucidated) a firearms ban on all common law misdemeanants,

any effort to construe the statute to that effect must fail. *See Bass*, 404 U.S. at 347-48 ("In

various ways over the years, we have stated that when choice has to be made between two

readings of what conduct Congress has made a crime, it is appropriate, before we choose the

harsher alternative, to require that Congress should have spoken in language that is clear and

definite.") (citations and quotations omitted).

* * *

In sum, there is no basis for expanding the reach of the federal felon-in-possession statute

to include simple uncodified common law misdemeanor offenses. Plaintiffs have properly stated

their first claim for relief under 18 U.S.C. § 925A and are entitled to summary judgment.

IV.    **SECOND CLAIM FOR RELIEF—THE GOVERNMENT'S APPLICATION OF A FIREARMS BAN AGAINST ORDINARY COMMON LAW MISDEMEANANTS VIOLATES THE SECOND AMENDMENT**

The government has also moved under Fed. R. Civ. P. 12(b)(6) to dismiss Plaintiffs' second claim for relief, taking the position that Mr. Schrader "should be considered to be a convicted felon for purposes of this Second Amendment challenge," Def. Br. at 25 (citation omitted); *see also generally id*. at 24-30, even though it is undisputed that Schrader's 42-year-old conviction was for a common law *misdemeanor* offense. In a previous filing in this case, the government went on to argue that

> . . . the historical understanding of the scope of the Second Amendment extends only to "law-abiding citizens," and [Schrader] admits that he has not been one at all times. *Heller* v. *District of Columbia* (sic), 554 U.S. 570, 625 (2008).

Def. Reply [Dkt. # 11] at 2. The government offered no limiting principle, and appears to take the position that it may permanently disqualify persons convicted of *any* legal offenses from firearms ownership. But as outlined below, the government's imposition of a firearms ban on Schrader cannot be reconciled with the Supreme Court's opinions in *Heller* and *McDonald*, nor does it find support in the original historical meaning of the Second Amendment right to keep and bear arms. Accordingly, Plaintiffs are also entitled to summary judgment on their second claim for relief, and the government's motion to dismiss the claim should be denied.

A.    **The Supreme Court's *Heller* Decision Changed The Relevant Doctrinal Framework For Analyzing Government Action Implicating The Right To Keep And Bear Arms**

1.    **The Supreme Court's decisions in *Heller* and *McDonald***

In 2008, the Supreme Court decided the case of *District of Columbia* v. *Heller*, 554 U.S. 570 (2008), which represented the Court's first substantial analysis of the Second Amendment's

30

original public meaning. Striking down the District of Columbia's categorical ban on handgun possession, the Court engaged in a detailed analysis of the Second Amendment's text and history and concluded that it protects an individual right to keep and bear arms for lawful purposes that include self-defense. *Id*. at 592.

In so doing, the Court explained that the Second Amendment (much like the First and Fourth Amendments) codifies a *pre-existing* right to keep and bear arms—one that must be defined in accordance with its historical background. *Id*. Not surprisingly then, the Court noted that this pre-existing right was historically subject to certain pre-existing limitations on its scope. From "Blackstone through the 19th-century cases," the right to keep and bear arms was never treated as "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id*. at 626 (citations omitted). Rather, it protected the use of certain types of weapons, for certain lawful purposes.

The Court declined to undertake an "exhaustive historical analysis . . . of the full scope of the Second Amendment," but did provide guidance as to its pre-existing limitations. *Id*. at 626-27. For example, the sorts of "arms" protected by the Second Amendment did not include all weapons, but only those that were "in common use at the time." *Id*. at 627 (quoting *United States* v. *Miller*, 307 U.S. 174, 179 (1939)). Thus, the right did not protect unusual weapons that were "not typically possessed by law abiding citizens for lawful purposes." *Id*. at 625; *accord United States* v. *Tagg*, 572 F.3d 1320, 1326 (11th Cir. 2009) (holding that pipe bombs are not protected weapons under the Second Amendment).

The Court also disclaimed that nothing in its opinion "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws

forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27. The Court identified those particular regulatory measures as "presumptively lawful," but also explained that it was not providing an exhaustive list. *Id*. at 627, n.26.

Finally, the Court declined to adopt a particular level of scrutiny for analyzing the Second Amendment right. *Id*. at 2821. Because the District of Columbia had imposed an absolute ban on handgun ownership that could not survive any level of heightened scrutiny, the Court found it unnecessary to decide this question and left it open for future cases. *Id*. at 634-35. The Court did, however, expressly rule out the possibility of rational basis review. *Id*. at 628, n.27.

### 2.    The applicable doctrinal framework

In the wake of *Heller*, most courts have followed a two-step doctrinal approach to cases potentially implicating the Second Amendment. *See*, e.g., *United States* v. *Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010); *United States* v. *Reese*, 627 F.3d 792, 800 (10th Cir. 2010).

The first step is to consider whether the particular exercise of government power regulates conduct falling within the actual scope of the Second Amendment at all. *See*, *e.g.*, *Marzzarella*, 614 F.3d at 89; *Chester*, 628 F.3d at 680; *see also Heller* v. *District of Columbia*, 698 F. Supp. 2d 179, 188 (D.D.C. 2010), *appeal docketed and pending*, No. 10-7036 (D.C. Cir. April 2, 2010) ("*Heller II*") (explaining that the appropriate level of scrutiny "will come into play, of course, only in cases in which the law implicates the core Second Amendment right . . . "). Courts typically do this by examining whether the law at issue implicates a "core" Second Amendment right—such as the right of "law abiding, responsible citizens to use arms in defense of hearth and home" identified by the Supreme Court in *Heller. Heller*, 554 U.S. at 635; *Heller*

32

*II*, 698 F. Supp. 2d at 188; *Marzzarella*, 614 F.3d at 92; *see also United States* v. *Rene E.*, 583 F.3d 8, 12-16 (1st Cir. 2009) (upholding the constitutionality of a federal ban on juvenile handgun possession after conducting a historical analysis and concluding that juveniles fall outside the scope of the Second Amendment's core protections).

If the government action falls outside the scope of the Second Amendment, then the analysis goes no further. But if found to intrude upon a core component of the right to keep and bear arms, the second step requires application of the appropriate level of judicial scrutiny. *See*, *e.g.*, *Heller II*, 698 F. Supp. 2d at 188; *Chester*, 628 F.3d at 681-682; *Marzzarella*, 614 F.3d at 89; *Reese*, 627 F.3d at 800-801.

Courts are divided on what the appropriate level of scrutiny should be. Some have concluded that the right to keep and bear arms is entitled to strict scrutiny, based on its status as a fundamental, constitutionally-enumerated right deeply rooted in our nation's history and traditions. *United States* v. *Engstrum*, 609 F. Supp. 2d 1227, 1231-32 (D. Utah 2009); *State of Wisconsin* v. *Schultz*, No. 10-CM-138, slip. op. (Wis. Ct. App. Oct. 12, 2010). Other courts have applied a form of intermediate scrutiny, usually after looking to *Heller*'s disclaimer about the presumed constitutionality of felon dispossession laws and concluding it to be inconsistent with strict scrutiny review. *United States* v. *Skoien*, 587 F.3d 803, 811-812 (7th Cir. 2009) *vacated* 614 F.3d 638 (7th Cir. 2010) (en banc). One decision of this Court applied intermediate scrutiny in a Second Amendment case, reasoning that strict scrutiny could not apply because in *Heller*, "the Supreme Court did not explicitly hold that the Second Amendment right is a fundamental right . . . If the Supreme Court had wanted to declare the Second Amendment right a fundamental right, it would have done so explicitly." *Id.*, at 187. Shortly after this decision was published,

33

however, the Supreme Court did in fact declare the right "fundamental" in an intervening

opinion. *McDonald*, 130 S. Ct. at 3042 (plurality opinion) & 3059 (Thomas, J., concurring).

Still other courts have reasoned that the Second Amendment might implicate different

levels of scrutiny, depending on the nature of the law challenged.[8] "[A]s has been the experience

under the First Amendment, we might expect that courts will employ different types of scrutiny

in assessing burdens on Second Amendment rights, depending on the character of the Second

Amendment question presented." *United States* v. *Masciandaro,* 638 F.3d 458, 470 (4th Cir.

2011); *cf. Marzzarella*, 614 F.3d at 96; *United States* v. *Williams*, 616 F.3d 685, 692 (7th Cir.

2010) (declining to "adopt a level of scrutiny applicable to every disarmament challenge . . . ").

Under this approach, the Fourth Circuit applies strict scrutiny to cases implicating the Second

Amendment's fundamental core, *Masciandaro*, 638 F.3d at 470-71, but intermediate scrutiny

where the "claim is not within the core right identified in *Heller*—the right of a law-abiding,

responsible citizen to possess and carry a weapon for self-defense." *Chester*, 628 F.3d at 683; *cf.*

*Cent. Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n*, 447 U.S. 557, 563 n.5 (1980) (an

intermediate standard of review may apply to an enumerated right under circumstances where the

right's exercise is "of less constitutional moment.").

As outlined in greater detail below, Plaintiff Schrader prevails under either test, but urges

this court to adopt the strict scrutiny approach—the evaluative test most consistent with the

---

[8] Without specifying an exact level of heightened scrutiny, the Ninth Circuit recently held in *Nordyke* v. *King*, 2011 U.S. App. LEXIS 8906 at *6 n.9 (9th Cir. May 2, 2011) that "regulations which substantially burden the right to keep and bear arms trigger heightened scrutiny under the Second Amendment." *Id*. at *6. But on June 13, 2011, the Ninth Circuit ordered the *Nordyke* Appellees to respond to a motion for re-hearing *en banc*. And given the case's "long and tangled procedural history" since 1999, *Nordyke*, 2011 U.S. App. LEXIS at *6, it is quite possible that this panel opinion may too be vacated.

Supreme Court's fundamental rights jurisprudence.

**B.      Schrader's Core Second Amendment Rights Are Implicated By The Government's Application Of The Felon-In-Possession Ban**

There can be little doubt that § 922(g)(1)'s total ban on firearms possession implicates Schrader's core Second Amendment rights. Schrader has been denied the ability to possess a shotgun and handgun for self-defense. SMF ¶¶ 11-14. Thus, the government's imposition of the § 922(g)(1) comprehensive firearms ban against him goes directly to the heart of the Second Amendment right of "law abiding, responsible citizens to use arms in defense of hearth and home" identified by the Supreme Court in *Heller*. 554 U.S. at 635; *see also Heller II*, 698 F. Supp. 2d at 190 ("Because no individual may possess an unregistered firearm in the District, the registration requirements plainly implicate the core Second Amendment right, that is, the right to defend one's self in one's home.").

Because Schrader is being categorically denied the right to own and use a firearm "in defense of hearth and home," the first step of the inquiry is easily satisfied. Accordingly, the analysis must proceed to the next step of determining whether the firearms ban can withstand the appropriate level of scrutiny demanded by the Second Amendment.

**C.      The Application Of 18 U.S.C. § 922(g)(1) To Schrader Cannot Survive Independent Review Under Any Appropriate Level Of Scrutiny**

As applied against Schrader, the government's categorical lifetime firearms ban cannot survive any appropriate standard of review, regardless of whether the ban is evaluated under strict or intermediate scrutiny. While Plaintiffs urge that strict scrutiny is most appropriate for reasons discussed below, both relevant standards are analyzed in turn.

1.     **A complete firearms ban applied to an ordinary common law misdemeanant like Schrader cannot survive strict scrutiny—the appropriate level of Second Amendment scrutiny**

(a)     **The core of the right to keep and bear arms is fundamental and entitled to strict scrutiny review**

It is well-established that any law encroaching upon a core "fundamental right"—a right "deeply rooted" in "our Nation's history, legal traditions, and practices"—must be evaluated under a strict scrutiny standard that generally requires it to be "narrowly tailored to serve a compelling state interest." *Washington* v. *Glucksberg*, 521 U.S. 702, 720-721 (1997); *see also Reno* v. *Flores*, 507 U.S. 292, 302 (1993) (substantive due process "forbids the government to infringe certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.") (citations omitted).

Operating under this *Glucksberg* framework, the Supreme Court last term examined the right to keep and bear arms and declared it "fundamental." *McDonald*, 130 S. Ct. at 3042 (majority opinion) & 3059 (THOMAS, J. concurring). Indeed, *Heller*'s exhaustive historical analysis of the right confirmed its deeply rooted status in our Nation's history, legal traditions, and practices. Beginning with its historical origins in England, and continuing from the time of the Founding to the present day, the right of the people to keep and bear arms has always enjoyed primary standing in the history of the United States. *See generally Heller*, 554 U.S. 570; *McDonald*, 130 S. Ct. at 3036-42.

Moreover, the Second Amendment's special status as an enumerated constitutional right provides further weighty evidence of its fundamental character. The Supreme Court has long referred to the various provisions of the Bill of Rights as fundamental and entitled to elevated scrutiny. *See*, *e.g.*, *Grosjean* v. *American Press Co., Inc.*, 297 U.S. 233, 243-44 (1936) (speaking

36

of "certain fundamental rights, safeguarded by the first eight amendments against federal action"
as protected by the Fourteenth Amendment) (emphasis added); *United States* v. *Carolene Prod.
Co.*, 304 U.S. 144, 153 n.4 (1938) (elevated scrutiny for enumerated rights); *Planned Parenthood
of S.E. Pa.* v. *Casey*, 505 U.S. 833, 847 (1992) (explaining that "all *fundamental rights*
comprised within the term liberty are protected by the Federal Constitution from invasion by the
States," and that the "most familiar of the substantive liberties" are those "already guaranteed to
the individual against federal interference by the *express provisions of the first eight Amendments
to the Constitution*") (citations and quotations omitted) (emphasis added).

Finally, the *Heller* opinion itself explicitly recognized the right to keep and bear arms as
"*fundamental* for English subjects" at the time of the founding. 554 U.S. at 593 (emphasis
added). Like the other provisions of the Bill of Rights, the Second Amendment was an attempt to
answer the objections of Anti-Federalists who worried that the new Constitution would be used
to deprive the people of rights traditionally considered to be the rights of Englishmen. *Id.* at 598-
99; *McDonald*, 130 S. Ct. at 3036-37. This right fundamental for English subjects is thus
fundamental for American citizens as well.

Like *Heller*, the *McDonald* opinion stopped short of elucidating a level of scrutiny. But
given the Second Amendment's status as a fundamental right, there is no apparent basis for a
standard less than strict scrutiny in evaluating a law implicating core Second Amendment rights.

> **(b)      Common law felons were historically outside the protective
> scope of the right to keep and bear arms; *Heller*'s dictum
> concerning the presumed constitutionality of felon
> dispossession laws is entirely consistent with strict scrutiny**

As noted above, the Supreme Court's observations about the presumed constitutionality

of felon-in-possession laws are best read as limitations on the *scope* of the Second Amendment.

37

From a historical perspective, convicted felons stood outside the protective scope of the Second Amendment. *See United States* v. *Emerson*, 270 F.3d 203, 227 n.21 (5th Cir. 2001) ("We also note that recognition that the Second Amendment does not prohibit legislation such as [the federal felon-in-possession ban] is in no way inconsistent with an individual rights model. . . . [Just as] the First Amendment does not permit the publication of libels, the Second Amendment is not infringed by laws prohibiting the carrying of concealed weapons") (citations and quotations omitted). Thus, just as categorical bans on unprotected speech are entirely consistent with the First Amendment, *see*, *e.g.*, *New York* v. *Ferber*, 458 U.S. 747 (1982), so too are felon dispossession laws consistent with the Second—even under the framework of strict scrutiny.

Indeed, modern scholarship confirms *Heller*'s treatment of felons—at least as understood and defined at common law—as unprotected by the Second Amendment. At common law, felons suffered a form a civil death, forfeiting their liberties as punishment for their crimes. Convicted felons were also subject to forfeiture of all property, *see* 4 W. Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 94 (1769) (hereinafter "Blackstone"), which would presumably include any arms that they might possess.  A recent law review article explains:

> [T]here is every reason to believe that the Founding Fathers would have deemed persons convicted of any of the common law felonies not to be among "the [virtuous] people" to whom they were guaranteeing the right to arms. At common law, felons were essentially stripped of property and other rights: "A felon who had broken the social contract no longer had any right to social advantages, including transfer of  property . . . ." A felon "could not own any property himself, nor could [his heirs] claim through him."

Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 HASTINGS L.J. 1339, 1360-61 (2009) (citations omitted).[9]

_____

[9] *See also* J.W. Cecil Turner, KENNY'S OUTLINES OF CRIMINAL LAW 93 (16th ed. 1952), which observes that:

Most other scholarship has also concluded that these common law felons lie outside the

protections of the Second Amendment. *See* Don B. Kates, Jr., *Handgun Prohibition and the*

*Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204, 266 (1984) ("The

constitutionality of [felon dispossession laws] cannot seriously be questioned on a theory that

felons are included within 'the people' whose right to arms is guaranteed by the second

amendment. Felons simply did not fall within the benefits of the common law right to possess

arms. That law punished felons with automatic forfeiture of all goods, usually accompanied by

death."); Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 TENN. L. REV.

461, 480 (1995) (concluding that under a classical republican model, "felons, children, and the

insane were excluded from the right to arms precisely as (and for the same reasons) they were

excluded from the franchise—though some (women for example) who lacked the right to vote

nonetheless possessed the right to arms."); Robert Dowlut, *The Right to Arms: Does the*

*Constitution or the Predilection of Judges Reign?*, 36 OKLA L. REV. 65, 96 (1983) ("Colonial

and English societies of the eighteenth century, as well as their modern counterparts, have

excluded infants, idiots, lunatics, and felons [from possessing firearms]."); Stephen P. Halbrook,

*What the Framers Intended: A Linguistic Analysis of the Right to "Bear Arms"*, 49 LAW &

CONTEMP. PROBS. 151 (1986) ("violent criminals, children, and those of unsound mind may be

---

Amongst indictable crimes, the common law singled out some as being so conspicuously
heinous that a man adjudged guilty of any of them incurred—not as any express part of
his sentence but as a consequence that necessary ensued upon it—a forfeiture of property,
whether of his lands or of his goods or of both (in the case of treason). Such crimes came
to be called "felonies." The other, and lesser, crimes were known as "transgressions" or
"trespasses," and did not obtain their present name of misdemeanours until a much later
date. A felony is, therefore, a crime which either involved by common law such a
forfeiture, or else has been placed by statute on the footing of those crimes which did
involve it.

deprived of firearms . . . .").[10]

But while persons convicted of serious crimes comparable to common law felonies may forfeit the protections of the Second Amendment, there is no basis for concluding that ordinary misdemeanants do as well. *Heller* makes no mention of misdemeanor crimes in its discussion of presumptively constitutional firearms laws. *Heller*, 554 U.S. at 626-27. To be sure, the opinion was careful to note that this list was non-exhaustive. *Id*. at 627 n.26. But if the Court were inclined to exclude *all* convicts—felons and misdemeanants alike—from the protection of the Second Amendment, it would be unusual to limit its discussion to felons.

Moreover, there is no historical correlation between Schrader's particular conviction for simple assault and battery and a felony-level offense.[11] At common law, all forms of battery were classified as misdemeanor offenses. *See* 4 Blackstone 216-18 (1769); *see also Johnson*, 130 S. Ct. at 1271. So too were convictions for the related offense of "affray"[12]—a common law misdemeanor defined as "the fighting of two or more persons in some public place, to the terror

---

[10] Of course, at common law, the felon classification was historically reserved for violent and extreme crimes that were frequently punishable by death. *See generally* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 HARV. J.L. & PUB. POL'Y 695, 714-28 (2009) (questioning the historical compatibility of blanket felon dispossession laws with the right to keep and bear arms); *see also* Adam Winkler, *Heller's Catch 22*, 56 UCLA L. REV. 1551, 1562-65 (2009) (same); *Williams*, 616 F.3d at 692 ("The academic writing on the subject of whether felons were excluded from firearm possession at the time of the founding is inconclusive at best . . .") (citation and quotation omitted).

[11] Plaintiffs do not foreclose the possibility that certain misdemeanor crimes that raise heightened societal dangers might be analogized to felony-level offenses. *See, e.g.*, *United States* v. *White*, 593 F.3d 1199, 1205-1206 (11th Cir. 2010) (upholding against facial challenge the federal firearms ban on any person convicted of a "misdemeanor crime of domestic violence" after analogizing it to the presumptively-constitutional felon-in-possession ban.)

[12] Notably, affray continues to be a viable common law criminal offense in the State of Maryland. *See Hickman* v. *State*, 193 Md. App. 238, 253 (2010).

of his majesty's subjects." *See* 4 Blackstone 144 (1769).

Viewed in the proper historical context, then, *Heller*'s disclaimer about felon-in-possession laws is most naturally read as a limitation on the right's *scope*, not its applicable level of scrutiny. Because felons at common law traditionally fell outside the protections of the Second Amendment, the government may impose felon-level restrictions without intruding on its core. But any entrenchment upon these core protections must withstand strict scrutiny to survive.

### (c)     A complete firearms ban applied to ordinary common law misdemeanants like Schrader cannot survive strict scrutiny

Applying strict scrutiny, the government's application of an absolute ban on Schrader's right to possess a firearm cannot be justified under the Second Amendment. A law subject to strict scrutiny must be narrowly tailored to achieve a compelling governmental interest. *See*, *e.g.*, *Grutter* v. *Bollinger*, 539 U.S. 306, 326 (2003). And while "[s]trict scrutiny is not strict in theory, but fatal in fact," *id*. (internal quotation marks omitted), it is nevertheless an "exacting standard and deliberately difficult to pass, in deference to the primacy of the individual liberties the Constitution secures." *Skoien*, 587 F.3d at 811 n. 5. In the First Amendment context, for example, a court applying strict scrutiny must ask whether "the challenged regulation is the least restrictive means among available, effective alternatives." *Ashcroft* v. *ACLU*, 542 U.S. 656, 666 (2004) (emphasis added). "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *United States* v. *Playboy Entm't Group*, 529 U.S. 803, 813 (2000). Strict scrutiny requires a "detailed examination, both as to ends and as to means." *Parents Involved in Cmty. Sch.* v. *Seattle Sch. Dist. No. 1*, 551 U.S. 701, 743 (2007) (quotation and citation omitted). And in *any* as-applied challenge, the challenger should be permitted to

41

"present facts about himself and his background that distinguish his circumstances from those of persons historically barred from Second Amendment protections." *Barton*, 633 F.3d at 174.

> [A] felon convicted of a minor, non-violent crime might show that he is no more dangerous than a typical law-abiding citizen. Similarly, a court might find that a felon whose crime of conviction is decades-old poses no continuing threat to society. The North Carolina Supreme Court did just that in *Britt* v. *State*, 363 N.C. 546 (N.C. 2009), finding that a felon convicted in 1979 of one count of possession of a controlled substance with intent to distribute had a constitutional right to keep and bear arms, at least as that right is understood under the North Carolina Constitution. *Id*. at 323.

*Id*.

Here, the government seeks to apply against Schrader an absolute ban on the possession of any firearm for any reason. Far from being narrowly tailored, the firearms ban imposed by § 922(g)(1) is essentially the most restrictive regulatory scheme imaginable. The government has made no individualized finding that Schrader's possession of a firearm presents any sort of danger to society. Moreover, the ban is for life, and provides no effective vehicle for reacquiring his rights. While the law theoretically allows an affected party to petition the Attorney General for relief of the disability, see 18 U.S.C. § 925(c), this "relief provision has been rendered inoperative," as Congress has repeatedly barred the Attorney General from using appropriated funds to investigate or act upon any such petitions. *See Logan*, 552 U.S. at 28 n.1. This leaves Schrader's Second Amendment right entirely eviscerated, with no effective means of restoration. Such a scheme is plainly incompatible with the requirements of strict scrutiny. *Cf. Gonzales* v. *O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 433 (2006) ("It is established in our strict scrutiny jurisprudence that a law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited") (quotations and citations omitted).

42

The government is also unable to provide a "compelling interest" for dispossessing an ordinary misdemeanant like Schrader of his firearms rights. The government has made no finding that Schrader's possession of a firearm poses any danger to society at all. To the contrary, its mechanical application of the federal gun ban against him is based on a single misdemeanor conviction that occurred over forty years ago as a 20-year-old Navy serviceman.

Finally, as explained in greater detail below, the government will not be permitted to proffer ad hoc justifications for applying the ban against Schrader, but will instead be required to defend the ban under the actual justifications contemplated by Congress. These justifications—which fail to take the Second Amendment into account at all—do not rise to anywhere near the level of a compelling governmental interest.

> **2.     A complete firearms ban applied to an ordinary common law misdemeanant like Schrader also fails review under intermediate scrutiny**

Even were this court to conclude that the right to keep and bear arms is not entitled to strict scrutiny, the government would be similarly unable to meet its burden under an intermediate scrutiny standard of review. As set forth by this court in *Heller II*, intermediate scrutiny is an "an exacting measure of scrutiny" that will apply to a regulation that "implicates the core Second Amendment right, namely, the right of law abiding, responsible citizens to use arms in defense of hearth and home." 698 F. Supp. 2d at 188 (citation and quotation omitted). Intermediate scrutiny requires a court to determine "whether the measure is substantially related to an important governmental interest." *Id.*; *see also Clark* v. *Jeter*, 486 U.S. 456, 461 (1988) (same). And "[s]ignificantly, intermediate scrutiny places the burden of establishing the required fit squarely upon the government." *Chester*, 628 F.3d at 683 (citing *Bd. of Trs.* v. *Fox*, 492 U.S.

43

469, 480-481 (1989)).

In *Heller II*, this court upheld against a Second Amendment challenge the District of Columbia's firearms registration scheme, finding it to be substantially related to the government's interest in preventing crime and promoting public safety. *Id*. at 190-91. The District had conducted hearings, heard testimony, and made various factual findings. The District ostensibly chose the registration scheme after balancing the government's interest in promoting public safety with the constitutional right of the people to keep firearms for purposes of self defense. *Id*. at 190-93. Moreover, the plaintiffs in that case were evidently not prohibited from owning firearms, but simply burdened with the administrative costs and inconveniences of the registration scheme.

In this case, however, Schrader has been entirely stripped of his core Second Amendment rights to "to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635. The government has made no individualized findings that he poses a threat to public safety, and will be able to identify no other important governmental interest for banning his possession of firearms.

In applying intermediate scrutiny in the context of gender classifications, the Supreme Court has explained that the "burden of justification is demanding and it rests entirely on the State." *United States* v. *Virginia*, 518 U.S. 515, 533 (1996). More importantly, the "justification must be genuine, not hypothesized or invented post hoc in response to litigation." *Id*.

In this case, the original 1968 passage of the felon-in-possession ban pre-dated *Heller*, and thus did not appear to reflect any considerations at all for the constitutional right of the people to keep and bear arms. Congress' relevant findings of fact appear to have focused instead on potential threats to interstate commerce and other issues unrelated to the Second Amendment.

44

*See*, *e.g.*, *Scarborough*, 431 U.S. at 571 n.10 (1977) (quoting the congressional findings of fact associated with the Federal Gun Control Act of 1968). Of course, to the extent the federal firearms ban affects persons who fall outside the protection of the Second Amendment—*e.g.*, felons, the insane, juveniles, etc.—the scheme will not raise constitutional issues. But for an ordinary misdemeanant like Schrader, the Second Amendment will not permit the government to invent post hoc justifications for banning his possession of firearms.

## CONCLUSION

The government's imposition of a categorical, lifetime ban on Schrader's ability to possess a firearm has no basis in federal law and also violates his Second Amendment right to keep and bear arms. Accordingly, Plaintiffs are entitled to summary judgment for the removal of Schrader's firearms disability from the NICS computer database pursuant to 18 U.S.C. § 925A, as well as an order permanently enjoining Defendants from enforcing a firearms ban on the basis of ordinary common law misdemeanor convictions.

Dated: July 1, 2011                      Respectfully submitted,

Alan Gura (D.C. Bar No. 453449)
Thomas M. Huff (D.C. Bar No. 978294)      By:     /s/ Thomas M. Huff
Gura & Possessky, PLLC                            Thomas M. Huff
101 N. Columbus Street, Suite 405
Alexandria, VA 22314                      Attorneys for Plaintiffs
703.835.9085/Fax 703.997.7665