**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JEFFERSON WAYNE SCHRADER and | ) | |
| SECOND AMENDMENT FOUNDATION, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 10-1736 (RMC) |
| v. | ) | |
| | ) | |
| ERIC HOLDER, Attorney General of the United | ) | |
| States, in his official capacity, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS**
**SECOND AMENDED COMPLAINT AND OPPOSITION TO PLAINTIFFS'**
**CROSS-MOTION FOR SUMMARY JUDGMENT**

As explained in Defendants' opening brief, Plaintiffs' challenges to two provisions of the

Gun Control Act, 18 U.S.C. §§ 921(a)(20)(B) and 922(g)(1), should be dismissed.  Initially,

Plaintiff Schrader lacks standing because he has not suffered a cognizable injury-in-fact that can

be traced to defendants or redressed by the Court, and Plaintiff Second Amendment Foundation

("SAF"), with no members other than Schrader identified and no evidence in the record, fails to

establish either its organizational or representational standing.  Moreover, even if Plaintiffs had

standing, they still could not prevail.  First, because Plaintiff Schrader admits that he was

convicted by the state of Maryland of "a crime punishable by imprisonment for a term exceeding

one year," he is barred from possessing firearms under the clear statutory language of Section

922(g)(1).  Moreover, his conviction does not fall within the statutory exception contained in

Section 921(a)(20)(B) because he was not convicted of a "State offense . . . punishable by a term

of imprisonment of two years or less."  Sections 922(g)(1) and 921(a)(20)(B) do not turn on

whether the underlying conviction was for a violent crime, on the actual sentence imposed, or the

felony/misdemeanor designation.  Rather, the dispositive criterion is whether, as a result of the conviction, the criminal defendant faced a potential sentence of more than two years in state prison, and Plaintiff Schrader indisputably faced a potential prison sentence greater than two years as a result of his conviction for common law assault in Maryland in 1968.

Second, 18 U.S.C. § 922(g)(1), as applied to Plaintiff Schrader in light of his prior assault and battery conviction in Maryland, is constitutional under the Second Amendment.  Accepting Plaintiffs' theories would exclude from the federal ban on possession of firearms every person who was convicted by a state of a common law crime which has since been codified without a prescribed sentencing range, regardless of the nature of the crime.  There is no evidence that Congress intended that result, and the plain language of the challenged provisions contradicts such an interpretation.  Further, the history and text of the Second Amendment establish that this particular statutory ban on firearms is Constitutional.  As explained further below, neither Plaintiffs' opposition brief to Defendants' motion to dismiss nor Plaintiffs' cross-motion for summary judgment does anything to diminish any of these arguments.  This action should therefore be dismissed.

I.      **The Court Should Dismiss Plaintiffs' Claims for Lack of Subject Matter Jurisdiction Because Plaintiffs Lack Standing.**

Plaintiffs' Opposition relies heavily on an inapposite comparison between Plaintiff Schrader and the plaintiff in *Dearth v. Holder*, 641 F.3d 499 (D.C. Cir. 2011), and arguments this Court previously rejected regarding Plaintiff SAF.  *See* Pls.' Opp. at 11-16.  Because neither plaintiff is able to demonstrate appropriate standing, the Court should dismiss this case for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1).

**A.    Despite Belatedly Conjuring a Vaguely Present Intention to Acquire Unspecified Firearms Other Than Those He Previously Sought, Plaintiff Schrader Still Lacks Standing.**

As outlined in Defendants' motion to dismiss, Plaintiff Schrader cannot establish standing because he does not establish a real and imminent injury that can be reasonably traced to Defendants and redressed by the Court.  As explained in Defendants' opening brief, Plaintiff Schrader failed through his well-pleaded factual allegations and affidavit submitted in support of his motion for summary judgment to establish an injury. In any event, any purported injury stems from the application of clearly-written statutes to a criminal conviction within the scope of 18 U.S.C. § 922(g)(1), and not excluded by Section 921(a)(20)(B); thus, Plaintiff Schrader's  only remedy for any alleged injury lies with Congress or the state of Maryland, and not this Court.

Plaintiff Schrader's declaration describes two attempts to obtain firearms in late 2008-early 2009.  *See* Declaration of Jefferson Wayne Schrader ("Schrader Dec."), ¶¶ 9-12.  The events surrounding the latter of the two attempts were completed a "short time" after June 3, 2009.  *Id.* ¶¶ 11-12.  But this lawsuit was not filed until October 13, 2010 -- approximately eighteen months later-- and Plaintiff Schrader's declaration fails to describe anything that happened to him in that lengthy intervening period that has any bearing on his claims.  Plaintiff Schrader thus merely establishes, at most, an alleged past injury.  A past injury is insufficient to establish standing, because the injury must be actual or imminent.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 & n.1 (1992); *Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972) ("the 'injury in fact' test requires more than an injury to a cognizable interest.  It requires that the party seeking review be himself among the injured").

Further, Plaintiff Schrader is not pursuing these past firearms transactions.  Rather, he alleges an intention to acquire a different "handgun and long gun" from the ones that were the

subject of the two firearms transactions described in his complaint.  2d Am. Comp. ¶¶ 1, 14-16.

This gap is significant because it eliminates any potential injury stemming from the

administrative denial alleged in the SAC, and reduces Plaintiff Schrader's standing to his

generalized objection to laws passed by Congress that, by their terms, prohibit possession of

firearms by individuals with criminal convictions for offenses that are potentially punishable by

imprisonment for more than one year.  *See Mountain States Legal Found. v. Glickman*, 92 F.3d

1228, 1232 (D.C. Cir. 1996) ("[O]n any given claim the injury that supplies constitutional

standing must be the same as the injury within the requisite 'zone of interests' for purposes of

prudential standing."). This abstract desire is the sort of widely-held grievance that courts

typically reject for purposes of establishing a concrete injury.  *See Sierra Club v. Morton*, 405

U.S. at 739-40; *Evans v. Lynn*, 537 F.2d 571, 598 (2d Cir. 1976) ("[d]isagreement with

government action or policy, however strongly felt, does not, standing alone, constitute an

'injury' in the Constitutional sense which is cognizable in the federal courts and susceptible of

remedy by the judicial branch; it is a matter properly addressed to the Congress or the

Executive.").

     At least at summary judgment, the evidence is to be viewed in the light most favorable to

the non-moving party, i.e., the government with reference to Plaintiffs' Cross-Motion.  *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Because Plaintiff Schrader does not

define more precisely what kind of handgun and long gun he intends to possess for self-defense,

his intentions could extend to a desire to possess weapons prohibited by federal firearms

provisions for all citizens (e.g., unregistered sawed-off shotguns), and not just those challenged

here.  Moreover, Plaintiff Schrader fails to provide any facts or detail as to where, when, or how

he would effectuate his avowed present intention to purchase firearms.  Plaintiff Schrader's

contention that this case is "indistinguishable" from *Dearth* is incorrect.  *See* Pls.' Opp. at 13.

The two plaintiffs are different because nothing in the record in *Dearth* suggests that Mr. Dearth

had any criminal record.  Plaintiff Schrader's inability to purchase and possess firearms legally is

because of his admitted record from Maryland of a qualifying misdemeanor conviction, and not

because of any acts by Defendants.

Plaintiff Schrader correctly acknowledges that common law battery in Maryland has been

replaced by two levels of statutory assault.  *See* Pls.' Opp. at 7 n.3.  Even the lesser offense,

called Second Degree Assault, carries a maximum term of imprisonment of ten years.  *Id.*

Because ten years is more than the two years required under the federal provision he challenges

here, Plaintiff Schrader's allegations, even on their face, simply fail.  In other words, examining

Plaintiff Schrader's conviction in 1968 or today disqualifies him from firearms possession under

18 U.S.C. §§ 921(a)(20)(B) & 922(g)(1).  The Court should disregard Plaintiff Schrader's

assertion that he "is fully qualified to possess firearms under Georgia law" not only because it is

a conclusion of law, *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994),

but also because it is immaterial in light of his undisputed conviction which disqualfies him

under federal law.  *National Rifle Ass'n of Am., Inc. v. Reno*, 216 F.3d 122 (D.C. Cir. 2000)

(affirming dismissal of case involving challenge to federal regulation for information from states

in background checks of prospective firearms purchasers).  *See also Gonzales v. Raich*, 545 U.S.

1, 28 (2005) (courts start from a "strong presumption" that Acts of Congress are valid).

Accordingly, Plaintiff Schrader fails to demonstrate a current injury that is traceable to

Defendants and redressable by the Court because only Congress can change the ban on firearms

possession by people with state criminal convictions potentially punishable by more than two

years in prison.  As a result, Plaintiff Schrader lacks standing for both claims.  Unless Plaintiff

SAF can establish standing for the constitutional claim it asserts – which it cannot – this case should be dismissed.  Fed. R. Civ. P. 12(b)(1).

      **B.**      **Plaintiff SAF Again Fails To Show Either Organizational or Representational Standing.**

      As an initial matter, it is worth noting that Plaintiff SAF still presents only arguments and no evidence in support of its own standing.  *See* Pls.' Opp. at 16-18.  Instead, Plaintiff SAF relies only on the allegations in the SAC[1] and many of the same arguments it made and this Court rejected in *Hodgkins v. Holder*, 677 F. Supp. 2d 202, 203 (D.D.C. 2010), *reversed on other grounds sub nom. Dearth v. Holder*, 631 F.3d 499 (D.C. Cir. 2011).  *See* Pls.' Opp. at 17-18.  The D.C. Circuit left undisturbed the district court's conclusion in *Hodgkins* that SAF lacked standing.  *See Dearth*, 631 F.3d at 503 n.*.  Any "inquiry into standing is a highly case-specific endeavor," *Public Citizen v. FTC*, 869 F.2d 1541, 1546 (D.C. Cir. 1989) (citation and quotation marks omitted), requiring "careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted[.]" *Allen v. Wright*, 468 U.S. 737, 752 (1984).  Because SAF's allegations regarding standing in this case are similar to those alleged in *Hodgkins*, and the reasons for denying SAF's bid for standing in *Hodgkins* were persuasive, this Court should deny SAF standing here.

---

[1]  For purposes of Defendants' motion to dismiss, the Court should assess Plaintiff SAF's standing "on the assumption that the allegations of the [second amended] complaint relevant to standing are true." *Young America's Found. v. Gates*, 573 F.3d 797, 799 (D.C. Cir. 2009). However, "parties invoking jurisdiction at summary judgment may not rest on mere allegations, but must set forth by affidavit or other evidence specific facts demonstrating standing." *See Shays v. FEC*, 414 F.3d 76, 84 (D.C. Cir. 2005) (citation and internal quotation marks omitted); *Lujan*, 504 U.S. at 561 ("[s]ince they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each [standing] element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."). Accordingly, the absence of any evidence from Plaintiff SAF precludes granting its cross-motion for summary judgment.

Plaintiff SAF asserts that it has both organizational and representational standing to sue. *See* Pls.' Opp. at 16.  SAF alleges (without any evidentiary support) that it educates its members and the public about the government's enforcement of gun laws in general, including 18 U.S.C. § 922(g)(1), but without any particular reference to the application of the specific provisions specifically challenged here: Section 922(g)(1), as it operates in conjunction with Section 921(a)(20)(B).  *See id.* at 17.  It is thus too far a leap for SAF to contend, as it does, that "[t]he government's enforcement of the challenged provisions thus directly impacts the organization." *Id*.  *See Hodgkins*, 677 F. Supp. 2d at 206.

SAF also fails to offer even an estimate of how many of its members, including Plaintiff Schrader, would possess firearms but for their past conviction of a common law misdemeanor offense within the scope of Section 921(a)(20)(B).  Plaintiff Schrader has only stated that he did not consummate a handgun purchase in early 2009, but he does not cite the federal firearms prohibition as the sole reason for his conduct, or describe any other efforts he has taken to have the status of his Maryland conviction altered.  *See* Schrader Dec. ¶ 12.

In support of its organizational standing, Plaintiff SAF again cites *Fair Employment Council v. BMC Mktg. Corp.*, 28 F.3d 1268 (D.C. Cir. 1994), and *Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794 (D. C. Cir. 1987).  *See* Pls.' Opp. at 17.  In *Fair Employment* Council, the D.C. Circuit determined that Article III standing had been established by an organization alleging that the defendant's "discriminatory actions interfered with" the organization's "community outreach, counseling, and research projects," requiring the organization "to expend resources to counteract BMC's alleged discrimination."  *Nat'l Treasury Employees Union v. U.S.*, 101 F.3d 1423, 1429 (D.C. Cir. 1996) (quoting *Fair Employment Council*, 28 F.3d at 1276 (brackets and ellipses omitted)).  In *Haitian Refugee Ctr.*, however, the D.C. Circuit found that

neither the members nor the nonprofit membership corporation had standing to sue and affirmed the District Court's dismissal of the case. *Haitian Refugee Ctr.*, 794 F.2d at 816.[2]  The SAC contains no facts to support an injury here.  Unlike the pleading in *Haitian Refugee Center*, which was decided prior to the more stringent pleading standard adopted in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 & n.3 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), the SAC here contains no facts to support the conclusion that SAF has been injured.  *See* SAC, ¶¶ 2, 17.  *Haitian Refugee Center* presented a challenge to a specific interdiction program but SAF alleges only that it challenges the amorphous concept of federal gun control.  Moreover, Plaintiff SAF has failed to provide the Court with any substantive information about its activities.  Other than perhaps espousing a sincere opposition to all federal gun control provisions that hamper possession of firearms, the record is devoid of any evidence (as distinguished from conclusory statements) that the challenged statutes have affected the activities of SAF in any manner.  Under the cases cited by Defendants, that is insufficient to establish standing.  *See* Defs.' Mem. at 10, 15-19.  Plaintiffs largely fail to respond to these arguments or to distinguish these cases, and their opposition effectively concedes SAF's lack of standing.  *See Taylor v. FDIC*, 132 F.3d 753, 763 (D.C. Cir. 1997) ("At oral argument, . . . counsel explained that they did not respond to the [opposing party]'s assertion because it was so ludicrous.  Dignified silence is a dangerous tactic at best; here it proves fatal.").

---

[2] As to Plaintiffs' pinpoint citation to page 799 of the reported decision in *Haitian Refugee Center*, the most that can be said of that portion is that it accepts that the organization had established an injury for purposes of Article III standing.  *See* Pls.' Opp. at 17.  As set forth in Defendants' opening brief, injury is only one of the three elements of standing, and the D.C. Circuit further stated that "whether HRC's alleged injury is a mere generalized grievance need not be decided since the court's cases are less than entirely clear in this area and the discussion of the other standing requirements suffices to deny the Center's standing." *Haitian Refugee Ctr.*, 809 F.2d at 799 n.2.

In support of its representational standing, Plaintiff SAF claims to be "identical" to the organization of police officers in *Fraternal Order of Police v. United States*, 152 F.3d 998 (D.C. Cir. 1998) ("*FOP*"), *reh'g granted*, 159 F.3d 1362 (D.C. Cir. 1998), *and on reh'g*, 173 F.3d 898 (D.C. Cir. 1999), *cert. denied*, 528 U.S. 928 (1999). *See* Pls.' Opp. at 18. But Plaintiffs' comparison to the standing found for an organization of police officers is flawed. In *FOP*, the D.C. Circuit found that the Fraternal Order of Police had representational standing to assert claims on behalf of its members who were chief law enforcement officers ("CLEOs") where, among other things, FOP alleged that compliance with the challenged law resulted in the disqualification of subordinate officers, thereby injuring the CLEOs by forcing them to take affirmative action. *See id.* at 1000-01. No such injury is alleged here. Because the organization represented existing police officers whom the challenged law affirmatively required to take a particular action, FOP is not comparable to Plaintiff SAF. Plaintiff SAF is not being forced to do anything by the challenged statutes.

## II.    The Court Should Dismiss Plaintiffs' Complaint for Failure to State a Claim on Which Relief Can Be Granted.

### A.    The First Claim For Relief Fails Because the Plain Language of the Challenged Provisions Applies to Plaintiff Schrader's Undisputed Conviction.

As the entire record demonstrates, Plaintiff Schrader's Maryland assault conviction, which actually involved some violence, falls squarely within the scope of Section 922(g)(1) and is not excluded by Section 921(a)(20)(B). *See* Def.'s Mem. at 19-23. In those provisions, Congress defined the categories of citizens whose convictions for qualifying offenses would disqualify them from keeping firearms. Numerous other courts have held that the dispositive criterion for Section 922(g)(1) is the potential sentence, rather than the actual sentence imposed or the felony/misdemeanor designation. *See id.* Because there is no dispute in this case that

Plaintiff Schrader is the same person who was convicted of the assault Maryland reflected accurately in the NICS, Plaintiff Schrader cannot establish that the information in NICS about him is erroneous, and he therefore fails to state a valid claim.  Fed. R. Civ. P. 12(b)(6).[3]

When a court reviews an agency's construction of the statute which it administers, if based on the plain language of the statute, "the intent of Congress is clear, that is the end of the matter."  *Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842 (1984).  Here, 18 U.S.C. § 922(g)(1) clearly and unambiguously states that it applies to any person convicted of "a crime punishable by imprisonment for a term exceeding one year," and § 922(a)(20)(B) defines the term "crime punishable by imprisonment for a term exceeding one year" as excluding "any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less."  Here, 18 U.S.C. § 922(g)(1) clearly and unambiguously applies to any person convicted of "a crime punishable by imprisonment for a term exceeding one year," and § 922(a)(20)(B) defines the term "crime punishable by imprisonment for a term exceeding one year" as excluding "any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less."  Thus, state offenses punishable by more than two years imprisonment fall within § 922(g)(1), and that plain language defeats the First Claim.  *Chevron USA, Inc.*, 467 U.S. at 842 ("Congress has spoken directly to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court as well as the agency must give effect to the unambiguously expressed intent of Congress." ).

---

[3] The NICS is comprised of three databases: the Interstate Identification Index; the National Crime Information Center; and the NICS Index.  The three databases contain records that may reveal information demonstrating the existence of federal and/or state prohibitions against firearm possession. See Declaration of William L. Finch, ¶ 3 (the Finch Declaration was previously filed with Defendants' Reply and Opposition to Plaintiffs' Cross Motion for Summary Judgment (ECF No. 12-2)).

Plaintiff Schrader's arguments attempt to create an ambiguity where none exists. Defendants agree that the term "punishable" in 18 U.S.C. § 921(a)(20)(B) should be given an ordinary meaning because the statute does not define it otherwise. *See* Pls.' Opp. at 19. There is no need to reach for "subtle but important variations," as Schrader urges. *Id*. The dictionary defining the term as "deserving of, or liable to punishment" is ordinary. Even under the Black's Law Dictionary definition Plaintiff Schrader supplies, there is no difference here because Plaintiff Schrader's assault conviction does "giv[e] rise to a specified punishment" -- namely, a potential term of imprisonment exceeding two years. There is no reason to adopt Schrader's view that a "specified punishment" should be read to mean "a specified punishment range with a prescribed maximum punishment." *See id*. The term "punishable" means simply what it says: deserving of punishment.

To the extent the Court considers Plaintiffs' arguments on the Second Amendment claim as applying to the Section 925A claim, Plaintiff Schrader still would not be able to escape dismissal. Plaintiffs' assertion that federal law enforcement is incorrectly interpreting or applying the law (Pls.' Opp. at 21) misses the mark. The pertinent question is whether the definition Congress set out in the federal statute to disqualify people Congress believed should not possess firearms includes Plaintiff Schrader, and it plainly does. *United States v. Coleman*, 158 F.3d 199, 203-04 (4th Cir. 1998) (*en banc*); *United States v. Hassan El*, 5 F.3d 726, 732-33 (4th Cir. 1993), *cert. denied*, 114 S. Ct. 1374 (1994); *see United States v. Kirksey*, 138 F.3d 120, 123-26 (4th Cir. 1998) (Maryland common law assault can qualify as a "violent felony" for purposes of federal sentencing guidelines but does not do so *per se*), *cert. denied*, 119 S. Ct. 122 (1998); *United States v. Williams*, No. 09-00044-CG-C, 2009 U.S. Dist. LEXIS 70299, at *3 (S.D. Ala. Aug. 11, 2009). Although Plaintiffs conjure distinct meanings supposedly in their

favor concerning specified punishments, that is not how any court has interpreted the relevant statutory provisions.  *See* Pls.' Opp. at 19-21.  No legal authority supports Plaintiffs' position.

Indeed, the logical weakness in Plaintiffs' argument is revealed in their bold contention that "[b]ecause uncodified common-law offenses are not 'punishable by' *any* particular statutory criteria, they do not fall within the purview of the law."  Pls.' Opp. at 19.  Under that view, no common law offense, regardless of its violence or seriousness, could serve as a predicate to firearms exclusion under federal law.  Even staying purely within Maryland, there are common law offenses that it would defy common sense to believe Congress intended to exclude from the reach of section 922(g)(1), including the common law offenses of murder and involuntary manslaughter.  *See, e.g., Sifrit v. Maryland*, 857 A.2d 88, 100 (Md. 2004); *Maryland v. Albrecht*, 649 A.2d 336, 347 (Md. 1994).[4]  The continued status of serious and typically violent crimes as common law offenses under state law, and the variety across the fifty states in discretionary prosecutorial decisions about what crimes to charge, weigh heavily in favor of sticking to the plain language of federal law including state crimes punishable by more than two years imprisonment within the prohibition on possession of firearms.[5]

---

[4]  *See also Hickman v. State*, 996 A.2d 974, 983 (Md. Ct. Spec. App. 2010) (holding that common-law affray continues to be a viable offense in Maryland); *Jones-Harris v. State*, 943 A.2d 1272, 1286-88 (Md. Ct. Spec. App. 2008) (upholding conviction for common-law offense of false imprisonment); *Schlamp v. State*, 891 A.2d 327 (Md. 2006) (discussing common-law offense of riot); *Purnell v. State*, 827 A.2d 68, 78 (Md. 2003) (Maryland also recognizes the common-law offense of resisting arrest).

[5]  Plaintiffs' reliance on *Johnson v. United States*, 130 S. Ct. 1265 (2010), is misplaced.  *See* Pls.' Opp. at 23.  *Johnson* involved applying the term "physical force" within the definition of "violent felony" under the Armed Career Criminal Act.  *Johnson*, 130 S. Ct. at 1270.  The Supreme Court recognized that it was bound by state court interpretation of state law, *id*. at 1269-70, and used the ordinary meaning of the phrase "physical force" within the overall context of the statute.  *Id*. at 1270-71.  In this case, applying the ordinary meaning of the words in the challenged statutes does not produce nonsensical results, merely some with which Plaintiffs disagree.  In addition, that Congress chose to address particular crimes involving domestic violence misdemeanors in a separate section of the statute does not change this conclusion.

Plaintiff Schrader correctly acknowledges that common law battery in Maryland has been replaced by two levels of statutory assault.  See Pls.' Opp. at 7 n.3.  However, even the lower level – designated "Second Degree Assault," carries a maximum term of imprisonment of *ten years*.  *Id.*  The significant punishment provided Maryland's subsequent codification of the common law crime of battery makes clear that the State considered this crime to be quite serious. Plaintiff Schrader's characterization of himself as an "ordinary misdemeanant," Pls.' Opp. at 24, thus rings hollow.  In addition and in any event, the nature of the offense at the time of the conviction is controlling.  *E.g., U.S. v. Penney*, 576 F.3d 297, 303-06 (6th Cir. 2009) (upholding a conviction under section 922(g)(1) against various challenges, including that the underlying conviction in 1976 was a misdemeanor where  state law provided at the time of the conviction that defendant could have been imprisoned for up to five years).

### 1.      In Any Event, Plaintiffs' Statutory Interpretation Is Incorrect.

As explained above, because the statutory language is clear, "that is the end of the matter."  *Chevron*, 467 U.S. at 842.  In any event, Plaintiffs' interpretation of the statute is plainly incorrect.  Plaintiff Schrader argues that the exception is not triggered here because there was no statutory maximum penalty for misdemeanor assault at the time of his conviction. Among other things, Plaintiff Schrader argues that this purported conclusion is compelled by the alleged definition of "punishable by"; "the spirit of federalism that permeates the federal scheme";  the "overarching design of the federal gun control scheme"; and the legislative history of the Federal Gun Control Act of 1968.  *See* Pls.' Opp. at 21-26.

This is incorrect for multiple reasons.  First and foremost, Plaintiffs' interpretation is at odds with the plain language of Section 921(a)(20)(B).  Under that provision, the term "crime punishable by imprisonment for a term exceeding one year," as used in Section 922(g)(1), is

defined to exclude "any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less." The operative phrase "punishable by a term of imprisonment of two years or less" contains no requirement that the punishment contain a statutory maximum or otherwise be statutorily limited. Under Plaintiffs' purported interpretation, the words "as prescribed by statute" or similar words are impermissibly read into the statute. Plaintiffs thus err by failing to address the actual language of the statutory provisions in question.

Second, Plaintiff Schrader fails to adequately respond to the Fourth Circuit's *en banc* decision in *United States v. Coleman*, 158 F.3d 199, 203-04 (4th Cir. 1998), which is directly on point. Plaintiffs do not dispute that *Coleman* is directly applicable to this case, but merely point out that *Coleman* is not controlling, and that the decision should be afforded little weight because the Fourth Circuit purportedly engaged in a "cursory analysis of the statute's text." Pls.' Opp. at 27-28. But that analysis is sufficient, and perhaps its brevity signals the clarity of the matter. In suggesting that the nine Circuit Court judges in the Fourth Circuit got it wrong in *Coleman*, Plaintiffs further argue *Coleman* runs afoul of *Heller*, and that the Fourth Circuit's own decision in *United States v. Chester* questions *Coleman*'s continued viability. *See* Pls.' Opp. at 28 & n.7.

To the contrary, the analysis in *Coleman* is consistent with the plain language of Sections 922(g)(1) and 921(a)(20)(B) and is in accord with how other courts have interpreted these provisions. Indeed, Plaintiffs essentially ignore the numerous decisions applying these provisions to conclude that the operation of Sections 922(g)(1) and 921(a)(20)(B) turns on the length of punishment potentially available, rather than the actual punishment received. *See* Defs.' Mem. at 9-12. Rather than attempting to distinguish these cases, Plaintiffs attempt to divert the Court's attention to non-textual arguments such as the statute's purported legislative history. See Pls.'

Opp. at 19-25.  But "legislative history is irrelevant to the interpretation of an unambiguous statute."  *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 808-09 n.3 (1989); *see also Performance Coal Co. v. Fed. Mine & Health Review Comm'n*, 642 F.3d 234, 238 (D.C. Cir. 2011) ("Because congressional intent is best divined from the statutory language itself, resort to legislative history is inappropriate when the statute is unambiguous.")

Third, despite Plaintiffs' contention otherwise, Pls.' Opp. at 30-31, *Heller* is irrelevant to the statutory interpretation question at issue here – namely, whether a specific offense implicates Section 922(g)(1).   However, as explained below, to the extent that *Heller* is relevant, it undermines Plaintiffs' argument given the *Heller* presumption language and the myriad post-*Heller* decisions that have uniformly rejected Second Amendment challenges to 922(g)(1). *See Williams v. United States*, 616 F.3d 685, 693 (7th Cir. 2010) (collecting cases), *cert. denied*, 131 S. Ct. 805 (2010).   Nor is *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010), relevant to this statutory interpretation question; indeed, *Chester* does not even address Section 922(g)(1) but, instead, involves an entirely different provision, Section 922(g)(9).

Finally, Plaintiffs insist that to impose a ban on firearms possession on an individual such as Plaintiff Schrader produces a nonsensical result.  *See* Pls.' Opp. at 24.  This contention would be better addressed to a legislative body, as "[u]nder the system of government created by our Constitution, it is up to the legislatures, not the courts, to decide on the wisdom and utility of legislation." *Ferguson v. Skrupa*, 372 U.S. 726, 729 (1963).  Moreover, the ban would cease to exist if Plaintiff Schrader were to get his Maryland conviction expunged, set aside, or made the subject of a pardon – things he has not apparently tried to do.   In sum, because Maryland common law assault was punishable by a term of imprisonment of more than two years, Plaintiff Schrader's assault conviction was obviously *not* an offense "punishable by a term of

imprisonment of two years or less," and his conviction is thus not excluded by Section 921(a)(21)(B).  Rather, because he was convicted of "a crime punishable by imprisonment for a term exceeding one year," 18 U.S.C. § 922(g)(1), by its plain language, bars his possession of firearms.

> ### 2.    Plaintiff Schrader Cannot Fit Through the "Escape Hatch" In 18 U.S.C. § 921(a)(20) Because He Never Lost His Maryland Civil Rights.

In a prior brief, Plaintiff Schrader argued that Section 922(g)(1) does not apply to him because his civil rights were automatically restored by the state of Maryland by operation of a statute:  Md. Code Ann. § 8-103.  *See* ECF No. 8. at 26-29.  By failing to renew that argument, Plaintiff Schrader has abandoned it, and the Court should not address it.  Were the Court to consider it, it should reject it for the reasons set forth in Defendants' previous memorandum [ECF No. 11].

This argument depends on a portion of Section 921(a)(20) precluding the application of Section 922(g)(1) to convictions for which a person "has had civil rights restored."  *See* 18 U.S.C. § 921(a)(20).  "It is generally agreed that the 'civil rights' referred to in Section 921(a)(20) are the rights to vote, to hold elective office, and to serve on a jury."  *United States v. Bost*, 87 F.3d 1333, 1335 (D.C. Cir. 1996) (citation omitted).  Significantly, however, the Supreme Court has held that the civil rights restoration language of Section 921(a)(20) does not apply to a person who lost no civil rights as a result of his or her conviction.  *Logan v. United States*, 552 U.S. 23, 37 (2007) ("we hold that the words 'civil rights restored' do not cover the case of an offender who lost no civil rights.").[6]

---

[6]  As noted above, the avenue of relief for people who never had their civil rights removed is to have the conviction expunged, overturned or made the subject of a pardon.

In this case, the relevant issue is whether Plaintiff Schrader ever had his civil rights removed by the assault conviction.  Plaintiff Schrader concedes that his assault conviction did not result in him losing his right to vote or to run for public office.  *See* Pls.' Opp. at 27.  In his brief, he contends that he initially lost, but then had restored, his right to serve on a jury through the operation of a statute amended in 2006, namely, Maryland Code Annotated § 8-103.  *See id.* at 27-28.  Contrary to Plaintiff Schrader's argument, however, the pre-2006 version of this statute did not deprive him of his right to serve on a jury.  Rather, this earlier version of the statute -- then codified at Md. Code Ann. § 8-207(b) -- precluded jury service for any person who "[h]as a charge pending against him for a crime punishable by a fine of more than $500, or by imprisonment for more than six months, or both, or has been convicted of such a crime *and has received a sentence of a fine of more than $500, or of imprisonment for more than six months, or both*, and has not been pardoned."  *Owens v. State*, 906 A.2d 989, 1007-08 (Md. App. 2006) (quoting Md. Code Ann. § 8-207(b)) (emphasis added), *aff'd*, 924 A.2d 1072 (Md. 2007). Because Plaintiff Schrader received less than a five-hundred-dollar fine and no term of imprisonment, he falls outside the scope of the pre-2006 version of the statute on which he relies, and he never lost his right to serve on a jury under Maryland law.  Accordingly, Plaintiff Schrader does not fall within the exception in 18 U.S.C. § 921(a)(20) to the ban on firearms possession.

### 3.    The Rule of Lenity Is Inapplicable Here.

Finally, Plaintiff Schrader's claim that the rule of lenity should affect the Court's interpretation of the statutory provisions at issue is incorrect.  *See* Pls.' Opp. at 25.  The rule does not apply unless the statutory language is ambiguous, which, as explained above, these provisions are not. *See Barber v. Thomas*, 130 S. Ct. 2499, 2508 (2010) ("[T]he rule of lenity

only applies if, after considering text, structure, history, and purpose, there remains a 'grievous ambiguity or  uncertainty' in the statute, such that the Court must simply 'guess as to what Congress intended.'" (citations omitted)).  Here, the statute is clear, and it leaves nothing for the Court (or Plaintiff Schrader) to wonder about.  Congress dictated that state offenses exposing the person convicted of them to imprisonment for more than two years are within the federal ban on firearms possession.

Moreover, Plaintiff Schrader's contention that the rule of lenity should somehow apply to allow him to possess firearms notwithstanding his Maryland conviction is incorrect.  *See id.* at 28-29.  In addition to the statutory language being clear on its face, Plaintiff Schrader is not the subject of an existing federal prosecution at this time.  In this civil action, the rule of lenity has no impact.  *See Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 704 n.18 (1994) ("we have never suggested that the rule of lenity should provide the standard for reviewing facial challenges to administrative regulations whenever the governing statute authorizes criminal enforcement").  Thus, the rule of lenity does not afford Plaintiff Schrader any refuge.

For all these reasons, the First Claim should be dismissed.

**B.     The Second Claim Fails Because the Challenged Provisions Full Comply with the Second Amendment.**

**1.     Genuine Disputes of Material Facts Remain, Precluding Entry of Summary Judgment for Plaintiffs.**

The Court should deny Plaintiffs' Renewed Cross-Motion for Summary Judgment on the Second Claim for Relief.  Defendants attach their response to Plaintiffs' Statement of Undisputed Material Facts and Defendants' Statement of Material Facts and Statement of Genuine Issues, filed herewith, and incorporate it here by reference.

2.      **Plaintiff Schrader Conviction Falls Outside the Scope of the Second Amendment's Protections Because It Was a Crime That Was Punishable by Imprisonment Exceeding Two Years, and That Was Later Codified and Made Punishable by up to Ten Years' Imprisonment.**

In *Heller*, after determining that the Second Amendment conferred an individual right to keep and bear arms, the Supreme Court made clear that "the right secured by the Second Amendment is not unlimited," 554 U.S. at 626, and identified several "exceptions," *id.* at 635, that it characterized as "permissible" "regulations of the right." *Id.* In particular, the Court stated that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the *possession of firearms by felons . . .*" *Id.* (emphasis added). The Court further cautioned that "[w]e identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at 627 n.26.[7]

Here, Plaintiff Schrader was convicted of common-law assault and battery, a violent crime that the State of Maryland later codified as punishable by up to 10 or 25 years in prison. Under these circumstances, and because the crime at issue was subject to a term of imprisonment exceeding one year at the time of punishment, Plaintiff Schrader qualifies a felon for purposes of federal law, and should be considered to be a convicted felon for purposes of his Second Amendment challenge. *See Coleman*, 158 F.3d at 203-04. As noted above, Plaintiffs entirely fail to distinguish *Coleman*. Moreover, it is worth noting that several courts have summarily rejected similar as-applied challenges to Section 922(g)(1) based on the presumption of the constitutionality of firearms prohibitions recognized in *Heller*, and reaffirmed in *McDonald*. *See*

---

7 A statute should be presumed to be constitutional, and should be interpreted that way as long as a reasonable reading of the statute permits it. *See National Mining Ass'n v. Kempthorne*, 512 F.3d 702, 711 (D.C. Cir. 2008). Although the Court must independently assess any statute's constitutionality, *see Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177-80 (1803), that does not mean that it should function as a super-legislature weighing the wisdom of statutory enactments. *See Ferguson v. Skrupa*, 372 U.S. 726, 731 (1963)

*United States v. Khami*, No. 08-2437, 2010 U.S. App. LEXIS 1649, at **17-21 (6th Cir. Jan. 26,

2010) (citing *Heller* and summarily rejecting facial and as-applied challenges § 922(g)(1)), *cert.*

*denied*, 130 S. Ct. 3345 (2010); *United States v. Schultz*, No. 1:08-CR-75-TS, 2009 U.S. Dist.

LEXIS 234, at *3-7 (N.D. Ind. Jan. 5, 2009) (same); *United States v. Henry*, No. 08-20095, 2008

U.S. Dist. LEXIS 60780, at *1-3 (E.D. Mich. Aug. 7, 2008) (citing *Heller* and summarily

rejecting an as-applied challenge to § 922(g)(1).  The application of *Coleman* and these other

decisions here leads to the conclusion that as applied to Plaintiff Schrader, Section 922(g)(1) is

presumptively lawful.  *Heller*, 554 U.S. at 627 n.26.

Given that Plaintiff Schrader was convicted of a state crime punishable by imprisonment

for more than two years – and a crime that the State of Maryland later deemed posed a risk to

public safety enough to codify and prescribe a term of imprisonment for up to 10 or 25 years –

his generalized argument about the alleged historical differences between convicted felons and

misdemeanants in the context of lost rights misses the point.  *See* Pls.' Opp. at 36-38.  To begin

with, *Heller* itself does not suggest that Congress could only disarm criminals only if they fell

outside the scope of the Second Amendment as understood at the time of its adoption.  Indeed, as

Justice Breyer noted in dissent, the majority specifically did not base its approval of the Second

Amendment "exceptions" on proof of "colonial analogues."  *Heller*, 554 U.S. at 721-22; *see also*

*United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (*Heller* "tell[s] us that

statutory prohibitions on the possession of weapons by some persons are proper – and,

importantly for current purposes, that the legislative role did not end in 1791.  That *some*

categorical limits are proper is part of the original meaning, leaving to the peoples' elected

representatives the filling in of details.") (emphasis in original).  Nonetheless, as the discussion

below demonstrates, in acknowledging Congress's authority to disarm criminals, *Heller* was

consistent with the history of the right to arms as it developed in England and the American colonies.

 *Heller* identified the right protected by the 1689 English Declaration of Rights as "the predecessor of our Second Amendment." *Id*. at 592-93.  It is undisputed that both before and after its adoption, the English government retained the power to disarm individuals it viewed as dangerous.  *See Heller*, 128 S. Ct. at 2792, 2798.  More significantly for present purposes, the English Declaration of Rights did not repeal the 1662 Militia Act, which authorized lieutenants of the militia (appointed by the King) to disarm "any person or persons" judged "dangerous to the Peace of the Kingdome."  13 & 14 Car. 2, c. 3, § 1 (1662) (Eng.); Joyce Lee Malcolm, *To Keep and Bear Arms*, 123 (1994); *accord* Patrick J. Charles, *"Arms for Their Defence"?: An Historical, Legal, and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated In McDonald v. City of Chicago*, 57 Clev. State L. Rev. 351, 373, 376, 382-83, 405 (2009).

 Because individuals could be disarmed without any adjudication of wrongdoing, it is unsurprising that they could also forfeit their right to keep or use firearms following conviction of a crime.  Malcolm, for example, notes that a Nottinghamshire labourer was bound "not to shoot again for seven years" after a misdemeanor conviction for "shooting with hailshot." Malcolm, *supra*, at 10.   As for those caught committing more serious crimes, forfeiture of firearms was apparently a given.  4 William Blackstone, *Commentaries on the Laws of England*, 95 (1769) (hereinafter *Blackstone*) (felonies "subject the committers of them to forfeitures"), *id*. at 385 (same).

 In the Colonies, as well, governments frequently disarmed those they perceived as dangerous, and such restrictions were not viewed as inconsistent with the right to bear arms.

Malcolm, *supra*, at 140-41; Robert J. Cottrol and Raymond T. Diamond, *The Second Amendment: Towards an Afro-Americanist Reconstruction*, 80 Georgetown L.J. 309, 323-27 (1991); Robert Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: the Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157 (2007) (Virginia).

Colonial governments also disarmed persons who refused to swear a loyalty oath.  Saul Cornell, *Commonplace or Anachronism: the Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory*, 16 Const. Comment. 221, 228-29 (1999); Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* 28-30 (2006).  According to historian Saul Cornell, these enactments showed that the right to bear arms was viewed as "limited to those members of the polity who were deemed capable of exercising it in a virtuous manner."  Saul Cornell, *"Don't Know Much About History." The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 672 (2002).

The documentary record surrounding the adoption of the Constitution confirms that the right to keep and bear arms was limited to "law-abiding and responsible" citizens.  Most significantly, the Pennsylvania anti-federalist faction offered the following proposal at the Pennsylvania Convention:

> That the people have a right to bear arms for the defense of themselves and their own state or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them, unless for crimes committed, or real danger of public injury from individuals[.]

The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, 1787, reprinted in 2 Schwartz, *The Bill of Rights, A Documentary History* 665 (1971).  The *Heller* Court found this Pennsylvania Minority proposal

to be both "highly influential" and a "precursor" to the Second Amendment.  *Heller*, 128 S.Ct. at 2804.

 Although the Second Amendment itself proved more "succinct[ ]" than the Pennsylvania proposal, *Heller*, 554 U.S. at 659 (Stevens, J., dissenting), the latter remains probative of how the Second Amendment's supporters viewed the balance between public security and the right to keep and bear arms.  *See Heller*, 554 U.S. at 605 (reaffirming that "the Bill of Rights codified venerable, widely understood liberties"); Stephen P. Halbrook, *The Founders' Second Amendment* 273 (2008) (arguing that the Second Amendment did not need to contain "an explicit exclusion of criminals from the individual right to keep and bear arms [ ] because this . . . was understood.").

 Citing to Blackstone, Plaintiffs contend that, "[a]t common law, all forms of battery were classified as misdemeanor crimes."  Pls.' Opp. at 40.  This is misleading.  Blackstone does relate that "crime" in "common usage" sometimes "denote[d] such offences as are of a deeper and more atrocious dye," than the "smaller faults, and omissions of less consequence" called "misdemeanours."  4 Blackstone 5.  This usage was by no means universal.  *See* T. Sheridan, *A Complete Dictionary of the English Language* (1796) (hereinafter *Sheridan*) (defining a "crime" as "[a]n act contrary to right; an offence"); Samuel Johnson, *Dictionary of the English Language* (5th ed. 1773) (hereinafter *Johnson*) (defining "crime" as "An act contrary to right; an offence; a great fault").  Indeed, Blackstone himself acknowledged this broader usage, which he described as "proper[ ]."  4 Blackstone 5.  And severe battery resulting in death would be described both at common law and today as other offenses, such as murder.  Thus, there is no one-size-fits all approach for a "historical correlation between Schrader's particular conviction for simple assault and battery and a felony-level offense."  Pls.' Opp. at 40.

In any event, the relevant question here is whether the legislature may properly consider a crime punishable by imprisonment of one year or more at the time of sentencing – a crime that the State considered dangerous enough to later codify and punish by imprisonment of 10 or 25 years – to be dangerous enough to merit treatment as a felony under Section 922(g)(1).   Simply because misdemeanants and felons historically lost different types of rights upon conviction does not prevent Congress from properly prohibiting firearm possession by misdemeanants today. *See Skoien*, 614 F.3d at 641 ("[W]e do take from *Heller* the message that exclusions need not mirror limits that were on the books in 1791.  This is the sort of message that, whether or not technically dictum, a court of appeals must respect, given the Supreme Court's entitlement to speak through its opinions as well as through its technical holdings.").   In sum, a restriction on the ability of an individual punished of a crime of violence that was punishable by a term exceeding one year at the time of imprisonment – and a crime that was considered dangerous enough for the State imposing sentence to later codify the crime as punishable by up to 10 or 25 years' imprisonment – is consistent with the Second Amendment.

### 3. In Any Event, the Statutory Provisions as Applied Survive Any Level of Constitutional Means-End Scrutiny.

The Court's inquiry may end once it finds that, as applied to Plaintiff Schrader, Sections 922(g)(1) and 921(a)(20)(B) "accord[] with the historical understanding of the scope of the [Second Amendment] right."  *Heller*, 554 U.S. at 625.  However, if any further analysis is needed, the law passes muster under the two-step inquiry suggested by *Heller*.  Because Heller "suggests a two-pronged approach to Second Amendment challenges to federal statutes," *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010), *cert. denied*, 131 S. Ct. 958 (2011), in the wake of that decision, many Courts of Appeals have followed a two-step doctrinal approach to cases potentially implicating the Second Amendment. *See Marzzarella*, 614 F.3d at 89; *United*

*States v. Reese*, 627 F.3d 792, 800 (10th Cir. 2010); *Chester*, 628 F.3d at 680.  Under this

approach, a reviewing court first asks "whether the challenged law imposes a burden on conduct

falling within the Second Amendment's guarantee." *Marzzarella*, 614 F.2d at 89.  If the law at

issue does not impose a burden on conduct falling within the Second Amendment's guarantee,

the Court's inquiry is complete. "If it does, [the Court] evaluate[s] the law under some form of

means-end scrutiny." *Id*. "If the law passes muster under that standard, it is constitutional [and]

[i]f it fails it is invalid.  *Id*.[8]

C.    **If the Court Were to Determine that the Provisions at Issue Burden Conduct Protected by the Second Amendment, It Should Apply No More Than Intermediate Scrutiny.**

The Supreme Court in *Heller* left open the question of the precise level of scrutiny

applicable to Second Amendment claims.  Although the *Heller* Court made clear that rational

basis review is not the proper standard of review for Second Amendment challenges, the

Supreme Court also implicitly rejected strict scrutiny review in this context.  *See Heller*, 128 S.

---

[8] Plaintiffs may not challenge Section 922(g)(1), as it operates in conjunction with Section 921(a)(20)(B), except as it applies to Plaintiff Schrader.  Ordinarily, a party may not facially challenge a law that is constitutional as applied to him.  *See Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973) ("Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court").  Exercising judicial restraint in a facial challenge "frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretation of statutes in areas where their constitutional application might be cloudy." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008) (quoting *United States v. Raines*, 362 U.S. 17, 22 (1960)).  "Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the facts to which it is to be applied." *Id.* (citations omitted). "Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution. We must keep in mind that a ruling of unconstitutionality frustrates the intent of the elected representatives of the people." *Id.* at 451 (citations omitted).

Ct. at 2851 (Breyer, J., dissenting) ("[T]he majority implicitly, and appropriately, rejects [a "strict scrutiny test] by broadly approving a set of laws ... whose constitutionality under a strict scrutiny standard would be far from clear.").  Post-*Heller*, almost every court to examine the issue has held that Second Amendment challenges do not trigger strict scrutiny.[9]  Other courts found it unnecessary to select a standard of review because they found that a particular provision of 922 (g) passed all standards of review.[10]

Although counsel for Defendants is unaware of any United States Court of Appeals decision which has addressed the constitutionality of Section 922(g)(1) in conjunction with Section 921(a)(20)(B) either pre- or post-*Heller*, several Courts of Appeals, including the Fourth Circuit, have rejected constitutional challenges to other provisions of Section 922(g) based on

---

[9]  *See, e.g., United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010) (and cases cited therein); *United States v. Bledsoe*, No. SA-08-cr-13(2)-XR, 2008 WL 3538717 at *3 (W.D. Tex. Aug. 8, 2008) ("Given that the Supreme Court declined to set a standard for which to evaluate Second Amendment regulations, this Court finds unwarranted Defendant's assertion that strict scrutiny, the most exacting form of scrutiny available, be used to evaluate the statutes in question in this case."); *United States v. Chafin*, No. 2:08-00129, 2008 WL 4951028, at *2 n.3 (S.D. W. Va. Nov. 18, 2008) ("An in-depth analysis is likewise unwarranted concerning defendant's contention that any post-*Heller* firearm restriction must satisfy strict constitutional scrutiny.  The law appears otherwise."); *United States v. Miller*, No. 08-CR-10097, 2009 WL 499111, at *6 (W.D. Tenn. Feb. 26, 2009) (defendant challenging 18 U.S.C. § 922(g) (1) "cannot invoke strict scrutiny through a fundamental rights theory."); *United States v. Radencich*, No. 3:08-CR-00084(01)RM, 2009 WL 127648, at *4 (N.D. Ind. Jan. 20, 2009); *United States v. Schultz*, No. 1:08-CR-75-TS, 2009 WL 35225, at *5 (N.D. Ind. Jan. 5, 2009); *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010), *cert. denied*, 131 S. Ct. 958 (2011).  *But see United States v. Engstrum*, 609 F. Supp. 2d 1227 (D. Utah 2009), *overruled in United States v. Reese*, 627 F.3d 792 (10th Cir. 2010).

[10]  *See, e.g., United States v. Luedtke*, No. 08-cr-189, 2008 WL 4951140 (E.D. Wis. Nov. 18, 2008); *United States v. Erwin*, No. 1:07-CR-556(LEK), 2008 WL 4534058, at *2 n.2 (N.D.N.Y. Oct. 6, 2008); *United States v. Knight*, No. 07-127-P-H, 2008 WL 4097410 (D. Me. Sept. 4, 2008).

*Heller*.[11]  In particular, nearly every court to address the constitutionality of Section 922(g)(9),

prohibiting possession of a firearm by people convicted of misdemeanors of domestic violence,

post-*Heller* has found that statute constitutional.[12]  In addition, the Fourth Circuit declined to

decide whether and to what extent the Second Amendment right recognized in *Heller* applies

outside the home, but rejected under an intermediate scrutiny standard a defendant's challenge to

his conviction for possessing a loaded handgun in a motor vehicle within a national park area, in

violation of 36 C.F.R. § 2.4(b)).  *United States v. Masciandaro*, 638 F.3d 458, 465-74 (4th Cir.

2011).

 Plaintiffs' argument in favor of applying strict scrutiny to § 922(g)(1) and

§ 921(a)(20)(B), namely, that the Second Amendment protects a "fundamental" right, is

misguided.  *See* Pls.' Opp. at 33-39.  Courts "do not apply strict scrutiny whenever a law

impinges upon a right specifically enumerated in the Bill of Rights."  *United States v. Chester*,

628 F.3d 673, 682 (4th Cir. 2010); *accord United States v. Marzzarella*, 614 F.3d 85, 96 (3d Cir.

2010) ("Strict scrutiny does not apply automatically any time an enumerated right is involved."),

*cert. denied*, 131 S. Ct. 958 (2011).  Although strict scrutiny is sometimes applied to

---

[11]  *United States v. Williams*, 616 F.3d 685 (7th Cir. 2010); *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010); *United States v. McRobie*, No. 08-46322009 WL 82715, at *1 (4th Cir. Jan. 14, 2009) (per curium); *United States v. Brunson*, 292 Fed. Appx. 259, at **1 (4th Cir. Sept. 11, 2008) (per curium); *United States v. Stucky*, No. 08-0291-Cr. 2009 WL 692116, at *1 (2d Cir. Mar. 18, 2009); *United States v. Anderson*, No. 08-40160, 2009 WL 330263, at *2 (5th Cir. Feb. 11, 2009); *United States v. Frazier*, No. 07-6135, 2008 WL 4949153 (6th Cir. Nov. 19, 2008); *United States v. Irish*, 285 Fed. Appx. 326, at *1 (8th Cir. July 31, 2008) (per curium); *United States v. Brye*, No. 08-12578, 2009 WL 637553, at *1 (11th Cir. Mar. 13, 2009) (per curium).

[12]  *See, e.g.*, *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) (*en banc*); *United States v. Booker*, 570 F.Supp. 2d 162 (D. Me. 2008); *United States v. Wyman*, No. CR-08-154-B-W, 2009 WL 426293, at *1 (D. Me. Feb. 20, 2009); *United States v. White*, No. 07-00361-WS, 2008 WL 3211298, at *1 (S.D. Ala. Aug. 6, 2008).  *But see United States v. Chester*, 628 F.3d 673, 692 (4th Cir. 2010).

constitutional claims that involve enumerated and fundamental rights, less demanding scrutiny is frequently applied as well.  See Adam Winkler, *Fundamentally Wrong About Fundamental Rights*, 23 Const. Comment. 227, 233 (Summer 2006) ("All incorporated rights may be fundamental, but not all incorporated rights trigger strict scrutiny.  As noted above, there is no strict scrutiny found in Fourth Amendment doctrine, Sixth Amendment doctrine, or in the case law emerging from the incorporated provisions of the Eighth Amendment.").

Moreover, even in contexts where strict scrutiny sometimes applies, such as the right to free speech, the Supreme Court will, depending on the nature of the restriction at issue, use a more deferential standard of review.  *See Marzzarella*, 614 F.3d at 96 ("[T]he right to free speech, an undeniably enumerated fundamental right, is susceptible to several standards of scrutiny, depending upon the type of law challenged and the type of speech at issue. We see no reason why the Second Amendment would be any different."); *Chester*, 628 F.3d at 682; Adam Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683, 695 (2007); Ashutosh Bhagwat, *The Test That Ate Everything: Intermediate Scrutiny in First Amendment Jurisprudence*, 2007 U. Ill. L. Rev. 783, 786-800 (2007).

Thus, simply because the Supreme Court in *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3042 (2010), suggested that the right to keep and bear arms is "fundamental" and  that the Second Amendment is applicable to the states, such a conclusion does not affect the level of constitutional scrutiny appropriate for resolution of Plaintiffs' claim.  Indeed, *McDonald* makes that clear by declining (as did *Heller*) to consider the "standard of scrutiny" question.

For those reasons, every appellate court to have considered arguments like Plaintiffs' has rejected strict scrutiny.  *See, e.g., Reese*, 627 F.3d at 801-802 (upholding 18 U.S.C. § 922(g)(8) under intermediate scrutiny); *United States v. Yancey*, 621 F.3d 681, 682-687 (7th Cir. 2010)

(upholding 18 U.S.C. § 922(g)(3), which disarms unlawful drug users, under intermediate

scrutiny review); *United States v. Williams*, 616 F.3d 685, 692-694 (7th Cir. 2010) (upholding 18

U.S.C. § 922(g)(1), as applied to violent felons, under intermediate scrutiny), *cert. denied*, 131 S.

Ct. 805; *Marzzarella*, 614 F.3d at 95-101 (upholding 18 U.S.C. § 922(k), which prohibits

possession of a firearm with an obliterated serial number, under intermediate scrutiny); *see also*

*United States v. Rene E.*, 583 F.3d 8, 12-13 (1st Cir. 2009) (upholding 18 U.S.C. § 922(x)(2)(A),

which prohibits juveniles from possessing handguns, under an historical analysis).[13]

Indeed, the application of strict scrutiny in this case would be inconsistent with the

historical understanding of the right to keep and bear arms. *See United States v. Brown*, 715 F.

Supp. 2d 688, 695-98 (E.D. Va. 2010) (canvassing the history and finding that persons who

commit misdemeanor crimes of domestic violence fall outside the scope of the Second

Amendment). As noted above, the founding generation accepted extensive restrictions on who

could keep and bear arms, and specifically understood the need to disarm criminals and other

dangerous people. *See also Chester*, 628 F.3d at 682-83 (rejecting claim that strict scrutiny

should apply because § 922(g)(9) burdened his Second Amendment right to possess a firearm in

his home for self defense and finding that the claim was outside of the core right identified in

*Heller* -- the right of a law-abiding, responsible citizen -- by virtue of the defendant's criminal

history as a domestic violence misdemeanant). Nor would a strict scrutiny approach be easy to

reconcile with *Heller* itself. While the Supreme Court declined to identify a particular standard

---

[13] In *United States v. Engstrum*, 609 F. Supp. 2d 1227 (D. Utah 2009), the district court upheld the constitutionality of Section 922(g)(9) under strict scrutiny and instructed the jury that "if you find that the Defendant did not pose a prospective risk of violence, he may not be deprived of his Second Amendment rights[.]" The Tenth Circuit granted the government's petition for a writ of mandamus to preclude this instruction, and concluded that no such individualized inquiry was required. *In re United States*, 578 F.3d 1195, 1197-1200 (10th Cir. 2009) (unpublished order).

of review, its conclusion that specific forms of firearms regulations were "presumptively lawful"
under the Second Amendment displays a degree of deference to Congress that is inconsistent
with strict scrutiny review. *See Heller*, 554 U.S. at 688 (Breyer, J., dissenting).

The strict scrutiny approach would also disregard the nature of both the Second
Amendment right and the government's interest in regulating the use of firearms. While firearms
undeniably serve lawful purposes, including the "core lawful purpose of self-defense," *Heller*,
554 U.S. at 630, in the wrong hands they also pose a serious risk of injury or death. By contrast,
other rights that sometimes trigger strict scrutiny, such as the right to free speech, rarely pose
public safety concerns, and where they do, strict scrutiny is not applied. *See id.*, 554 U.S. at
689-90 (Breyer, J., dissenting) (citing cases). Moreover, in limiting the possession of firearms
by those who may be incapable of using them responsibly, the government performs its "cardinal
civic responsibilit[y]" to protect the health, safety and welfare of its citizens. *Dep't of Revenue
of Ky. v. Davis*, 553 U.S. 328, 342 (2008). Accordingly, such laws should not trigger any
presumption of an "invidious" motive, unlike other government actions (such as classifications
based on race or content based regulations of speech) that automatically trigger strict scrutiny
review. Winkler, 105 Mich. L. Rev. at 700-03.

For all these reasons, strict scrutiny is no more appropriate than rational basis review
here. Instead, intermediate scrutiny should apply.

### 1. Sections 922(g)(1) and 921(a)(20)(B) Are Substantially Related to the Important Governmental Interests in Protecting Public Safety and Combating Violent Crime

To satisfy intermediate scrutiny, "a statutory classification must be substantially related
to an important governmental objective." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). Protecting
public safety and combating crime are well-established *compelling* governmental interests. *See*

*United States v. Salerno*, 481 U.S. 739, 748, 750 (1987) (noting that the Supreme Court has

"repeatedly held that the Government's regulatory interest in community safety can, in

appropriate circumstances, outweigh an individual's liberty interest" and that the government's

"general interest in preventing crime is compelling"); *Schall*, 467 U.S. 253, 264 (1984) ("The

legitimate and compelling state interest in protecting the community from crime cannot be

doubted.") (citation and internal punctuation omitted).

Several relevant factors should properly influence intermediate scrutiny review as applied

here. First,

> intermediate scrutiny, by definition, permits legislative bodies to paint with a
> broader brush than strict scrutiny. The quantum of empirical evidence needed to
> satisfy heightened judicial scrutiny of legislative judgments varies up or down
> with the novelty and plausibility of the justification raised. As a consequence, the
> degree of fit between the registration scheme in this case and the well-established
> goal of promoting public safety need not be perfect; it must only be substantial.

*Heller v. Dist. of Columbia*, 698 F. Supp. 2d 179, 191 (D.D.C. 2010) (citations and internal

punctuation omitted). Second, in order to advance its compelling interests in combating crime

and protecting public safety, Congress may need to make "predictive judgments" about the risk

of dangerous behavior. Such judgments are entitled to "substantial deference" by the courts.

*Turner Broadcasting Sys. v. FCC*, 512 U.S. 622, 665 (1994). Moreover, the primary role in

making such judgments properly falls to Congress, not the courts, because Congress is "far better

equipped than the judiciary" to collect, weigh, and evaluate the relevant evidence, and to

formulate appropriate firearms policy in response. *Id*. at 665-66.

Here, the relevant question is whether prohibiting individuals convicted of a crime of

violence that was punishable at the time of sentencing by more than one year of imprisonment,

and that was deemed dangerous enough for the State imposing sentence to codify and impose a

sentence of up to 10 or 25 years' imprisonment is substantially related to protecting public safety

and combating crime.  The risks associated with firearm possession by individuals convicted of

such a violent crime are obvious, and therefore the plainly legitimate sweep of § 922(g)(1) in

conjunction with § 921(a)(20)(B) is equally obvious.  Preventing persons convicted of such a

violent assault, involving violence against another person, from possessing firearms substantially

relates to the twin goals of combating violent crime and protecting public safety.

    In fact, a Bureau of Justice Statistics study from 2002 ("BJS Recidivism Statistics"

attached as Exhibit A) chronicles re-arrests among 272,111 prisoners within the first three years

of release.[14]  The study found that among those who had been released after serving jail time for

violent offenses, 61.7% were re-arrested and 39.9% were re-convicted.  See Table, page 8.

Among those who had served jail time for violent assault in particular, 65.1% were re-arrested

and 44.2% were re-convicted.  Id.  The data further demonstrates that of the 65.1% that were

re-arrested after being released from violent assault-related sentences, 31.4% of them were

re-arrested for another violent offense, and 22% were re-arrested for another assault offense in

particular.  Id. at 9.  As the study states, "the released assaulter was the one most likely to be

rearrested for assault."  Id.

    A study by the National Institute of Justice followed over 1500 subjects, all of whom

"sought to purchase a handgun from a federally licensed firearm dealer in California during

1989-1991 and who had at least one conviction... for a violent misdemeanor that became grounds

for denial of handgun purchase in 1991."  See Exhibit B at 1.  The study found that "denial of

---

[14]   The Court may properly take judicial notice of such materials, as other appellate courts
have done in upholding related provisions of Section 922(g).  See, e.g., Reese, 627 F.3d at
802-03 (upholding 18 U.S.C. § 922(g)(8), which disarms persons subject to domestic violence
protective orders); Williams, 616 F.3d at 692-94 (upholding 18 U.S.C. § 922(g)(1), as applied to
violent felons); Yancey, 621 F.3d at 682-87 (upholding 18 U.S.C. § 922(g)(3), which disarms
unlawful drug users).

handgun purchase was associated with a moderate decrease in risk of arrest for new gun and/or violent crimes," even taking into account gender, age and criminal history.  *Id*. at 42.

Finally, the application of Sections 922(g)(1) and 921(a)(20)(B) to Plaintiff Schrader does not produce "nonsensical" results, as Plaintiffs claim.  *See* Pls.' Opp. at 21.  Given the potential dangers associated with the particular type of crime Plaintiff Schrader committed, it is entirely proper for Congress to prohibit individuals convicted of this crime from possessing firearms.  Moreover, statutes that prohibit firearm possession need not require an individualized prediction of danger, as Plaintiffs posit.  *See* Pls.' Opp. at 40.  For example, § 922(g)(1), which *Heller* expressly excepted from its holding, prohibits convicted felons from possessing firearms -- even if the underlying crime is a non-violent felony.  This fact has led one district court to note that, "[i]f anything, as a predictor of firearm misuse, the definitional net cast by § 922(g)(9) is tighter than the next cast by § 922(g) (1)."  *Booker*, 570 F. Supp. 2d at 164; *see also Skoien*, 614 F.3d at 641 ("[S]ome categorical disqualifications are permissible: Congress is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons, nor need these limits be established by evidence presented in court.").

In sum, under the circumstances of this case, restricting Plaintiff Schrader from possessing firearms serves compelling interests that lie at the heart of one of the government's most critical functions: protecting public safety.  Here, Congress has done so consistent with the Second Amendment.

## <u>Conclusion</u>

For the reasons stated above and in Defendants' opening brief, the Court should grant

Defendants' motion to dismiss and deny Plaintiffs' Cross-Motion for Summary Judgment.

Dated:  August 19, 2011.

Respectfully submitted,

RONALD C. MACHEN JR., D.C. BAR # 447889
United States Attorney

RUDOLPH CONTRERAS, D.C. BAR # 434122
Chief, Civil Division

By:  _____/s/_____
JANE M. LYONS, D.C. Bar. # 451737
Assistant United States Attorney
555 Fourth St., N.W. - Room E4104
Washington, D.C.  20530
Phone: (202) 514-7161
jane.lyons@usdoj.gov