**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JEFFERSON WAYNE SCHRADER, et al., | ) | |
| | ) | Case No. 10-CV-1736-RMC |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ERIC HOLDER, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**REPLY BRIEF IN SUPPORT OF
PLAINTIFFS' RENEWED CROSS-MOTION FOR SUMMARY JUDGMENT**

**COME NOW** the Plaintiffs, Jefferson Schrader and the Second Amendment Foundation,

Inc., by and through undersigned counsel, and submit their Reply Brief in Support of Plaintiffs'

Renewed Cross-Motion for Summary Judgment, pursuant to this Court's Minute Order of July

18, 2011.

Dated: September 2, 2011                 Respectfully submitted,

                                         Alan Gura (D.C. Bar No. 453449)
                                         Thomas M. Huff (D.C. Bar No. 978294)
                                         Gura & Possessky, PLLC
                                         101 N. Columbus Street, Suite 405
                                         Alexandria, VA 22314
                                         703.835.9085/Fax 703.997.7665

                                         By:  /s/ Thomas M. Huff
                                              Thomas M. Huff

                                         Attorneys for Plaintiffs

# TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      THE GOVERNMENT'S OPPOSITION RAISES NO GENUINE DISPUTE
        OF MATERIAL FACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     SCHRADER IS ENTITLED TO THE REMOVAL  OF HIS FIREARMS
        DISQUALIFICATION BECAUSE 18 U.S.C. § 922(g)(1) DOES NOT
        PROHIBIT ORDINARY COMMON LAW MISDEMEANANTS FROM
        PURCHASING OR POSSESSING FIREARMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        A.      The Government's Argument That 18 U.S.C. § 922(g)(1) Bans All
                Common Law Misdemeanants From Possessing Firearms Fails. . . . . . . . . . . . . . 5

        B.      The Government's Arguments Concerning The Fourth Circuit's
                Holding In Coleman Are Anticipated And Rebutted By Plaintiffs'
                Opening Brief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        C.      The Government's References To Maryland's Statutory Form Of Second
                Degree Assault Are Inapposite Because Schrader Has Never Been Charged
                With Or Convicted Of That Offense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        D.      The Government's Claim That The Rule Of Lenity Is Inapplicable To Civil
                Cases Is Mistaken. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        E.      Plaintiffs' Renewed Cross-Motion For Summary Judgment Does Not
                Make An Argument Under The Statutory Escape Hatch Provision Of
                18 U.S.C. § 921(a)(20). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

III.    THE GOVERNMENT'S IMPOSITION OF A FIREARMS BAN
        ON ORDINARY COMMON LAW MISDEMEANANTS VIOLATES
        THE SECOND AMENDMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        A.      The Government's Attempt To Characterize Schrader's Claim As Outside
                The Protective Scope Of The Second Amendment Fails. . . . . . . . . . . . . . . . . . . 11

        B.      The Government's Attempt To Classify Schrader As A "Convicted Felon"
                Fails. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

1. Schrader's 1968 conviction for common law misdemeanor assault and battery in Maryland was also a misdemeanor at common law at the time of the Second Amendment's historical origins. . . . . . . . . . . . . . 16

2. While certain heightened or aggravated misdemeanor offenses might properly be analogized to felony-level crimes, Schrader's conviction for simple common law misdemeanor assault and battery raises no such issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

C. The Government's Attempt To Distinguish The Supreme Court's Strict Scrutiny Framework Fails. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

D. The Government's Attempt To Justify Its Application Of A Gun Ban Against Schrader Under Intermediate Scrutiny Fails. . . . . . . . . . . . . . . . . . . . . 21

IV. THE GOVERNMENT'S REFERENCES TO FACIAL CHALLENGES ARE INAPPOSITE BECAUSE PLAINTIFFS ARE CHALLENGING 18 U.S.C. § 922(g)(1) ONLY AS APPLIED TO SCHRADER AND OTHERS SIMILARLY SITUATED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

**Cases**

*Atty. Griev. Comm'n* v. *Theriault*,
390 Md. 202 (Md. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Babbitt* v. *Sweet Home Chapter of Communities for a Great Oregon*,
515 U.S. 687 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Bd. of Trs.* v. *Fox*,
492 U.S. 469 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Clark* v. *Jeter*,
486 U.S. 456 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Dearth* v. *Holder*,
641 F.3d 499 (D.C. Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-4

*District of Columbia* v. *Heller*,
554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11-15, 20-22

*Ezell* v. *Chicago*,
--- F.3d ---, 2011 U.S. App. LEXIS 14108 (7th Cir. July 6, 2011). . . . . . 3, 12, 13, 16, 20

*Hannah* v. *United States*,
No. WDQ-09-0507, 2010 U.S. Dist. LEXIS 130326 (D. Md. Dec. 8, 2010). . . . . . . . . . 9

*Harris* v. *United States*,
536 U.S. 545 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Heller* v. *District of Columbia*,
698 F. Supp. 2d 179 (D.D.C. 2010) ("Heller II"). . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Housley* v. *Holquist*,
No. 10-1881, 2011 U.S. Dist. LEXIS 97297 (D. Md. Aug. 30, 2011). . . . . . . . . . . . . . 9

*Johnson* v. *United States*,
130 S. Ct. 1265 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Kyllo* v. *United States*,
533 U.S. 27 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*McDonald* v. *City of Chicago*,
   130 S. Ct. 3020 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12, 19, 20

*New York* v. *Ferber*,
   458 U.S. 747 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Parker* v. *District of Columbia*,
   478 F.3d 370 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Reno* v. *Flores*,
   507 U.S. 292 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Small* v. *United States*,
   544 U.S. 385 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Summers* v. *Earth Island Inst.*,
   129 S. Ct. 1142 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States* v. *Chester*,
   628 F.3d 673 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 20, 21

*United States* v. *Coleman*,
   158 F.3d 199 (4th Cir. 1998) (en banc). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-8, 15

*United States* v. *Marzzarella*,
   614 F.3d 85 (3d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States* v. *Schultheis*,
   486 F.2d 1331 (4th Cir. 1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States* v. *Thompson/Center Arms Co.*,
   504 U.S. 505 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States* v. *Virginia*,
   518 U.S. 515 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States* v. *White*,
   593 F.3d 1199 (11th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Washington* v. *Glucksberg*,
   521 U.S. 702 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

iv

**Statutes and Rules**

18 U.S.C. § 921(a)(20).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. § 922(g)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-7, 16, 22

18 U.S.C. § 925A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

MD. CRIMINAL LAW CODE ANN. § 10-201. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

MD. CRIMINAL LAW CODE ANN. § 3-201. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

MD. CRIMINAL LAW CODE ANN. § 3-202. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

MD. CRIMINAL LAW CODE ANN. § 3-203. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

MD. CRIMINAL PROCEDURE CODE ANN. § 10-105. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**Other Authorities**

ALI, MODEL PENAL CODE (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

The Address and Reasons of Dissent of the Minority of the Convention
     of the State of Pennsylvania to Their Constituents, 1787. . . . . . . . . . . . . . . . . . . . . . . 14

W. Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND (1769). . . . . . . . . . . . . . . . . . . 16, 17

W. LaFave & A. Scott, SUBSTANTIVE CRIMINAL LAW (1986 and Supp. 2003). . . . . . . . . . . . . 17

**INTRODUCTION**

In 1968, then 20-year-old Navy serviceman Jefferson Schrader was convicted of a simple, non-aggravated form of misdemeanor common law assault and battery for his role in a fist fight. Schrader was not sentenced to any jail time, he went on to serve a tour in Vietnam, and has had no further encounters with law enforcement save a minor traffic infraction.

This case raises the question of whether the federal government may invoke that 43-year-old common law misdemeanor conviction as a basis for depriving Schrader for life of his fundamental constitutional right to keep and bear arms. The parties' disagreement implicates two questions: first, whether the federal firearms dispossession statute applies to Schrader's case at all, and if so, whether the government can justify such application under the Second Amendment. The answer to both questions is no.

**ARGUMENT**

## I.   THE GOVERNMENT'S OPPOSITION RAISES NO GENUINE DISPUTE OF MATERIAL FACT

Along with its opposition to Plaintiffs' summary judgment motion, the government filed a Response to Plaintiffs' Statement of Undisputed Material Facts and Statement of Genuine Issues Regarding Plaintiffs' Renewed Cross-Motion for Summary Judgment [Dkt. # 24], purporting to raise two disputed issues of fact. Both are alleged to implicate Schrader's standing to bring suit, but the D.C. Circuit's most recent pronouncements on Second Amendment standing demonstrate that neither raise genuine material issues.

_First_, while the government expressly concedes that it "do[es] not dispute that Plaintiff Schrader '_presently_ intends to _purchase and possess_ a _handgun and long gun_ for self-defense

1

within his own *home*,'" *id*. at 2, ¶ 3 (emphasis added), it nonetheless demands that his motion also spell out "[w]hat specific type(s) of firearms (including but not limited to the manufacturer, model, and any modifications) Plaintiff Schrader intends to purchase and possess and the details concerning when, where, or how Plaintiff Schrader would purchase these firearms in the future." *Id*. at 9, ¶ 1.

But this demand lacks merit. "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia* v. *Heller*, 554 U.S. 570, 582 (2008). At the time of the founding, "all firearms constituted 'arms.'" *Id*. at 581 (citation omitted). And the government's firearms ban against Schrader in this case is absolute—it does not ban Schrader from having only particular firearms, nor does it prevent him from buying arms at certain times, buying arms from certain vendors, or using particular methods of payment to do so. Thus, it is of no relevance what particular gun model Schrader would choose, where he would buy it, whether he would do so on a Wednesday or Thursday, or whether he would use Visa, Mastercard, or a jar of pennies as payment. If the government banned Schrader from buying books, he would not need to allege with specificity his plan to purchase a specific book at some specific time and place, with a particular method of payment. The present situation is no different.

Regardless, as Plaintiffs' opening brief points out, *see* Pl. Br. [Dkt. #21] at 14-16, this unsupported demand is simply irreconcilable with the D.C. Circuit's recent holdings on Second Amendment standing in *Dearth* v. *Holder*, 641 F.3d 499 (D.C. Cir. 2011), which are indistinguishable from this case. The plaintiff in *Dearth* successfully established standing by pleading only the following regarding his intent to obtain firearms:

2

> Mr. Dearth intends to purchase firearms within the United States, which he would store securely at his relatives' home in Mount Vernon, Ohio, and which he would access for lawful sporting purposes as well as for other purposes, including self-defense, while visiting the United States.

Compl. [Dkt. # 1] at § 11, *Dearth* v. *Holder*, No. 1:09-cv-587-RLW (D.D.C. March 23, 2009).

> Attempting to distinguish *Dearth*, the government offers only:

> The two plaintiffs are different because nothing in the record in *Dearth* suggests that Mr. Dearth had any criminal record. Plaintiff Schrader's inability to purchase and possess firearms legally is because of his admitted record from Maryland of a qualifying misdemeanor conviction, and not because of any acts by Defendants.

Pl. Opp. [Dkt. # 26] at 5.

As a starting point, this argument simply assumes the correctness of the government's position on the merits: the legal dispute over whether the government's firearms ban against Schrader can be justified under federal law or the Second Amendment is the very subject of this lawsuit. *See Ezell* v. *Chicago*, --- F.3d ---, 2011 U.S. App. LEXIS 14108 at *14 & 23 (7th Cir. July 6, 2011) (noting error of mixing standing and merits inquiries). But more importantly, it does nothing to distinguish the *injury* at issue here—namely, the government's repeated denials of Schrader's attempted handgun transactions and, more broadly, its enforcement of a legal scheme that has "thwarted [plaintiff's] best efforts to acquire a firearm." *Dearth*, 641 F.3d at 502. Schrader's injury is identical to Dearth's, and it is this *injury* that provides standing to sue.[1]

Just as in *Dearth*, Schrader has made two affirmative attempts to obtain firearms (a shotgun and a handgun), but both efforts have been thwarted by "denial decisions" by Defendants, who continue to list him in their NICS database as firearms disqualified. As *Dearth*

---

[1] *See*, *e.g.*, *Summers* v. *Earth Island Inst.*, 129 S. Ct. 1142, 1149 (2009) (Article III standing doctrine concerns the judiciary's power to "redress or prevent actual or imminently threatened *injury* to persons caused by private or official violation of law.") (emphasis added).

makes clear, these administrative denials create an "actual controversy" that the Declaratory

Judgment Act entitles him to resolve in an Article III court. *See id*. at 501-03. Schrader has fully

pleaded this injury, and has done so with just as much specificity as Mr. Dearth. His standing to

sue under the Declaratory Judgment Act necessarily follows.

 *Second*, the government claims a factual issue over "[w]hether Plaintiff Schrader has had

his conviction for assault expunged by the State of Maryland or made any attempt to request a

pardon." Def. Statement of Genuine Issues [Dkt. # 24] at 9, ¶ 2. This too is apparently claimed to

implicate Schrader's standing—the government argues that instead of bringing suit, Schrader's

appropriate "avenue of relief . . . is to have the conviction expunged, overturned or made the

subject of a pardon." Def. Opp. [Dkt. #26] at 16, n.6; *see also id*. at 15.

 As a preliminary point, Plaintiffs note that Maryland law does not actually allow for the

expungement of criminal convictions at all without a pardon, except in cases involving certain

nuisance crimes not at issue here. *See* MD. CRIMINAL PROCEDURE CODE ANN. § 10-105(8) & (9).

Thus, Schrader's only remaining hope would be to seek executive pardon of his 1968 conviction

by the Governor of Maryland. *See* 18 U.S.C. § 921(a)(20).

 But Plaintiffs are challenging the full application of the government's firearms ban

against Schrader—its extremely narrow escape hatch notwithstanding. That ban is directly

blocking him from exercising a fundamental constitutional right to keep a handgun and long gun

in his home for self defense. Its constitutional deficiencies cannot be cured by offering him—and

others similarly situated—a remote hope of relief that depends upon a discretionary act of

clemency by a state executive official. Accordingly, the issue of whether Schrader has sought an

executive pardon is immaterial.

II.   **SCHRADER IS ENTITLED TO THE REMOVAL OF HIS FIREARMS DISQUALIFICATION BECAUSE 18 U.S.C. § 922(g)(1) DOES NOT PROHIBIT ORDINARY COMMON LAW MISDEMEANANTS FROM PURCHASING OR POSSESSING FIREARMS**

A.   **The Government's Argument That 18 U.S.C. § 922(g)(1) Bans All Common Law Misdemeanants From Possessing Firearms Fails**

The government's arguments concerning Plaintiffs' first claim for relief are permeated with a red herring that significantly distracts from the specific legal controversy at issue. For example, the government begins with an assertion that

> . . . Congress defined the categories of citizens whose convictions for qualifying offenses would disqualify them from keeping firearms. Numerous other courts have held that the dispositive criterion for Section 922(g)(1) is the potential sentence, rather than the actual sentence imposed or the felony/misdemeanor designation.

Def. Opp. [Dkt. # 26] at 9.

This greatly oversimplifies the statutory issue in this case. Plaintiffs do not dispute that 18 U.S.C. § 922(g)(1)—colloquially known as the "felon-in-possession" statute—prohibits firearm possession by any person convicted of a "crime punishable by imprisonment for a term exceeding one year," regardless of whether the convicted person received an "actual sentence" of that length. But the question here is how this federal framework applies to convictions for state *common law* misdemeanors—uncodified offenses for which *no* statutorily-specified punishment criteria exists at all.

The government urges that this felon-in-possession scheme should simply be construed to cover *all* common law misdemeanors. Under the government's view, any misdemeanor that lacks statutory punishment criteria will be *per se* classifiable as a felony disqualifying offense; the absence of any legislative pronouncement on the matter can be simply ignored. *See* Def. Opp. at 9-16. Plaintiffs disagree, and argue that Congress chose the word "punishable"—a term that

5

necessarily refers to *specified* punishments—to describe predicate offenses that a convicting jurisdiction's legislature has affirmatively deemed serious enough to warrant a prison sentence exceeding one year. *See* Pl. Br. [Dkt. # 21] at 18-29.

While the government may disagree with Plaintiffs' proposed statutory construction, the unavoidable reality is that a conviction for an uncodified common law simple misdemeanor offense presents a unique scenario that does not fit easily into the federal statutory scheme. Indeed, it appears never to have been contemplated by the enacting Congress at all. *See id.* at 24-26; *see also Small* v. *United States*, 544 U.S. 385, 393 (2005) (holding that foreign convictions do not trigger Section 922(g) and noting that "[t]he statute's lengthy legislative history confirms the fact that Congress did not consider whether foreign convictions should or should not serve as a predicate to liability under the provision here at issue"). Plaintiffs' opening brief squarely confronts the difficulties of this unique scenario with eleven pages of analysis that apply standard principles of statutory construction to the Act's text, structure, and recorded legislative history. Plaintiffs submit that this analysis establishes that Schrader's 1968 conviction for an ordinary, non-aggravated common law misdemeanor should not be treated as a disqualifying offense under federal law. *See* Pl. Br. at 18-29.

### B.    The Government's Arguments Concerning The Fourth Circuit's Holding In *Coleman* Are Anticipated And Rebutted By Plaintiffs' Opening Brief

The government's statutory argument focuses largely on the Fourth Circuit's opinion in *United States* v. *Coleman*, 158 F.3d 199 (4th Cir. 1998), an *en banc* decision that found common law assault to be a disqualifying offense under § 922(g)(1). *See* Def. Opp. [Dkt. # 26] at 11, 14, & 19-20. Although *Coleman* is not controlling in this jurisdiction, Plaintiffs' opening brief devotes a full section to why it should not carry persuasive merit either. *See* Pl. Br. [Dkt. # 21] at

6

26-28. Plaintiffs rest primarily on those arguments and reply here only briefly rather than revisit the issue in full.

Plaintiffs point out in their opening brief that the *Coleman* court offered little textual analysis of § 922(g)(1), dedicating just three sentences to the issue. Pl. Br. at 28; *see also Coleman*, 158 F.3d at 203-04. The government replies that "that analysis is sufficient, and perhaps its brevity signals the clarity of the matter." Def. Opp. at 14. But the full history of the Fourth Circuit's approach demonstrates that the matter is far from clear.

Indeed, for the quarter century prior to *Coleman*, the Fourth Circuit's jurisprudence on the matter was controlled by *United States* v. *Schultheis*, 486 F.2d 1331, 1334-35 & n.2 (4th Cir. 1973), which held that a Maryland conviction for common law misdemeanor assault and battery was *not* "properly classified as a 'felony' within the meaning of the federal statute." The *Schultheis* court noted the statute's "silen[ce] regarding its application to common law convictions" and concluded that it would look to the actual sentence imposed to appraise the seriousness of the conviction in such cases. *Id*. While *Coleman* would eventually reverse *Schultheis*, it did so only over a dissent that criticized the majority for "blindly lump[ing] into the same category the most trivial and the most heinous assaults, thereby defeating the clear Congressional desire to exclude minor transgressions of the law from the sweep of" the federal felon-in-possession statute. *Id*. at 205 (WIDENER, J., dissenting) (citing *Schultheis*, 486 F.2d at 1333). Plainly, the issue is not as simple as the government suggests.

The government further claims that Plaintiffs' construction "is not how any court has interpreted the relevant statutory provisions." Def. Opp. at 11-12. But not only does this claim ignore *Schultheis*, it also neglects to point out that the Fourth Circuit appears to be the *only*

7

jurisdiction to have taken up the issue as it applies to common law misdemeanants, and has done

so only after significant internal struggle. Thus, it could just as accurately be said that only one

court has ever adopted the government's position.

Of greater relevance is the Supreme Court's repeated instruction under the constitutional

avoidance canon that "when a statute is susceptible of two constructions, by one of which grave

and doubtful constitutional questions arise and by the other of which such questions are avoided,

our duty is to adopt the latter." *Harris* v. *United States*, 536 U.S. 545, 555 (2002) (citation and

quotation omitted). *Coleman* predated the Supreme Court's decisions in *Heller* and *McDonald* v.

*City of Chicago*, 130 S. Ct. 3020 (2010), which confirmed that the Second Amendment protects

an individual, fundamental right to keep and bear arms.[2] As demonstrated in Section III below,

*Coleman*'s broad interpretation of the federal statute would violate the Second Amendment here.

This further counsels against adoption of the Fourth Circuit's *Coleman* rule.

### C. The Government's References To Maryland's Statutory Form Of Second Degree Statutory Are Inapposite Because Schrader Has Never Been Charged With Or Convicted Of That Offense

As both parties note, Maryland formally codified the offenses of First and Second Degree

Assault in 1996. *See* Pl. Br. [Dkt. # 21] at 7, n.3; Def. Opp. [Dkt. # 26] at 13, 19-20, 24, 31. First

---

[2] Moreover, as Plaintiffs observe in their opening brief, the Fourth Circuit itself has recently vacated and remanded a district court opinion for failing to adequately scrutinize the government's application of 18 U.S.C. § 922(g)(9) under the Second Amendment in *United States* v. *Chester*, 628 F.3d 673, 674 (4th Cir. 2010). *See* Pl. Br. [Dkt. # 21] at 28, n.7. The government attempts to summarily dismiss *Chester* as irrelevant because it addresses Section 922(g)(9) (concerning misdemeanor crimes of domestic violence) rather than the Section 922(g)(1) felon-in-possession provision at issue here. *See* Def. Opp. [Dkt. # 26] at 15. But this minor distinction misses the broader point: the Fourth Circuit has concluded that *Heller* requires the federal firearms laws to be evaluated under elevated scrutiny to the extent that they entrench upon a core component of the constitutional right to keep and bear arms. And where elevated constitutional scrutiny comes into play, so too will the constitutional avoidance canon.

Degree Assault is a very serious felony-level offense that is punishable by up to 25 years imprisonment, and encompasses any assault that causes (or attempts to cause) "a substantial risk of death" or "permanent or protracted . . . disfigurement" or "impairment of . . . any body member or organ," or that is carried out with a firearm. MD. CRIMINAL LAW CODE ANN. §§ 3-201; 3-202. Second Degree Assault is a catch-all misdemeanor offense that covers all other forms of assault, as well as the "intentional[] caus[ing of] physical injury to" a "law enforcement" or "parole" officer; it is punishable by up to 10 years imprisonment. *Id*. at § 3-203. Disorderly Conduct is a misdemeanor punishable by up to 60 days in jail. *Id*. at § 10-201.

As a catch-all, the Maryland offense of Second Degree Assault encompasses a wide variety of aggravated forms of assault. Aside from expressly covering assault upon a law enforcement officer,[3] it also covers spousal abuse,[4] child abuse, and other elevated and very serious forms of aggravated assault.[5] Plaintiffs do not dispute that a conviction for Second Degree Assault—which is statutorily "punishable by" up to 10 years imprisonment—would trigger the federal felon-in-possession scheme as a statutory matter. But Schrader does not have a conviction for statutory Second Degree Assault; he has a 43-year-old conviction for simple assault and battery at *common law* for his role in a fistfight as a 20-year-old Navy serviceman. And as the government concedes, it is the actual offense "at the time of the conviction [that is]

---

[3] *See Housley* v. *Holquist*, No. 10-1881, 2011 U.S. Dist. LEXIS 97297, at *10-11, n.3 (D. Md. Aug. 30, 2011).

[4] *See Atty. Griev. Comm'n* v. *Theriault*, 390 Md. 202, 205 (Md. 2005).

[5] *See Hannah* v. *United States*, No. WDQ-09-0507, 2010 U.S. Dist. LEXIS 130326, at *1-2 (D. Md. Dec. 8, 2010) (defendant pleaded guilty to Maryland Second Degree Assault after duct-taping victim at gunpoint and "caus[ing] two pit bulls to chew on his legs and buttocks.") (citation and internal quotation omitted).

controlling." Def. Opp. at 13. Thus, the government's hypothetical claim that Schrader might

today have been convicted of Second Degree statutory assault is misplaced.

> **D.     The Government's Claim That The Rule Of Lenity Is Inapplicable To Civil Cases Is Mistaken**

The government's brief also suggests that the rule of lenity is inapplicable to Schrader

because he is "not the subject of an existing federal prosecution at this time" and that "[i]n this

civil action, the rule of lenity has no impact." Def. Opp. at 18. As support, the government quotes

a portion of a footnote from the Supreme Court case of *Babbitt* v. *Sweet Home Chapter of

Communities for a Great Oregon*, 515 U.S. 687, 704 n.18 (1994). But the full text of that

footnote makes clear that the Court was not distinguishing between civil and criminal actions,

but merely between facial challenges to certain longstanding regulations and challenges to

statutes for which no regulations have been promulgated. In fact, the Court expressly disclaims a

distinction between criminal and civil actions, and indeed cites another case that affirmatively

applies the rule of lenity in a civil setting. *See id*. (*citing United States* v. *Thompson/Center Arms

Co.*, 504 U.S. 505, 517-518 (1992)). As that case expressly states:

> [*A*]*lthough it is a tax statute that we construe now in a civil setting, the NFA has criminal applications* that carry no additional requirement of willfulness. . . .  It is proper, therefore, to apply the rule of lenity and resolve the ambiguity in Thompson/Center's favor.

*Thompson/Center Arms*, 504 U.S. at 517-518 (emphasis added). Accordingly, the government's

argument concerning the inapplicability of the rule of lenity is simply mistaken.

10

E.     **Plaintiffs' Renewed Cross-Motion For Summary Judgment Does Not Make An Argument Under The Statutory Escape Hatch Provision Of 18 U.S.C. § 921(a)(20)**

As the government notes, *see* Def. Opp. at 16-17, Plaintiffs' opening brief in support of their original Cross-Motion for Summary Judgment made an alternative statutory argument under the "escape hatch" provisions of 18 U.S.C. § 921(a)(20). *See* Dkt. # 8 at 26-29. However, Plaintiffs withdrew this argument for reasons explained in the corresponding reply brief to that motion. *See* Dkt. # 14 at 18-20. Thus, Plaintiffs do not renew it in the present Cross-Motion.

III.   **THE GOVERNMENT'S IMPOSITION OF A FIREARMS BAN ON ORDINARY COMMON LAW MISDEMEANANTS VIOLATES THE SECOND AMENDMENT**

A.     **The Government's Attempt To Characterize Schrader's Claim As Outside The Protective Scope Of The Second Amendment Fails**

The government seeks to read into *Heller* a number of broad limitations on the scope of the Second Amendment's protections—limitations that are impossible to reconcile with the entirety of the opinion. For example, the government claims that the federal firearms laws should enjoy a presumption of constitutionality, Def. Opp. [Dkt. # 26] at 19-20, & n. 7; *contra Heller*, 554 U.S. at 629 n.27, and that *Heller* should not be read as confining Congress to "the scope of the Second Amendment as understood at the time of its adoption." *Id*. at 20.

Accordingly, the government concludes that Congress is free to disqualify even persons convicted of simple, non-aggravated misdemeanor offenses from possessing firearms, and asserts that "[s]imply because misdemeanants and felons historically lost different types of rights upon conviction does not prevent Congress from properly prohibiting firearm possession by misdemeanants today." *Id*. at 24; *see also id*. at 20 (claiming that Schrader's "generalized

argument about the alleged historical differences between convicted felons and misdemeanants in the context of lost rights misses the point."). But this reading of *Heller* is highly untenable.

To the contrary, *Heller*'s conclusion that the Second Amendment protects an individual right to keep and bear was based on an exhaustive analysis of its historical scope. *See* Pl. Br. at 29-30; *see also Heller*, 554 U.S. at 634-35 ("A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad."); *McDonald*, 130 S. Ct. at 3047 ("In *Heller* . . . we expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing."); *Ezell*, --- F.3d ---, 2011 U.S. App. LEXIS 14108 at *40 (". . . this wider historical lense is required if we are to follow the Court's lead in resolving questions about the scope of the Second Amendment by consulting its original public meaning as both a starting point and an important constraint on the analysis") (*citing Heller*, 554 U.S. at 610-19; *McDonald*, 130 S. Ct. at 3038-42).

As the Court in *Heller* explained, the Second Amendment codifies a *pre-existing* right to keep and bear arms—one that must be defined in light of its historical background. 554 U.S. at 592. As a pre-existing right, it was subject to certain pre-existing historical limitations on its scope. *See Id*. at 626. For example, the Court disclaimed that nothing in its opinion "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of

12

arms." *Id*. 626-27. The Court described these prohibitions as "presumptively lawful," though also explained that it was not providing an exhaustive list. *Id*. at 627, n.26.

The government's reading of *Heller* makes surplusage of this entire discussion. If a person must be free of all simple (non-aggravated) misdemeanor convictions to qualify for protection under the Second Amendment, there would be no reason for the Court to limit its discussion to *felon*-dispossession laws—laws that most scholars have found consistent with the original public meaning of the Second Amendment, at least to the extent the term "felony" is used consistent with its meaning common law. *See* Pl. Br. [Dkt. # 21] at 37-41.

By contrast, the government's proposed reading of *Heller* lacks any definable limiting principle, and would seemingly exclude *all* misdemeanants from the protective scope of the Second Amendment. *See* Def. Opp. at 24. Regardless, there is simply no historical basis for this proposed reading. And as the Seventh Circuit has recently explained, the burden for establishing such a proposition lies with the government:

> [I]f the government can establish that a challenged firearms law regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment—1791 or 1868—then the analysis can stop there; the regulated activity is categorically unprotected . . . If the government cannot establish this—if the historical evidence is inconclusive or suggests that the regulated activity is not categorically unprotected—then there must be a second inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights.

*Ezell*, --- F.3d ---, 2011 U.S. App. LEXIS 14108 at *42-43. The government fails to provide any evidence (let alone conclusive evidence) for its claim that persons convicted of common law misdemeanors historically fell outside the protective scope of the right to keep and bear arms.

Instead, the government's makes a variety of historical arguments that have already been explained or rejected by the Court in *Heller*. For example, the government cites *Heller* for the

claim that the 1689 English Declaration of Right—a predecessor of the American Second

Amendment, and later codified as the English Bill of Rights—did not restrict parliament from

"disarm[ing] individuals it viewed as dangerous." Def. Opp. at 21 (*citing Heller*, 128 S. Ct. at

2792, 2798) (corresponding citations in United States Reports are 554 U.S. at 582-83 & 593-94).

In actuality, those sections of *Heller* point out that the Second Amendment's English predecessor

failed to protect Catholics, and was thus *less protective* than its American analogue:

> To be sure, it was an individual right not available to the whole population, given that it
> was restricted to Protestants, and like all written English rights it was held only against
> the Crown, not Parliament.

*Heller*, 554 U.S. at 593. Thus, under the English analogue, "Catholics convicted of not attending

service in the Church of England" could be prohibited from keeping arms in their homes. *Id*. at

582. Plainly, this is not true of the American Bill of Rights: *Heller* makes clear that the Second

Amendment right to keep and bear arms does indeed function as a restriction on the legislature,

and the Amendment's plain text—along with common sense—dictates that its protections are not

confined to Protestants.

Finally, the government cites a Pennsylvania minority proposal from the Pennsylvania

convention, which had proposed that "the people have a right to bear arms for the defence of

themselves and their own state" or "for the purpose of killing game;" and that "no law shall be

passed for disarming the people . . . unless for crimes committed . . . " Def. Opp. at 22 (*citing*

The Address and Reasons of Dissent of the Minority of the Convention of the State of

Pennsylvania to Their Constituents, 1787). *Heller* cited this proposal as evidence that the original

public meaning of the term "bear arms" was not limited to the carrying of arms in a militia. *See*

*Heller*, 554 U.S. at 604-05. Its qualifying language concerning the disarmament of persons "for

14

crimes committed" did not make its way into the text of the actual Second Amendment. And even if it had, the government's own brief points out that Blackstone defined the term "crime" in "common usage" as "denoting such offences as are of a deeper and more atrocious dye" than the "smaller faults, and omissions of less consequence" called "misdemeanors"—though also acknowledging that the usage was not entirely universal. *See* Def. Opp. at 23. Thus, the government itself appears to acknowledge that a misdemeanor conviction such as Schrader's would not have fallen within the "common usage" of the term "crime."

### B. The Government's Attempt To Classify Schrader As A "Convicted Felon" Fails

Alternatively, the government attempts to characterize Schrader as a felon, claiming that "because the crime at issue was subject to a term of imprisonment exceeding one year at the time of punishment, Plaintiff Schrader qualifies as a felon for purposes of federal law, and should be considered to be a convicted felon for purposes of his Second Amendment challenge." Def. Opp. at 19.[6] Thus, the government takes the position that the term "felon," as used in *Heller*, does not mean "felon" in either the historical or literal sense (it is undisputed that Schrader's conviction was a misdemeanor under Maryland law), but rather however the federal government chooses to define it. The government goes on to claim that "[s]imply because misdemeanants and felons historically lost different types of rights upon conviction does not prevent Congress from properly prohibiting firearm possession by misdemeanants today." Def. Opp. at 24.

---

[6] The government directs the reader to "*See Coleman*, 158 F.3d at 203-04" for this proposition. Plaintiffs are compelled to note that *Coleman* in fact makes no mention of the Second Amendment at all.

This would be a particularly unsatisfying method for defining the scope of a fundamental constitutional right.[7] Taken to its logical conclusion, this reasoning would permit the government to define even trivial parking infractions as "felonies," and then bootstrap the "felon" prohibition upon them. But more importantly, it is simply irreconcilable with the *Heller* opinion itself, which focuses on the *historical* scope and definition of the right to keep and bear arms, as well as its historic limitations. *See* Pl. Br. [Dkt. # 21] at 30-32; *see also Ezell*, --- F.3d ---, 2011 U.S. App. LEXIS 14108 at *36 (". . . *Heller* focused almost exclusively on the original public meaning of the Second Amendment, consulting the text and relevant historical materials to determine how the Amendment was understood at the time of ratification.") Thus, the relevant inquiry must focus instead on whether the conviction at issue was one that would be historically classified as a felony at the time of the Second Amendment's common law origins, or perhaps alternatively, could be properly analogized as such. And as explained below, the answer to both inquiries in this case is no.

1. **Schrader's 1968 conviction for common law misdemeanor assault and battery in Maryland was also a misdemeanor at common law at the time of the Second Amendment's historical origins**

As Plaintiffs observe in their opening brief, there is simply no historical correlation between Schrader's conviction for simple assault and battery and a felony-level offense—in fact, all forms of battery were historically misdemeanors at common law. *See* Pl. Br. [Dkt. # 21] at 40-41 (citing 4 W. Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 216-18 (1769)). The

---

[7] And regardless, Section 922(g)(1) does not use the term "felony" at all, and is only described as the "felon-in-possession" statute by courts and commentators in the colloquial sense. *See* Pl. Br. at 5, n.2; *see also* Def. Br. at 3, n.1. It does not purport to be a formal classification tool for distinguishing between felonies and misdemeanors, much less in the context of adjudicating constitutional claims.

government provides no evidence to the contrary, and merely points to a minority of founding-era sources that used the term "crime" in a way that might include misdemeanor offenses. Def. Opp. [Dkt. # 26] at 23. But this observation has little relevance to the important historical distinction between felonies and misdemeanors.

And notably, the Supreme Court itself has recently observed that "[a]t common law, battery—*all* battery, and not merely battery by the merest touching—was a misdemeanor, not a felony." *Johnson* v. *United States*, 130 S. Ct. 1265, 1271 (2010) (emphasis in original) (citing 4 BLACKSTONE 216-218 (1769); 1 W. LaFave & A. Scott, SUBSTANTIVE CRIMINAL LAW § 2.1(b), at 90 (1986 and Supp. 2003); ALI, MODEL PENAL CODE § 211.1, Comment, p. 175 (1980)). The same can be said of the related offense of "affray"—a common law misdemeanor defined as "the fighting of two or more persons in some public place, to the terror of his majesty's subjects." *See* 4 BLACKSTONE 144 (1769).

The subject of Schrader's conviction was a simple misdemeanor—both under Maryland law and at common law. No substantive historical basis exists for treating it as a felony.

**2.      While certain heightened or aggravated misdemeanor offenses might properly be analogized to felony-level crimes, Schrader's conviction for simple common law misdemeanor assault and battery raises no such issue**

While Plaintiffs submit that Schrader's 1968 conviction for simple assault and battery makes him an "ordinary" common law misdemeanant, the government takes issue with this description of Schrader. *See* Def. Opp. at 13. Plaintiffs do not intend it as an argumentative characterization, but merely an accurate description of Schrader's appropriate status for purposes of evaluating his Second Amendment claim. He was convicted of simple (*i.e.*, non-aggravated) assault and battery, as opposed to a more serious form such as aggravated assault. Plaintiffs have

noted in their opening brief that they do not foreclose the possibility that certain aggravated

misdemeanor crimes that raise heightened societal dangers might be analogized to felony-level

offenses. *See* Pl. Br. at 40, n.11; *see also*, *e.g.*, *United States* v. *White*, 593 F.3d 1199, 1205-1206

(11th Cir. 2010) (upholding against facial challenge the federal firearms ban on any person

convicted of a "misdemeanor crime of domestic violence" analogized to the presumptively-

constitutional felon-in-possession ban.). But no such aggravated offense is at issue here.

It is undoubtedly true that many modern criminal offenses have aggravated variants that

simply did not exist at common law, and that it may sometimes be necessary to draw historical

analogies. The application of historical principles to modern scenarios is not uncommon in

American constitutional law. *See*, *e.g.*, *Kyllo* v. *United States*, 533 U.S. 27, 40 (2001) (observing

that the "[t]he Fourth Amendment is to be construed in the light of what was deemed an

unreasonable search and seizure when it was adopted" in the context of scrutinizing the use of

modern "Thermovision" imaging technology) (citation and quotation omitted). But because

Schrader has not been convicted of any aggravated offense, his case here does not raise that

issue. Simple assault and battery was an offense that existed at common law, and was classified a

misdemeanor. Accordingly, the government's effort to avoid Second Amendment scrutiny by

classifying Schrader as a "felon" fails.

### C.     The Government's Attempt To Distinguish The Supreme Court's Strict Scrutiny Framework Fail

It is well-established that any law encroaching upon a core "fundamental right"—a right

"deeply rooted" in "our Nation's history, legal traditions, and practices"—must be evaluated

under a strict scrutiny standard that generally requires it to be "narrowly tailored to serve a

compelling state interest." *Washington* v. *Glucksberg*, 521 U.S. 702, 720-721 (1997); *see also*

*Reno* v. *Flores*, 507 U.S. 292, 302 (1993) (substantive due process "forbids the government to infringe certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.") (citations omitted). The Supreme Court just last term reexamined the core right to keep and bear arms and declared it to be "fundamental." *McDonald*, 130 S. Ct. at 3042 (majority opinion) & 3059 (THOMAS, J. concurring). The government provides no persuasive justification for abandoning the strict scrutiny approach here in evaluating the application of a categorical firearms ban that plainly implicates Schrader's core Second Amendment rights.

The government attempts to makes comparisons to the Court's jurisprudence under the Fourth, Sixth, and Eighth amendments, Def. Opp. at 27-28, but those constitutional provisions are much more procedural in nature and will therefore rarely implicate a traditional level of means-ends judicial scrutiny (e.g., rational basis, intermediate, or strict scrutiny).[8] The government also draws parallels to the First Amendment context, where the Supreme Court utilizes differing standards of review, depending on whether the particular restriction on speech is content-based or content-neutral. While Plaintiffs disagree with the specifics of the government's analysis, Plaintiffs do agree that First Amendment doctrine provides elucidating guidance in the Second Amendment context, and indeed the Supreme Court has invited the comparison. As the Seventh Circuit has recently observed:

> Both *Heller* and *McDonald* suggest that First Amendment analogues are more appropriate [than the "undue burden" test], *see Heller*, 554 U.S. at 582, 595, 635; *McDonald*, 130 S. Ct. at 3045, and on the strength of that suggestion, we and other circuits have already

---

[8] Notably, the Fourth Amendment's text contains its own "standard of review" in requiring that searches and seizures be "reasonable," U.S. CONST., AMEND. IV, a term that has been given unique application within the context of the Amendment's subject matter.

19

begun to adapt First Amendment doctrine to the Second Amendment context, *see Skoien*,
614 F.3d at 641; id. at 649 (Sykes, J., dissenting); *Chester*, 628 F.3d at 682; *Marzzarella*,
614 F.3d at 89 n.4; *see also* Volokh, *Implementing the Right to Keep and Bear Arms for
Self-Defense*, 56 UCLA L. Rev. at 1449, 1452, 1454-55; Lund, *The Second Amendment,
Heller, and Originalist Jurisprudence*, 56 UCLA L. Rev. at 1376; Winkler, *Heller's
Catch-22*, 56 UCLA L. Rev. at 1572.

*Ezell*, --- F.3d ---, 2011 U.S. App. LEXIS 14108 at *55.

The government cites *United States* v. *Marzzarella*, 614 F.3d 85 (3d Cir. 2010), where

the court observed that, in the First Amendment context, "[s]trict scrutiny is triggered by

content-based restrictions on speech in a public forum," but "content-neutral time, place, and

manner restrictions in a public forum trigger a form of intermediate scrutiny." *Id*. at 96. The court

found "no reason why the Second Amendment would be any different." *Id*. at 96-97. The court

did not reject the use of strict scrutiny, but merely applied intermediate scrutiny to a firearms

serial number regulation that "d[id] not severely limit the possession of firearms." *Id*. at 97. The

court contrasted this regulation with the District of Columbia's gun ban, which, it noted "did not

just regulate possession of handguns; [but] prohibited it." *Id*.; *see also Ezell*, -- F.3d ---, 2011

U.S. App. LEXIS 14108 at *43-44 ("Borrowing from the Court's First Amendment doctrine, the

rigor of . . . judicial review will depend on how close the law comes to the core of the Second

Amendment right and the severity of the law's burden on the right."). But the government in this

case *is* categorically prohibiting Schrader's possession of any firearms, and so its analogy to a

content-neutral speech regulation is misplaced. Because Schrader's core fundamental Second

Amendment right to keep a firearm in "the defense of hearth and home" is implicated, his claim

is entitled to be evaluated under the strict scrutiny approach that traditionally applies to core

fundamental rights. *See id*. at *59-61 (extrapolating First Amendment principles to evaluate a

city's ban on firearms ranges within city limits, finding the ban to be a "serious encroachment"

on "an important corollary" to "the core right to possess firearms for self-defense," and thus requiring "a more rigorous showing" than intermediate scrutiny, "if not quite 'strict scrutiny.'").

Finally, the government suggests that strict scrutiny would be inconsistent with *Heller*'s statement about the presumptive validity of certain longstanding firearms prohibitions. Def. Opp. [Dkt. # 26] at 29-30; *see also Heller*, 554 U.S. at 626-27 & n.26. Plaintiffs anticipate and address this argument in their opening brief, *see* Pl. Br. [Dkt. # 21] at 37-41, but these statements in *Heller* are best read as limitations on the scope of the Second Amendment. For example, felons—as defined by historical analogy to the common law—are simply outside the historical protections of the Second Amendment. *Id.* Thus, just as categorical bans on unprotected speech are entirely consistent with the First Amendment, *see, e.g., New York* v. *Ferber*, 458 U.S. 747 (1982), so too are felon dispossession laws consistent with the Second—even within the framework of strict scrutiny.

**D.    The Government's Attempt To Justify Its Application Of A Gun Ban Against Schrader Under Intermediate Scrutiny Fails**

The government's efforts to justify a firearms ban against Schrader under an intermediate scrutiny standard also fail. Intermediate scrutiny requires a court to determine "whether the measure is substantially related to an important governmental interest." *Heller* v. *District of Columbia*, 698 F. Supp. 2d 179, 188 (D.D.C. 2010) ("Heller II");[9] *see also Clark* v. *Jeter*, 486

---

[9] Plaintiffs note that significant portions of *Heller II*'s reasoning have since been rejected by the Supreme Court. *Heller II* reasoned that strict scrutiny could not apply because in *Heller*, "the Supreme Court did not explicitly hold that the Second Amendment right is a fundamental right . . . If the Supreme Court had wanted to declare the Second Amendment right a fundamental right, it would have done so explicitly." *Id.*, at 187. But three months later, the Supreme Court did in fact declare the Second Amendment right to be "fundamental." *McDonald*, 130 S. Ct. at 3042 (plurality opinion) & 3059 (Thomas, J., concurring).

U.S. 456, 461 (1988) (same). And "[s]ignificantly, intermediate scrutiny places the burden of

establishing the required fit squarely upon the government." *Chester*, 628 F.3d at 683 (*citing Bd.*

*of Trs.* v. *Fox*, 492 U.S. 469, 480-481 (1989)). The government fails to meet its burden here.

The government begins by pointing to "important governmental interests in protecting

public safety and combating violent crime." Def. Opp. at 30. While few quarrel with the

importance of these interests in the abstract, the government fails to explain how they justify the

application of a firearms ban against Schrader and others similarly situated. The government

urges judicial deference to the "predictive judgments" of Congress, *id*. at 31, but as Plaintiffs

point out in their opening brief, the recorded legislative history suggests that no member of

Congress even contemplated the applicability of § 922(g)(1) to common law misdemeanants. Pl.

Br. at 24-26. Furthermore, § 922(g)(1) predated the Supreme Court's intervening decisions in

*Heller* and *McDonald*, and is thus unlikely to have reflected any legislative weighing of Second

Amendment rights at all. *See id*. at 44-45.

Finally, the government offers two statistical studies as supporting evidence for the

application of its ban here. Plaintiffs reject the proposition that statistical studies are appropriate

tools for defining the scope of a fundamental constitutional right.[10] *See Heller*, 554 U.S. at 635-

36 ("We know of no other enumerated constitutional right whose core protection has been

subjected to a freestanding 'interest-balancing' approach. . . . And whatever else [the Second

Amendment] leaves to future evaluation, it surely elevates above all other interests the right of

---

[10] Plaintiffs also note that neither study was taken into consideration by the enacting
Congress, and that intermediate scrutiny does not permit the government to create post hoc
justifications for its laws and policies. *See* Pl. Br. at 44; *see also United States* v. *Virginia*, 518
U.S. 515, 533 (1996) (the "justification must be genuine, not hypothesized or invented post hoc
in response to litigation.").

law-abiding, responsible citizens to use arms in defense of hearth and home."). But even setting these objections aside, the studies are unenlightening. Neither provides any elucidating "predictive" evidence with respect to persons convicted of ordinary (*i.e.*, non-aggravated) common law misdemeanor offenses—the subject of this lawsuit.

The first is a 2002 Bureau of Justice Statistics study titled "BJS Recidivism Statistics" [Dkt. # 26-1]. The government cites it for certain recidivism statistics of prisoners, including those who have been convicted of some form of assault. But the study is infected with significant selection bias in that it surveys only *prisoners*. *See*, *e.g.*, *id* at 1. A person sentenced to time in *prison* after an assault conviction is likely to have committed a particularly aggravated form of assault, or to have appeared before the sentencing court with an extensive criminal record. Indeed, the subjects of the study were serving average prison sentences of five years. *Id* at 3. More problematic, the study does not purport to limit itself to simple assault, but instead includes a number of very serious offenses such as aggravated assault, sexual assault, and the use of deadly weapons. *Id*. at 15. The data therefore has little relevance to Schrader, who has never been in prison, and whose conviction was for a simple form of misdemeanor common law assault. It also unlikely to have much predictive value for the vast majority of simple misdemeanor assault convicts, most of whom are likely ordered to pay a fine (as in Schrader's case) or to serve a short jail[11] sentence.

---

[11] The government claims that the report studies persons released after serving "jail time." Def. Opp. at 32. While we are certain that the government intended to use this term in the colloquial sense, we note that the study appears to *specifically exclude* persons sentenced to time in "jail" as opposed to a prison. *See* NIJ Report at 13 (noting that "some persons received in New York jails were probably *mistakenly classified* as prison returns.") (emphasis added).

The second study is a National Institute of Justice report [Dkt. # 26-2] ("NIJ Report"), which purports to study to effectiveness of a California state law under which persons convicted of certain violent misdemeanors could be denied from purchasing handguns. The government cites this study its claim that "the denial of handgun purchase was associated with a moderate decrease in risk for new gun and/or violent crime." Def. Opp. at 32-33 (quotation and citation omitted). The measured decrease was indeed quite moderate; the study found it to drop only from 23.9% to 20.1%. *See* NIJ Report at 37. The study also appears vulnerable to significant methodological criticism. For example, it apparently reached its conclusion by comparing denied California gun transactions in 1991 (pursuant to a state gun law) with gun transactions during 1989-90 (before the denial law took effect). *Id*. at 1. This prompted one commentator to suggest that the measured decrease may simply be explained by an overall drop in crime over the same time period, though the study's authors downplay this concern. *Id*. at 43. The study's authors admit to other methodological vulnerabilities as well, particularly in light of its small sample size.[12]

In sum, the government fails to carry its burden of justifying its application of a federal firearms ban to ordinary common law misdemeanants—including those convicted of non-aggravated forms of simple misdemeanor assault and battery. Accordingly, that ban fails even if evaluated under a standard of intermediate scrutiny.

---

[12] *See* NIJ Report at 44 ("Our findings are subject to several limitations. The small size of the study population limited our statistical power to detect relative risks that were below approximately 1.25, or higher for subgroup analyses. When relative risks are below 1.5, results should be interpreted with caution regardless of the size of the study population due to the potential impact of unmeasured factors."); *see also id*. at 32 ("Unfortunately, California's criminal records did not reliably distinguish between violent crimes that involved guns and those that did not.")

**IV.    THE GOVERNMENT'S REFERENCES TO FACIAL CHALLENGES ARE
INAPPOSITE BECAUSE PLAINTIFFS CHALLENGE 18 U.S.C. § 922(g)(1)
ONLY AS APPLIED TO SCHRADER AND OTHERS SIMILARLY SITUATED**

The government's briefs occasionally reference and cite authority pertaining to facial

challenges. *See, e.g.*, Pl. Opp. at 18, 25, & n.8. Plaintiffs note that they are not challenging

Section 922(g)(1) on its face, but merely as applied to Schrader and others similarly situated. *See*,

*e.g.*, Pl. Br. at 41; *see also* Proposed Order [Dkt. # 22-4].

## CONCLUSION

Plaintiffs have stated each of their claims and are entitled to summary judgment. The

government's imposition of a categorical, lifetime ban on Mr. Schrader's ability to possess a

firearm has no basis in federal law and violates his individual right to keep and bear arms

enumerated in the Second Amendment. Accordingly, he is entitled to the removal of his firearms

disability from the NICS computer database pursuant to 18 U.S.C. § 925A, as well as an order

permanently enjoining Defendants from enforcing a firearms ban against ordinary common law

misdemeanants who face no other disqualifying barriers to firearms ownership.


Dated:  September 2, 2011                      Respectfully submitted,

                                              Alan Gura (D.C. Bar No. 453449)
                                              Thomas M. Huff (D.C. Bar No. 978294)
                                              Gura & Possessky, PLLC
                                              101 N. Columbus Street, Suite 405
                                              Alexandria, VA 22314
                                              703.835.9085/Fax 703.997.7665

                                          By: /s/ Thomas M. Huff
                                               Thomas M. Huff

                                              Attorneys for Plaintiffs